**EXHIBIT A – Plan Support Agreement**

## PLAN SUPPORT AGREEMENT

This PLAN SUPPORT AGREEMENT is made and entered into as of July 30, 2009 (this *"Agreement"*) by and among (i) Petra Fund REIT Corp. (*"Petra"* or the *"Company"*); and (ii) the undersigned holders of debt (each, together with its affiliates, successors and assigns, a *"Consenting Creditor"* or *"Plan Support Party"* and, together with the Company and any subsequent person that becomes a party hereto in accordance with the terms hereof, a *"Party,"* and collectively, the *"Parties"*).

### RECITALS

WHEREAS, the Company and each Plan Support Party are negotiating restructuring and recapitalization transactions (collectively, the *"Transactions"*) with respect to the capital structure of the Company, including the Company's obligations, whether secured or unsecured, under (i) that certain Master Repurchase Agreement, dated November 29, 2006, between Bear, Stearns Funding, Inc. (together with its affiliates, successors and assigns, *"JPM"*) and Petra (as amended, restated, supplemented, or otherwise modified from time to time, together with any related agreements, and together with any other repurchase agreements between JPM and Petra, the *"JPM Repo"*) and (ii) the Bear Stearns Institutional Account Agreement, between JPM and Petra (together with documents executed in connection therewith or related thereto, the *"JPM Broker Documents"*), pursuant to the terms and conditions set forth in the Restructuring Term Sheet attached hereto as <u>Exhibit A</u> (the *"Term Sheet"*) and in this Agreement;

WHEREAS, JPM has one or more claims (as such term is defined in section 101 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the *"Bankruptcy Code"*)) against Petra, arising out of, or related to, the JPM Repo and/or the JPM Broker Documents (the *"JPM Claims"* and, together with the claims of any other Consenting Creditors, the *"Claims"*);

WHEREAS, the Parties have engaged in good faith negotiations with the objective of reaching an agreement with regard to restructuring of the outstanding indebtedness and liabilities of the Company, in accordance with the terms set forth in this Agreement;

WHEREAS, consummation of the Transactions may require Petra to commence a voluntary reorganization case (the *"Chapter 11 Case"*) under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the *"Bankruptcy Court"*) to effect the Transactions through a prearranged chapter 11 plan of reorganization that implements and is otherwise materially consistent with the terms and conditions set forth in the Term Sheet and in this Agreement (the *"Plan"*); and

NOW, THEREFORE, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

## AGREEMENT

**Section 1.** *Agreement Effective Date.* This Agreement shall become effective and binding upon each of the Parties at 12:01 a.m. prevailing Eastern Time on the date on which the Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to the other Parties (or to their designated notice party, if not represented by counsel) (the *"Agreement Effective Date"*).

**Section 2.** *Term Sheet.* The Term Sheet is expressly incorporated herein and is made part of this Agreement. The general terms and conditions of the Transactions are set forth in the Term Sheet; *provided, however*, that the Term Sheet is supplemented by the terms and conditions of this Agreement. In the event of any inconsistencies between the terms of this Agreement and the Term Sheet, this Agreement shall govern.

**Section 3.** *Commitments Regarding the Transactions.*

### 3.1 Support for Restructuring

Subject to the terms and conditions of this Agreement, each of the Parties agrees and covenants that it shall: (i) consent to each and every commercially reasonable action contemplated or otherwise required to be taken to effectuate the Transactions, including executing any agreements or other documents necessary to effectuate the Transactions; (ii) take no actions inconsistent with the Transactions; and (iii) negotiate in good faith the definitive documentation contemplated by this Agreement or otherwise necessary to effectuate the Transactions, including, if necessary, the Plan.

### 3.2 Agreement to Vote.

(a) If Petra commences a Chapter 11 Case, as long as this Agreement has not been terminated in accordance with the terms hereof, each Plan Support Party agrees that it shall, subject to (i) the receipt by such Plan Support Party of a disclosure statement (the *"Disclosure Statement"*) and other solicitation materials in respect of the Plan (together with the Disclosure Statement, the *"Solicitation Materials"*), which Solicitation Materials reflect the agreement set forth in the Term Sheet and have been approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code and are in all material respects reasonably satisfactory to the Plan Support Party, (ii) the Plan Support Party's reasonable satisfaction with the Plan, Disclosure Statement, any pleadings or proposed orders related thereto, and any document that is appropriate or necessary to implement the Plan (collectively, the *"Plan Documents"*), and (iii) the Plan Support Party being entitled under such Plan to vote to accept or reject the Plan:

(i) vote its Claims (excluding, for the avoidance of doubt, the JPM REIT Collateral (as such term is defined in the Term Sheet)) to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the Solicitation Period and its actual receipt of the Solicitation Materials and ballot;

(ii)     not change or withdraw (or cause to be changed or withdrawn) such vote; and

(iii)     not, in any material respect, (A) object to, delay, impede, or take any other action to interfere with acceptance or implementation of the Plan or (B) propose, file, support, or vote for any restructuring, workout, plan of arrangement, or plan of reorganization for the Company other than the Plan.

(b)     For the avoidance of doubt, each Plan Support Party also agrees that, (i) unless this Agreement is terminated in accordance with the terms hereof, it will not take any action that would in any material respect interfere with, delay, or postpone the confirmation or consummation of the Plan and implementation of the Transactions and (ii) upon the commencement by the Company of the Chapter 11 Case and imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code as a result thereof, each Plan Support Party agrees that, except as provided in the Agreement or the Term Sheet, it will not exercise any right or remedy for the enforcement, collection, or recovery of any of its Claims against the Company (or claims against the Company's direct or indirect subsidiaries arising out of or related to the Claims); *provided, however,* that, except as otherwise set forth in this Agreement, the foregoing prohibition will not limit any Plan Support Party's rights under any applicable indenture, credit agreement, other loan document, the Bankruptcy Code, or applicable law to (A) terminate, close out, liquidate or accelerate any "commodity contract", "forward contract", "securities contract", "repurchase agreement", "swap agreement", "master netting agreements" (each term as such term is defined in the Bankruptcy Code) or similar transaction with the Company to the extent the underlying agreement, the Bankruptcy Code or applicable law permits such termination or close-out or (B) to appear and participate as a party in interest in any matter to be adjudicated in any case under the Bankruptcy Code concerning the Company, so long as such appearance and the positions advocated in connection therewith are not materially inconsistent with the Plan and do not materially hinder, delay, or prevent consummation of the Transactions.

3.3     <u>Commitment of Company</u>.  As long as this Agreement has not been terminated in accordance with the terms hereof, the Company shall (a) support and complete the Transactions embodied in the Term Sheet, and (b) do all things necessary and appropriate in furtherance of the Transactions embodied in the Term Sheet, including, without limitation, the following:

3.3.1     commence the Chapter 11 Case on or before August 31, 2009 (the "*Outside Petition Date,*" and the actual commencement date, the "*Petition Date*");

3.3.2     file the Disclosure Statement and Plan, each of which shall be reasonably satisfactory to the Plan Support Parties, no later than 60 days after the Petition Date (the "<u>Plan Filing Deadline</u>") or such later date as may be agreed to in writing by the Company and JPM;

3.3.3     seek a hearing for approval of the Disclosure Statement no later than 15 days after the date on which the Disclosure Statement and Plan is filed;

3.3.4    submit an order with the Bankruptcy Court approving the Disclosure Statement in form and substance satisfactory to JPM (the "Disclosure Statement Order") no later than 5 days after conclusion of the hearing on the Disclosure Statement;

3.3.5    complete the solicitation of the requisite acceptances of the Plan in accordance with section 1125 of the Bankruptcy Code no later than 30 days after the entry of the Disclosure Statement Order (the "Solicitation Period");

3.3.6    seek a hearing on confirmation of the Plan no later than 45 days after entry of the Disclosure Statement Order; submit an order with the Bankruptcy Court confirming the Plan in form and substance satisfactory to JPM (the "Confirmation Order") no later than 5 days after conclusion of the hearing on confirmation of the Plan (the "Confirmation Deadline");

3.3.7    cause the effective date of the Plan (the "Plan Effective Date") to occur no later than 30 days following the entry of the Confirmation Order;

3.3.8    obtain any and all required regulatory and/or third-party approvals for the Transactions embodied in the Term Sheet; and

3.3.9    not take any action that is inconsistent with, or is intended or is likely to interfere with consummation of, the restructuring and the Transactions embodied in the Term Sheet.

3.4    Transfer of Interests and Securities. Except as expressly provided herein, this Agreement shall not in any way restrict the right or ability of any Consenting Creditor to sell, use, assign, transfer or otherwise dispose of ("Transfer") any of its Claims against the Company; *provided, however*, that for the period commencing as of the date such Consenting Creditor, as applicable, executes this Agreement until termination of this Agreement pursuant to the terms hereof (such period, the "*Restricted Period*"), no Consenting Creditor shall Transfer any Claims against the Company, and any purported Transfer of Claims against the Company shall be void and without effect, unless (a) the transferee is a Consenting Creditor or (b) if the transferee is not a Consenting Creditor prior to the Transfer, such transferee delivers to the Company, at or prior to the time of the proposed Transfer, an executed copy of Exhibit B attached hereto pursuant to which such Transferee shall assume all obligations of the Consenting Creditor transferor hereunder in respect of the Claims being transferred (such transferee, if any, to also be a "*Consenting Creditor*", as applicable, hereunder). This Agreement shall in no way be construed to preclude a Consenting Creditor from acquiring additional Claims; *provided, however*, that (a) any Consenting Creditor that acquires additional Claims after executing this Agreement shall notify the Company of such acquisition within five business days after the closing of such trade and (b) additional Claims shall automatically and immediately upon acquisition by a Consenting Creditor be deemed subject to all of the terms of this Agreement whether or not notice is given to the Company of such acquisition.

3.5    Representation of Each Consenting Creditor with respect to its Claims. Each Consenting Creditor severally and not jointly represents and warrants that, with respect to its Claims, as of the date such Consenting Creditor executes and delivers this Agreement:

4

(a)     it is the beneficial owner of the face amount of the Claims (excluding, for the avoidance of doubt, the JPM REIT Collateral (as such term is defined in the Term Sheet)) , or is the nominee, investment manager, or advisor for beneficial holders of such Claims (excluding, for the avoidance of doubt, the JPM REIT Collateral (as such term is defined in the Term Sheet)), as reflected in such Consenting Creditor's signature block to this Agreement, which amount the Company and each Consenting Creditor understands and acknowledges is proprietary and confidential to such Consenting Creditor, except as reasonably determined by the Company to be necessary to be disclosed in a Chapter 11 Case;

(b)     other than pursuant to this Agreement and, with respect to the secured portions of its Claims, applicable law, such Claims (excluding, for the avoidance of doubt, the JPM REIT Collateral (as such term is defined in the Term Sheet)) are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal or other limitation on disposition, or encumbrances of any kind, that would materially and adversely affect in any way such Consenting Creditor's performance of its obligations contained in this Agreement at the time such obligations are required to be performed; and

(c)     it is not aware of any event that, due to any fiduciary or similar duty to any other person, or due to any regulatory or legal requirement, would prevent it from taking any material action required of it under this Agreement.

**Section 4.     *Mutual Representations, Warranties, and Covenants*.** Each of the Parties, severally and not jointly, represents, warrants, and covenants to each other Party, as of the date of this Agreement, as follows (each of which is a continuing representation, warranty, and covenant):

4.1     Enforceability. It is validly existing and in good standing under the laws of the state or country of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable laws relating to or limiting creditor's rights generally or by equitable principles relating to enforceability.

4.2     No Consent or Approval. Except as expressly provided in this Agreement, or the Bankruptcy Code, as applicable, no consent or approval is required by any other person or entity in order for it to carry out the Transactions contemplated by, and perform the respective obligations under, this Agreement.

4.3     Power and Authority. Except as expressly provided in this Agreement, it has all requisite power and authority to enter into this Agreement and to carry out the Transactions contemplated by, and perform its respective obligations under, this Agreement.

4.4     Authorization. The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary action on its part.

## Section 5.    *Termination Events.*

5.1    <u>Consenting Creditor Termination Events</u>.  This Agreement (i) will automatically terminate if the Plan Effective Date has not occurred by January 30, 2010, and (ii) may be terminated by the delivery of notice in accordance with Section 7.11 hereof to the Company by JPM upon the occurrence of any of the following (each a *"Consenting Creditor Termination Event"*):

(a)    failure of the Company to commence the Chapter 11 Case in accordance with Section 3.3.1 hereof;

(b)    failure of the Company to file the Plan and Disclosure Statement in accordance with Section 3.3.2 hereof;

(c)    any modification to the Plan or a subsequent chapter 11 plan filed by the Company with the Bankruptcy Court (or a chapter 11 plan supported or endorsed by the Company) to which JPM does not consent, which consent shall not be unreasonably withheld, or that is inconsistent with the terms and conditions set forth in the Term Sheet or this Agreement in a manner that is materially adverse to JPM;

(d)    failure of the Disclosure Statement Order to have been entered in accordance with Section 3.3.4 hereof;

(e)    failure of the Company to solicit the requisite acceptances of the Plan in accordance with Section 3.3.5 hereof;

(f)    failure of the Confirmation Order to have been entered in accordance with Section 3.3.6 hereof;

(g)    failure of the Plan Effective Date to occur in accordance with Section 3.3.7 hereof;

(h)    the breach in any material respect by the Company of any of the obligations, representations, warranties, or covenants of the Company set forth in this Agreement; provided, however, that the Consenting Creditor (or Consenting Creditors, if applicable) shall transmit a notice to the Company detailing any such breach, and the Company shall have five business days after receiving such notice to cure any breach;

(i)    the issuance, promulgation, announcement or adoption by any governmental agency, authority or legislative body, including any regulatory agency or authority or court of competent jurisdiction, of any law, ruling, decree, regulation or order (i) enjoining the consummation of a material portion of the Transactions in a way that cannot be reasonably remedied by the Company within five business days after receiving notice thereof or (ii) which, in the judgment of any Consenting Creditor, would have a material adverse effect on the Transactions or any material portion thereof;

(j)    failure of REIT counsel to the Company, Sidley Austin LLP, to deliver a legal opinion in the form attached as Exhibit A to the Term Sheet in the manner

contemplated by the Term Sheet, it being agreed and acknowledged by the parties hereto that the condition that such legal opinion be so delivered constitutes a material inducement for the Consenting Creditors agreement to enter into this Agreement, and in the absence of such condition, the Consenting Creditors would not have agreed to enter into this Agreement;

(k) the conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, unless such conversion is made with the prior written consent of the Parties;

(l) the appointment of a trustee, receiver, or examiner with expanded powers in the Chapter 11 Case unless such appointment is made with the written consent of the Parties;

(m) the Chapter 11 Case is dismissed;

(n) the Confirmation Order is reversed on appeal or vacated;

(o) the Company files any motion or pleading with the Bankruptcy Court that is inconsistent in any material respect with this Agreement or the Term Sheet or, if filed, any of the Plan Documents;

(p) any court shall enter a final, non-appealable judgment or order declaring this Agreement or any material provision hereof to be unenforceable;

(q) the Company shall withdraw the Plan or publicly announce its intention not to support the Plan; or

(r) JPM obtains knowledge that any statement or information furnished by or on behalf of Petra to JPM regarding or relating to the performance of the Petra CDO (as such term is defined in the Term Sheet), the collateral manager under the Petra CDO or any collateral securing the Petra CDO contains any untrue statement of material fact or omits to state a material fact necessary in order to make such statement or information not misleading.

Notwithstanding any provision in this Agreement to the contrary, upon the written consent of JPM, the dates set forth in this Section may be extended prior to or upon each such date and such later dates agreed to in lieu thereof and shall be of the same force and effect as the dates provided herein. If this Agreement is terminated by JPM pursuant to this Section 5.1, this Agreement shall be automatically and simultaneously terminated as to any other Party that is a signatory to this Agreement and the Term Sheet shall be deemed null and void for all purposes. No Party shall terminate this Agreement if such Party is in breach of any provision hereof.

5.2 Company Termination Events. The Company may terminate this Agreement as to all Parties upon five business days' prior written notice, upon the occurrence of any of the following events (each, a "*Company Termination Event*"): (a) the breach by any Plan Support Party of any of the representations, warranties, or covenants of such Plan Support Party set forth in this Agreement that would have a material adverse impact on the Company, or the consummation of the Transactions, that remains uncured for a period of five business days after the receipt by the Plan Support Party of notice of such breach; (b) the directors, officers, or

managers of the Company reasonably determine based upon the written advice of counsel (which shall be provided in advance to the Consenting Creditors) that proceeding with the Transactions would be inconsistent with the exercise of its fiduciary duties, or (c) the issuance, promulgation, announcement or adoption by any governmental agency, authority or legislative body, including any regulatory agency or authority or court of competent jurisdiction, of any law, ruling, decree, regulation or order enjoining the consummation of a material portion of the Transactions in a way that cannot be reasonably remedied by the Company or a Consenting Creditor within five business days after receiving notice thereof.

      5.3    <u>Mutual Termination</u>. This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual agreement among (a) the Company and (b) JPM.

      5.4    <u>Effect of Termination</u>. Upon termination of this Agreement under Section 5.1, 5.2, or 5.3, this Agreement shall be of no further force and effect and each Party hereto shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement. Upon the occurrence of any termination of this Agreement, any and all consents tendered by the Plan Support Party (or Plan Support Parties, as applicable) prior to such termination shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Transactions and this Agreement or otherwise.

      5.5    <u>Termination Upon Effectiveness</u>. This Agreement shall terminate automatically without any further required action or notice on the Plan Effective Date.

**Section 6.**    *Effectiveness; Amendments.*  This Agreement, including the Term Sheet, may not be modified, amended, or supplemented (except as expressly provided herein or therein) except in writing signed by all Parties.

**Section 7.**    *Miscellaneous.*

      7.1    <u>Further Assurances</u>. Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, from time to time, to effectuate the Transactions, as applicable.

      7.2    <u>Complete Agreement</u>. This Agreement is the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, between the Parties with respect thereto. No claim of waiver, modification, consent, or acquiescence with respect to any provision of this Agreement shall be made against any Party, except on the basis of a written instrument executed by or on behalf of such Party.

      7.3    <u>Parties</u>. This Agreement shall be binding upon, and inure to the benefit of, the Parties. No rights or obligations of any Party under this Agreement may be assigned or transferred to any other person or entity except as provided in Section 3.4 hereof. Nothing in this

Agreement, express or implied, shall give to any person or entity, other than the Parties, any benefit or any legal or equitable right, remedy, or claim under this Agreement.

7.4     Headings. The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

7.5     GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM; WAIVER OF TRIAL BY JURY. THIS AGREEMENT, TOGETHER WITH ANY CLAIMS, CONTROVERSIES OR DISPUTES ARISING UNDER OR RELATED TO THIS AGREEMENT, ARE TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF. Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in either the United States District Court for the Southern District of New York or any New York State court sitting in New York City (the *"Chosen Courts"*), and solely in connection with claims arising under this Agreement (a) irrevocably submits to the exclusive jurisdiction of the Chosen Courts, (b) waives any objection to laying venue in any such action or proceeding in the Chosen Courts, and (c) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any Party hereto; *provided, however*, that if the Company commences the Chapter 11 Case, then the Bankruptcy Court shall be the sole Chosen Court. Each party hereto irrevocably waives any and all right to trial by jury in any legal proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

7.6     Execution of Agreement. This Agreement may be executed and delivered (by facsimile, electronic mail, or otherwise) in any number of counterparts, each of which, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement. Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

7.7     Interpretation. This Agreement is the product of negotiations between the Company and the Consenting Creditor, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.

7.8     Successors and Assigns. This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, assigns, heirs, executors, administrators, and representatives, other than a trustee or similar representative appointed in a bankruptcy case. The Company shall not assign any of its rights or obligations under this Agreement to any person or entity without the prior written consent of JPM, and any attempt by the Company to assign any of its rights or obligations under this Agreement without the prior written consent of JPM shall be null and void.

7.9    Creditors' Committee. Notwithstanding anything herein to the contrary, if any Consenting Creditor is appointed to and serves on an official committee of creditors in the Chapter 11 Case, the terms of this Agreement shall not be construed so as to limit such Consenting Creditor's exercise (in its sole discretion) of its fiduciary duties to any person arising from its service on such committee, and any such exercise (in the sole discretion of such Consenting Creditor) of such fiduciary duties shall not be deemed to constitute a breach of the terms of this Agreement; *provided, however*, that nothing in this Agreement shall be construed as requiring any Consenting Creditor to serve on any official committee in any such Chapter 11 Case.

7.10    Relationship Among Parties. It is understood and agreed that no Plan Support Party has any fiduciary duty or other duty of trust or confidence in any form with any other Plan Support Party, and, except as provided in this Agreement, there are no commitments among or between them.

7.11    Notices. All notices hereunder shall be deemed given if in writing and delivered, if sent by telecopy, electronic mail, courier, or registered or certified mail (return receipt requested) to the following addresses and telecopier numbers (or at such other addresses or telecopier numbers as shall be specified by like notice):

(a)    if to the Company, to:

Petra Fund REIT Corp.
1370 Avenue of the Americas, 23rd Floor
New York, New York 10019
Facsimile: 212-489-1629
Attn: Lawrence Shelley

with copies (which shall not constitute notice) to:

Dickstein Shapiro LLP
1177 Avenue of the Americas
New York, New York 10036
Facsimile: 212-277-6501
Attn: Mark S. Fawer, Esq.
E-mail address: fawerm@dicksteinshapiro.com

(b)    if to JPM, to:
J.P. Morgan Securities, Inc.
270 Park Avenue
New York, NY 10017
Facsimile: 212-834-6047
Attn: Kunal K. Singh

with copies (which shall not constitute notice) to:

Cadwalader, Wickersham & Taft LLP
700 Sixth Street, N.W.
Washington, D.C. 20001

10

Any notice given by delivery, mail, or courier shall be effective when received. Any notice given by telecopier shall be effective upon oral or machine confirmation of transmission.

7.12 <u>Access</u>. The Company will afford the Plan Support Party and its respective attorneys, consultants, accountants, and other authorized representatives reasonable access, upon reasonable notice during normal business hours, to all properties, books, contracts, commitments, records, management personnel, lenders, and advisors of the Company; *provided, however,* that the Company's obligation hereunder shall be conditioned upon such Plan Support Party being party to an executed confidentiality agreement approved by and with the Company.

7.13 <u>Waiver</u>. Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict any right of any Party to protect and preserve its rights, remedies, and interests, including, without limitation, its claims against the Company. If the Transactions are not consummated, or if this Agreement is terminated for any reason (other than Section 5.5 hereof), the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms, or as reasonably necessary or appropriate to be disclosed in a Chapter 11 Case.

7.14 <u>Specific Performance; Limitation on Damages</u>. It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder; *provided, however,* that this provision shall in no way act to prevent a Party from seeking monetary damages to which it is otherwise entitled in addition to the specific performance and equitable relief described herein. Notwithstanding anything to the contrary set forth herein, the Parties hereby consent and agree that no Party shall be liable for any indirect, special, consequential or punitive damages whatsoever (included but not limited to lost profits) arising out of or relating to this Agreement, the Term Sheet or the Transaction, even if such Party has been informed of the likelihood thereof and regardless of the form of action.

7.15 <u>Several, Not Joint, Obligations</u>. The agreements, representations, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

7.16 <u>Remedies Cumulative.</u> All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

7.17   No Third-Party Beneficiaries. Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties, and no other person or entity shall be a third-party beneficiary hereof.

**Section 8.**   *Disclosure.* The Company shall publicly disclose (a) the existence of this Agreement and the material terms of the Term Sheet in a filing with the Bankruptcy Court on the Petition Date and (b) any material amendment to this Agreement and the Term Sheet in a filing with the Bankruptcy Court following the effective date of such amendment, each in form and substance reasonably acceptable to the Parties. The Company will provide to counsel for the Parties all press releases and filings relating to the Chapter 11 Case, this Agreement, the Term Sheet, or the transactions contemplated hereby and thereby and any amendments thereof, in each case, in advance of the public disclosure of any such press release or filing. To the extent that the Company fails to make such initial disclosure within five business days following the Agreement Effective Date or the effective date of any amendment hereto, the Consenting Creditor shall have the right, but not the obligation, to disclose such terms publicly. The Company shall not (a) use the name of any Plan Support Party in any press release without such Plan Support Party's prior written consent or (b) disclose to any person other than legal and financial advisors to the Company the principal amount or percentage of any notes or any other securities of the Company or any of their respective subsidiaries held by any Party, except as reasonably necessary or appropriate to do so in connection with a Chapter 11 Case.

IN WITNESS WHEREOF, the Parties have executed this Agreement on the day and year first above written.

*[signature pages follow]*

Signature Page to the Plan Support Agreement

Petra Fund REIT Corp.

By: _____

Name: Andrew Stone

Title: President

Signature Page to the Plan Support Agreement

Consenting Creditor  BEAR, STEARNS FUNDING, INC.

Name:  **Kunal K. Singh**
Title:  **Executive Director**  _Kunal Singh_

Address:  270 PARK AVENUE, 10th Fl, New York, NY 10019

Attention:  KUNAL K. SINGH
Telephone: 212-834-5467
Facsimile: 212-834-6047

Aggregate principal amount of secured Claims:

Aggregate principal amount of Unsecured Claims:

# EXHIBIT A
## TERM SHEET

THIS IS NOT AN OFFERING MEMORANDUM OR PROSPECTUS AND SHOULD NOT BE
TREATED AS OFFERING MATERIAL OF ANY SORT AND IS FOR INFORMATION
PURPOSES ONLY

## Petra Fund REIT Corp. Restructuring Term Sheet
July 30, 2009

## Summary of Principal Terms of Proposed Restructuring Agreement

*Please note that this term sheet (the "Term Sheet") is for discussion purposes only and sets forth terms and conditions that, other than as set forth in that certain Plan Support Agreement dated as of July 30, 2009, are non-binding in all respects and may or may not become part of a definitive agreement. The Term Sheet is not based on an existing agreement between the relevant parties and is not intended to impose any obligation whatsoever on any party. This Term Sheet is not to be construed as a commitment, offer, agreement-in-principle or other agreement or understanding of any kind by any party to any term or condition set forth herein.*

**Entity to be Restructured:** Petra Fund REIT Corp. ("Debtor")

**Parties:** Bear, Stearns Funding, Inc. ("JPM")
The Royal Bank of Scotland plc ("RBS")
General unsecured creditors ("GUCs")
Sponsors of the Debtor (the "Sponsors")

**Transaction Summary:** The restructuring will occur through a pre-packaged or pre-negotiated liquidating plan of reorganization (the "Plan") to be filed in the Debtor's voluntary chapter 11 case under the Bankruptcy Code (the "Case") for the Debtor before the United States Bankruptcy Court for the Southern District of New York (the "Court"), culminating in the confirmation of the Plan, the material terms and conditions of which are set forth in this Term Sheet.

**Assumptions:** For the purposes of this Term Sheet, it is assumed that the present fair market value of the JPM REIT Collateral (as defined below) is less than the amount of JPM's secured claims.

## Existing Claims and Interests:

**JPM:** Secured claims secured by (i) those certain Class K Notes due 2047, in the original principal amount of $32,500,000 (the "Class K Notes") issued by the co-issuers in connection with the Petra CRE CDO 2007-1 (the "Petra CDO") and (ii) those certain Preferred Shares in the aggregate original notional amount of $130,000,000 issued by the issuer in connection with the Petra CDO (collectively, with the Class K Notes, the "JPM REIT Collateral"), and unsecured deficiency claims. JPM has foreclosed or otherwise exercised its available remedies with respect to certain of its collateral other than the JPM REIT Collateral (the "JPM Repo Collateral") arising under the repurchase agreement between JPM and Debtor.

**RBS:** Secured claims secured by those certain (i) Class F Notes due 2047, in the original principal amount of $33,000,000, (ii) Class G Notes due 2047, in the original principal amount of $20,000,000, and (iii) Class J Notes due 2047, in the original principal amount of $42,500,000, each issued by the co-issuers in

connection with the Petra CDO (collectively, the "<u>RBS REIT Collateral</u>" and, together with the JPM REIT Collateral, the "<u>REIT Collateral</u>"), and unsecured deficiency claims. RBS has foreclosed and otherwise exercised its available remedies, and continues to exercise its remedies, with respect to its collateral other than the RBS REIT Collateral (the "<u>RBS Repo Collateral</u>") arising under one or more repurchase agreements between RBS (or its affiliates) and Debtor.

GUCs:    General unsecured claims.

**Bankruptcy Administration:**

- JPM will consent, on terms reasonably satisfactory to JPM, to the entry of a "cash collateral" or similar order that provides for the release to Debtor of those proceeds from the JPM Collateral necessary to satisfy ongoing administrative and priority expenses of the Debtor in the Case, including but not limited to (i) payment to Petra Capital Management LLC (the "<u>New REIT Collateral Manager</u>") of any monthly fees payable based on the same calculation as the New REIT Management Fees (as defined below), (ii) payment of all professional fees approved by the Bankruptcy Court, (iii) payment of all expenses or fees authorized or required by the Bankruptcy Court or applicable law, including the Bankruptcy Code or federal or local rules or procedures that govern cases within the Bankruptcy Court, and (iv) payment of any claims or expenses necessary or appropriate to support confirmation or consummation of the Plan.

**Plan Mechanics:**

- Debtor and/or Sponsors shall form and/or cause the formation of (along with the additional required number of stockholders) the following three companies: (i) Newco 1; (ii) Newco 2; and (iii) Newco 3. Newco 3 shall be a new real estate investment trust (the "<u>New REIT</u>"), and shall own 100% of the equity interests of both Newco 1 and Newco 2, each of which shall be treated as a Qualified REIT Subsidiary, Newco 1 shall own 100% of the equity interests of Petra PS SPV Corp and Petra PS SPV Corp shall continue to own the JPM REIT Collateral.

- Debtor shall (i) transfer (a) the JPM REIT Collateral, subsequent to the release of the existing liens held by JPM, and (b) all of the Debtor's shares of Petra PS SPV Corp. (a wholly-owned subsidiary of the Debtor), to Newco 1; and (ii) transfer the RBS REIT Collateral to Newco 2, subject to a lien in an amount equal to the current value of the RBS REIT Collateral, as determined by the Bankruptcy Court. The transfer of the REIT Collateral by Debtor shall be conditioned upon the delivery of an opinion of REIT counsel of the Debtor (Sidley Austin LLP), addressed to JPM, in the form attached as Exhibit A hereto, that the New REIT will qualify as a REIT, and that during and following the transfer of the REIT Collateral to

the New REIT or its subsidiaries, the issuer under the Petra CDO will continue to be treated as a Qualified REIT Subsidiary.

- The organizational documents of the New REIT shall provide for the issuance of one class of common stock (the "Common Stock"), the holders of which shall be identified in the Plan. In addition, the New REIT shall issue to at least ninety-nine additional stockholders (identified by Debtor in the Plan, in order to comply with the REIT rules under the federal tax code) Class P preferred stock (the "Class P Preferred Stock").

- Promptly following each "Payment Date" under the Petra CDO indenture, New REIT shall distribute all cash (whether constituting interest proceeds, principal proceeds or any other proceeds) received by it either directly or indirectly in connection with such Payment Date in respect of the JPM REIT Collateral, other than and subject to (i) any amounts applied to the payment of the New REIT Management Fees (as defined below) and (ii) any amounts reserved or allocated for distribution to the holders of the Class P Preferred Stock to comply with the REIT rules under the federal tax code (the "JPM REIT Collateral Cash Flow"), to the holders of the JPM Debt (as defined below). The JPM REIT Collateral Cash Flow shall be distributed to the holders of the JPM Debt on a monthly basis.

- Promptly following each "Payment Date" under the Petra CDO indenture, New REIT shall distribute all cash (whether constituting interest proceeds, principal proceeds or any other proceeds) received by it either directly or indirectly in connection with such Payment Date in respect of the RBS REIT Collateral (the "RBS REIT Collateral Cash Flow"), to the holders of the RBS Debt (as defined below). Notwithstanding the foregoing, in the event RBS makes a 1111(b) Election (as defined below), New REIT shall distribute to RBS an annual amount equal to the amount needed to satisfy that year's obligation under the 1111(b) Note (as defined below), with any remaining RBS REIT Collateral Cash Flow being distributed to New REIT for distribution to the holders of the Common Stock.

- For the avoidance of doubt, all New REIT Management Fees payable to the New REIT Collateral Manager in accordance with the New Management Agreement (as defined below) shall be payable on a non-cumulative basis and shall be deducted from the related JPM REIT Collateral Cash Flows before such JPM REIT Collateral Cash Flows are distributed to the holders of the JPM Debt in accordance with the preceding paragraphs.

- New REIT shall issue a debt instrument for the repayment of Debtor's reduced indebtedness to JPM in the outstanding principal amount of $14,598,737.00 (the "JPM Debt"). The JPM Debt will be non-recourse debt secured only by a perfected first-priority lien on, and payable solely from proceeds of, New REIT's shares of Newco 1. The Newco 1 shares

shall be delivered to an escrow agent of national reputation mutually acceptable to JPM and Debtor (the "Escrow Agent") pursuant to the related escrow agreement (the "Escrow Agreement"). The Escrow Agreement shall provide that so long as any JPM Debt remains outstanding, the Escrow Agent shall receive and distribute the JPM REIT Collateral Cash Flow to JPM in reduction of the JPM Debt. Upon the repayment of the JPM Debt in full, the Escrow Agent shall be instructed to release the Newco 1 shares to New REIT, and all liens in favor of JPM relating thereto shall be released.

- New REIT shall issue a debt instrument for the repayment of Debtor's reduced indebtedness to RBS in the outstanding principal amount of the then current value of the RBS REIT Collateral at the time of confirmation of the Plan, as then determined by and approved by the Bankruptcy Court (the "RBS Debt"). Notwithstanding the foregoing, in the event RBS makes an election under Section 1111(b) of the Bankruptcy Code to have its claims and the RBS REIT Collateral treated in accordance therewith (the "1111(b) Election"), (i) the RBS Debt shall be in the face amount of the total outstanding claims held by RBS against the Debtor at the time of confirmation of the Plan, regardless of the current value of the RBS REIT Collateral, but (ii) the debt instrument governing the payment of such RBS Debt (the "1111(b) Note") shall be calculated and structured such that the annual payments to RBS shall be limited to an amount such that the net present value of the total aggregate payments under the entirety of the 1111(b) Note are no greater than the current value of the RBS REIT Collateral at the time of confirmation of the Plan, as approved by the Bankruptcy Court. The RBS Debt will be non-recourse debt secured only by, and payable solely from proceeds of, the continuing lien of RBS on the RBS REIT Collateral. The RBS REIT Collateral shall be delivered to the Escrow Agent pursuant to the Escrow Agreement. The Escrow Agreement shall provide that so long as any RBS Debt remains outstanding, the Escrow Agent shall receive and distribute RBS's allocation specified above of the RBS REIT Collateral Cash Flow to RBS in reduction of the RBS Debt. Upon the repayment of the RBS Debt in full, the Escrow Agent shall be instructed to release the RBS REIT Collateral to Newco 2, and all liens in favor of RBS relating thereto shall be released.

- The New REIT shall enter into a management agreement with the New REIT Collateral Manager on terms similar to that certain existing Investment Management Agreement (the "New Management Agreement"), and the Sponsors shall cause the New REIT Collateral Manager to continue to diligently manage the assets of the New REIT in the best interests of its stockholders. On any date on which JPM REIT Collateral Cash Flow is payable to the holders of the JPM Debt, the New REIT shall also pay to the New REIT Collateral Manager a management fee (the "New REIT Management Fees"), as compensation for the ongoing

4

management of the assets of the New REIT by the New REIT Collateral Manager in an amount, if any, equal to the sum of: (i) an amount up to the first $150,000 of JPM REIT Collateral Cash Flow on such date that is attributable to the Petra CDO Preferred Shares on such date (or such lesser amount of JPM REIT Collateral Cash Flow, if any, that is attributable to the Petra CDO Preferred Shares on such date) plus (ii) if the total JPM REIT Collateral Cash Flow is greater than $500,000 (including the amount described in the preceding clause (i)), 7.5% of the total JPM REIT Collateral Cash Flow on such date (other than the amount up to $150,000 described in the preceding clause (i)), up to an aggregate cap of $250,000.[1]

## Proposed Treatment of Existing Claims and Interests:

- JPM's secured and unsecured claims to be exchanged for the JPM Debt, secured by a pledge by New REIT of the shares of Newco 1.

- RBS's claims to be bifurcated into a secured and unsecured portion, with the unsecured portion treated as part of the GUCs and the secured portion to be subject to "cram down" under Section 1129(b) of the Bankruptcy Code, exchanged for the RBS Debt, secured by a continuing lien on the RBS REIT Collateral.

- The GUCs shall receive a distribution from the remainder of the assets of Debtor's estate.

- All equity interests in Debtor are to be extinguished and the Debtor will be liquidated.

- Debtor and New REIT shall use all commercially reasonable efforts, and take such actions as are requested by JPM or are necessary, to effectuate the full transfer of all JPM Repo Collateral to JPM.

---

[1] Please note that the structure and proposed organizational document provisions are subject to Sidley Austin tax review in all respects.

**Claims/Interests Classification:**

| Type | Treatment of Claim Pursuant to Plan |
|---|---|
| Administrative | Paid in full in cash |
| Pre-Petition Secured | |
| JPM ("Class 1") | Impaired Payments on the JPM Debt |
| RBS ("Class 2") | Impaired Payments on the RBS Debt |
| Unsecured | |
| GUCs ("Class 3") | Impaired Distribution from remaining estate assets |
| Equity Interests | |
| All equity | Extinguished |

**Plan Timing:** The Debtor shall do the following within the timeframes established in a plan support agreement: (i) file the Plan and disclosure statement in accordance with this Term Sheet, (ii) obtain approval of the disclosure statement by the Court, and (iii) obtain an order of the Court confirming the Plan. A plan support agreement shall provide that the requisite majority of Class 1 will vote for the Plan.

**Miscellaneous:** The Plan shall provide for customary releases, injunction against future claims, discharge of debts, and other usual terms.



SIDLEY AUSTIN LLP
787 SEVENTH AVENUE
NEW YORK, NY 10019
(212) 839 5300
(212) 839 5599 FAX

| BEIJING | LOS ANGELES |
|---|---|
| BRUSSELS | NEW YORK |
| CHICAGO | SAN FRANCISCO |
| DALLAS | SHANGHAI |
| FRANKFURT | SINGAPORE |
| GENEVA | SYDNEY |
| HONG KONG | TOKYO |
| LONDON | WASHINGTON, D.C. |

FOUNDED 1866

August [], 2009

New Petra Fund REIT Corp.
1370 Avenue of the Americas
23rd Floor
New York, NY 10019

Petra Fund REIT Corp.
1370 Avenue of the Americas
23rd Floor
New York, NY 10019

Petra CRE CDO 2007-1, Ltd.
c/o Maples Finance Limited
P.O. Box 1093GT
George Town, Grand Cayman,
Cayman Islands

Bear, Stearns Funding, Inc.
383 Madison Avenue
New York, New York 10179

Re:    Restructuring of Petra Fund REIT Corp.

Ladies and Gentlemen:

We have acted as special U.S. federal income tax counsel to Petra CRE CDO 2007-1, Ltd., (the "CDO"), Petra Fund REIT Corp. (the "Old REIT") and New Petra Fund REIT Corp. (the "New REIT") in connection with the restructuring (the "Restructuring") of Old REIT and the transfer of interests in and assets of Old REIT and CDO to New REIT pursuant to the Plan filed under the Case with the Court. All terms not otherwise defined herein have the meaning assigned to them in the Restructuring Agreement. [1]

---

[1] The agreement that will embody the details of the plan of restructuring, including the issuance of the RBS Debt and the JPM Debt (together with any stock issued in the restructuring, the "Securities").

SIDLEY AUSTIN LLP
# SIDLEY

Petra Fund REIT Corp.
Petra CRE CDO 2007-1, Ltd.
Bear Stearns Funding, Inc.
August [], 2009
Page 2

  In rendering our opinion, we have reviewed (1) the Restructuring Agreement, (2) a certificate containing certain factual representations and covenants of New REIT (the "Officers' Certificate"), and (3) such other documentation or information provided to us by you as we have deemed necessary or appropriate as a basis for our opinion set forth herein (the Restructuring Agreement, the Officer's Certificate and such other documents, together, the "Transaction Documents").

  For purposes of our opinion, we have not independently verified all of the facts, representations and covenants set forth in the Transactions Documents. We have assumed and relied on your representation that the information presented in the Transaction Documents accurately and completely describes all material facts relevant to the Restructuring and our opinion. We have assumed that such statements, representations and covenants are true without regard to any qualification as to knowledge or belief. Our opinion is conditioned on, among other things, the initial and continuing accuracy of the facts, information, covenants and representations set forth in the Transaction Documents and the statements and representations made by representatives of the New REIT, without regard to any qualifications therein.

  Our opinion is also based on the correctness of the following assumptions: (i) since the formation of the CDO and immediately prior to the Restructuring, the Old REIT has retained beneficial ownership of 100% of the "equity" (as that term is used for U.S. federal income tax purposes) in the CDO, (ii) the Old REIT will continue to qualify as a real estate investment trust (a "REIT") under the Internal Revenue Code of 1986, as amended (the "Code") through the last day of its taxable year (including any short taxable year) ending in 2009, (iii) the New REIT will file with its return for its taxable year ending December 31, 2009 an election to be a REIT (iv) the first day of the 2009 taxable year of the New REIT (including any short taxable year) will occur on or before the last day of the Old REIT's 2009 taxable year, (v) the New REIT and any of its affiliates have been and will continue to be operated in accordance with the laws of the jurisdictions in which they were formed and in the manner described in the relevant organizational documents, (vi) there will be no changes in the applicable laws of the State of Maryland or of any other jurisdiction under the laws of which any such entity has been formed, and (vii) each of the written agreements to which the New REIT or any such entity is a party will be implemented, construed and enforced in accordance with its terms.

  In rendering our opinion, we have also considered the applicable provisions of the Code, the Treasury Regulations promulgated thereunder, judicial decisions, administrative rulings and other applicable authorities, in each case as in effect on the date hereof. The statutory provisions, regulations, decisions, rulings and other authorities on which this opinion is based are subject to change, and such changes could apply retroactively.



In our examination, we have assumed the legal capacity of all natural persons, the genuineness of all signatures, the authenticity of all documents submitted to us as originals, the conformity to original documents of all documents submitted to us as certified, conformed, or photostatic copies, and the authenticity of the originals of such copies.

This opinion shall not be construed as or deemed to be a guaranty or insuring agreement. Opinions of counsel represent only counsel's best legal judgment and are not binding on the Internal Revenue Service (the "IRS") or on any court. Accordingly, no assurance can be given that the IRS will not challenge the conclusions of the opinion set forth herein or that such a challenge would not be successful.

          \*         \*         \*         \*

To comply with certain Treasury regulations, we inform you that this opinion was not intended or written to be used, and cannot be used, by any person for the purpose of avoiding U.S. federal tax penalties.

          \*         \*         \*         \*

Based on and subject to the foregoing, we are of the opinion that:

(1)      Commencing with New REIT's taxable year ending December 31, 2009, the New REIT will be organized in conformity with the requirements for qualification as a REIT under the Code and the New REIT's proposed method of operation as described in the Officer's Certificate will enable the New REIT to continue to meet the requirements for qualification and taxation as a REIT under the Code.

(2)      During and following the steps required by the Restructuring Agreement, including any transfers of assets and the issuance of the Securities, the CDO will not cease to be a "qualified REIT subsidiary" ("QRS") under section 856(i) of the Code and as such, the CDO will not be treated as a separate corporation from the New REIT.

Other than as expressly stated above, we express no opinion on any issue relating to the Old REIT, the New REIT, the CDO or to any investment therein or under any other law. Furthermore, the New REIT's qualification as a REIT, and the CDO's qualification as a QRS, will depend upon the New REIT meeting, in its actual operations, the applicable asset composition (including the New REIT's continuing, beneficial ownership of 100% of the



Petra Fund REIT Corp.
Petra CRE CDO 2007-1, Ltd.
Bear Stearns Funding, Inc.
August [], 2009
Page 4

"equity" in the CDO following the Restructuring), source of income, shareholder diversification, distribution and other requirements of the Code and Treasury Regulations necessary for a corporation to qualify as a REIT. We will not review these operations and no assurance can be given that the actual operations of the New REIT and any of its affiliates will meet these requirements or the representations made to us with respect thereto.

This opinion has been prepared for you in connection with the Restructuring. This opinion is rendered as of the date hereof and we undertake no obligation to update this opinion or advise you of any changes in the event there is any change in legal authorities, facts, assumptions or documents on which this opinion is based (including the taking of any action by any party to the Transaction Documents pursuant to any opinion of counsel or a waiver), or any inaccuracy in any of the representations, warranties or assumptions upon which we have relied in rendering this opinion unless we are specifically engaged to do so. This opinion is rendered only to those to whom it is addressed and may not be relied on in connection with any transactions other than the transactions contemplated herein. This opinion may not be relied upon for any other purpose, or relied upon by any other person, firm or corporation for any purpose, without our prior written consent.

Very truly yours,

**EXHIBIT B**
**PROVISION FOR TRANSFER AGREEMENT**

The undersigned ("*Transferee*") hereby acknowledges that it has read and understands the Plan Support Agreement, dated as of July 30, 2009 (the "*Agreement*"), by and among Petra Fund REIT Corp., and certain lenders and other creditors, including the transferor to the Transferee of any Claims (the "*Transferor*"), and agrees to be bound by the terms and conditions thereof to the extent Transferor was thereby bound, and shall be deemed a "*Consenting Secured Creditor*" or "*Consenting Unsecured Creditor,*" as applicable, under the terms of the Agreement.

The Transferee specifically agrees (i) to be bound by the terms and conditions of the Agreement, and (ii) to be bound by the vote of the Transferor if cast prior to the effectiveness of the transfer of the loans or claims, as applicable.

Date Executed:     , 2009

_____

Print name of Transferee

_____

Name:
Title:

Address: _____

_____

Attention:_____
Telephone: _____
Facsimile:_____

Aggregate principal amount of secured claims:

Aggregate principal amount of unsecured claims:

3