**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.**

DICKSTEIN SHAPIRO LLP
1633 Broadway
New York, New York 10019
(212) 277-6500 (Telephone)
(212) 277-6501 (Facsimile)
Arnold Gulkowitz, Esq.
Brian E. Goldberg, Esq.
Shaya M. Berger, Esq.

Counsel for Petra Fund REIT Corp. and Petra Offshore Fund, L.P., debtors and debtors-in-possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE:<br><br>**PETRA FUND REIT CORP., et al.,**<br><br>**DEBTORS.** | **CHAPTER 11**<br><br>**CASE NO. 10-15500 (SCC)**<br><br><br>**(JOINTLY ADMINISTERED)** |

**DISCLOSURE STATEMENT OF**
**PETRA FUND REIT CORP. AND PETRA OFFSHORE FUND LP**

Dated: New York, New York
February 17, 2011

**Table of Contents**

                                                                                    PAGE

I    INTRODUCTION..................................................................................1

A.    Disclosure Statement Enclosures................................................................2
B.    Only Impaired Classes Vote....................................................................3
C.    Voting Deadline and Related Issues.............................................................3
D.    Confirmation Hearing..........................................................................4

II.   BACKGROUND ...................................................................................4

A.    History of the Debtor.........................................................................4
B.    Events Leading to the Chapter 11 Filings......................................................5
C.    The Chapter 11 Cases..........................................................................6

III.  REMAINING ASSETS OF THE ESTATES ..............................................................6

IV.   DESCRIPTION OF THE PLAN ......................................................................6

A.    Overview of the Plan..........................................................................7
B.    Treatment of Allowed Administrative Claims ...................................................8
C.    Treatment of Allowed Priority Tax Claims......................................................8
D.    Classification of Claims and Interests .......................................................8
E.    Treatment of Claims and Interests.............................................................9
F.    Means for Implementation of the Plan .........................................................11
G.    Liquidation Trust.............................................................................18
H.    Provisions Regarding the New REIT ............................................................19
I.    Provisions Regarding Voting and Distributions Under the Plan..................................22
J.    Unexpired Leases and Executory Contracts .....................................................24
K.    Effectiveness of the Plan ....................................................................25
L.    Retention of Jurisdiction ....................................................................26
M.    Miscellaneous Provisions .....................................................................26

V.    VOTING REQUIREMENTS, ACCEPTANCE AND CONFIRMATION OF THE
      PLAN..........................................................................................32

A.    Parties Entitled to Vote......................................................................32
B.    Classes Impaired Under the Plan...............................................................32
C.    Voting Procedures and Requirements ...........................................................32
D.    Confirmation Hearing..........................................................................33
E.    Confirmation..................................................................................33
F.    Acceptance of Plan ...........................................................................34
G.    Confirmation Without Acceptance of All Impaired Classes ......................................34

i

H.    Best Interests Test ........................................................................................35
I.    Liquidation Analysis ....................................................................................35
J.    Feasibility ...................................................................................................36
K.    Compliance with the Applicable Provisions of the Bankruptcy Code ...................................37

    VI.  ALTERNATIVE TO CONFIRMATION AND  CONSUMMATION OF THE
    PLAN ........................................................................................................37

    VII.  SECURITIES REGISTRATION EXEMPTION .......................................................37

A.    Securities Registration Exemption ..............................................................37
B.    Section 1145 of the Bankruptcy Code ..........................................................38
C.    Section 4(2) of the Securities Act/Regulation D ...........................................39
D.    Rule 144 and Rule 144A ..............................................................................39

    VIII.CERTAIN FEDERAL INCOME TAX  CONSEQUENCES OF THE PLAN .........40

A.    Tax Consequences to the Debtors .................................................................41
B.    Tax Considerations for All Claim Holders .....................................................44

    IX.  RISK FACTORS ....................................................................................45

A.    Bankruptcy Considerations ..........................................................................46
B.    Business Risks (Inherent Uncertainty of Financial Projections) ...........................................46
C.    Natural Disasters .........................................................................................46
D.    Tax-Related Risks ........................................................................................47

    X.  RECOMMENDATION AND CONCLUSION ........................................................48

DOCSNY-452583v2

# I. INTRODUCTION

Petra Fund REIT Corp. and Petra Offshore Fund LP, as debtors and debtors in possession, have filed the Plan of Reorganization of Petra Fund REIT Corp. and Petra Offshore Fund LP, dated February 17, 2011, with the United States Bankruptcy Court for the Southern District of New York. A copy of the Plan is annexed hereto as Exhibit A[1]. The Debtors hereby submit this disclosure statement, pursuant to section 1125 of title 11 of the Bankruptcy Code, in connection with the solicitation of acceptances or rejections of the Plan from certain holders of Claims against the Debtors.

Following a hearing held on _____ __, 2011, this Disclosure Statement was approved by the Court as containing "adequate information" in accordance with section 1125 of the Bankruptcy Code. Pursuant to section 1125(a)( 1) of the Bankruptcy Code, "adequate information" is defined as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan."

NO STATEMENTS OR INFORMATION CONCERNING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY HAVE BEEN AUTHORIZED, OTHER THAN THE STATEMENTS AND INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND THE INFORMATION ACCOMPANYING THIS DISCLOSURE STATEMENT. ALL OTHER STATEMENTS REGARDING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY, WHETHER WRITTEN OR ORAL, ARE UNAUTHORIZED. EXCEPT AS OTHERWISE SET FORTH HEREIN, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE BY THE DEBTORS AS OF THE DATE HEREOF, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME SUBSEQUENT TO THE DATE HEREOF.

APPROVAL OF THIS DISCLOSURE STATEMENT BY THE COURT DOES NOT INDICATE THAT THE COURT RECOMMENDS EITHER ACCEPTANCE OR REJECTION OF THE PLAN NOR DOES SUCH APPROVAL CONSTITUTE A DETERMINATION BY THE COURT OF THE FAIRNESS OR MERITS OF THE PLAN OR OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN PROPOSED BY THE DEBTORS. EACH HOLDER OF A CLAIM OR INTEREST SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY, INCLUDING THE CONDITIONS TO EFFECTIVENESS OF THE PLAN CONTAINED IN

---

[1] Capitalized terms used herein that are not otherwise defined shall have the meaning ascribed to them in the Plan.

ARTICLE X THEREOF.  AFTER CAREFULLY REVIEWING THESE DOCUMENTS, IF YOU ARE A CLAIM OR INTEREST HOLDER ENTITLED TO VOTE, PLEASE INDICATE YOUR VOTE WITH RESPECT TO THE PLAN ON THE ENCLOSED BALLOT AND RETURN IT IN THE ENVELOPE PROVIDED.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST, AND HOLDERS OF INTERESTS IN, THE DEBTORS (INCLUDING, WITHOUT LIMITATION, THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

THIS DISCLOSURE STATEMENT HAS NOT BEEN FILED WITH, NOR NECESSARILY REVIEWED BY, AND ANY SECURITIES TO BE ISSUED ON OR AFTER THE EFFECTIVE DATE WILL NOT HAVE BEEN THE SUBJECT OF A REGISTRATION STATEMENT FILED WITH, THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR WITH ANY OTHER SECURITIES REGULATORY AUTHORITY OF ANY STATE UNDER ANY STATE SECURITIES OR "BLUE SKY" LAWS.  THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC, ANY OTHER SECURITIES REGULATORY AUTHORITY, OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.  THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY STATE OR OTHER JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

THE DEBTORS BELIEVE THAT THE SOLICITATION OF VOTES ON THE PLAN MADE BY THIS DISCLOSURE STATEMENT, AND THE OFFER OF ANY NEW SECURITIES THAT MAY BE DEEMED TO BE MADE PURSUANT TO THE SOLICITATION ARE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND RELATED STATE STATUTES BY REASON OF THE EXEMPTION PROVIDED BY SECURITIES ACT SECTION 4(2), OR OTHER APPLICABLE EXEMPTIONS, AND EXPECT THAT THE ISSUANCE OF ANY SECURITIES UNDER THE PLAN WILL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND RELATED STATE STATUTES BY REASON OF THE APPLICABILITY OF SECTIONS 1145(a)(1) AND (2) OF THE BANKRUPTCY CODE AND SECURITIES ACT SECTION 4(2), OR OTHER APPLICABLE EXEMPTIONS.

## A.  **Disclosure Statement Enclosures**

Accompanying this Disclosure Statement are copies of: (a) the Plan (a copy of which is annexed hereto as Exhibit A); (b) a Notice (i) fixing the time for casting Ballots either accepting or rejecting the Plan, (ii) fixing the deadline for Filing objections to Confirmation of the Plan and (iii) scheduling a hearing on Confirmation of the Plan (the "Notice"); (c) a copy of the Order

DOCSNY-452583v2

approving this Disclosure Statement; and (d) for impaired Creditors and Interest holders entitled to vote to accept or reject the Plan, a ballot for acceptance or rejection of the Plan (the "Ballot").

Additional copies of the Disclosure Statement and the related enclosures are available upon request to Debtors' counsel, Dickstein Shapiro LLP ("Debtors' Counsel"), at the following address:

Dickstein Shapiro LLP
1633 Broadway
New York, New York 10019
Attention: Brian E. Goldberg and
Shaya M. Berger

## B.  Only Impaired Classes Vote

Pursuant to the provisions of the Bankruptcy Code, only Classes of Claims and Interests that are "impaired" under the Plan may vote to accept or reject the Plan.  Generally, a claim or interest is impaired under a plan if the holder's legal, equitable or contractual rights are changed under such plan.  In addition, if the holders of claims or interests in an impaired class do not receive or retain any property under a plan on account of such claims or interests, such impaired class is deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.

Under the Plan, Claims in Classes 1, 1A, 2 and 3 are Impaired and are entitled to vote on the Plan.  Holders of Interests in Classes 4 and 5 will receive no distribution and, accordingly, such holders are deemed to reject the Plan.  ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASSES 1, 1A, 2 AND 3.

For a summary of the treatment of each Class of Claims and Interests, see "Overview of the Plan" below.

## C.  Voting Deadline and Related Issues

The last day to vote to accept or reject the Plan is _____, 2011 (the "Voting Deadline").  To be counted, your ballot must be **RECEIVED BY DEBTORS' COUNSEL, DICKSTEIN SHAPIRO LLP, AT 1633 BROADWAY, NEW YORK, NEW YORK 10019, ATTENTION: BRIAN E. GOLDBERG AND SHAYA M. BERGER, OR BY FACSIMILE, AT 212-277-6501, ATTENTION: BRIAN E. GOLDBERG AND SHAYA M. BERGER, BY THE VOTING DEADLINE.**  The record date for determining which creditors or interest holders may vote on the Plan is _____, 2011 (the "Voting Record Date").

The Bankruptcy Code provides that only the ballots of creditors and interest holders who timely vote on the Plan will be counted for purposes of determining whether the requisite acceptances have been attained.  Failure to deliver a timely and properly completed ballot by the Voting Deadline will constitute abstention (will not be counted as either an acceptance or a rejection).

DOCSNY-452583v2

Each holder of record as of the Voting Record Date of an Allowed Claim in an Impaired Class of Claims set forth in Article IV of the Plan shall be entitled to vote separately to accept or reject the Plan with regard to each Impaired Class of Claims as provided in the Procedures Order. If the Debtor objects to a Claim, the Claim becomes a Disputed Claim. The holder of a Disputed Claim is not entitled to vote on the Plan unless the Debtor or such holder of the Disputed Claim obtains an order of the Court estimating the amount of the Disputed Claim for voting purposes. If the Debtor does not object to a Claim prior to the date on which the Disclosure Statement and the Ballot are transmitted to Creditors for voting, then the holder of such Claim will be permitted to vote on the Plan in the full amount of the Claim as filed.

Any Class of Claims that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or a Claim temporarily allowed under Bankruptcy Rule 3018 or as to which no vote is cast shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

If any Impaired Class of Claims or Interests entitled to vote shall not accept the Plan by the requisite statutory majorities provided in section 1126(c) of the Bankruptcy Code, then the Debtors reserve the right to amend the Plan in accordance with Article XII of the Plan or to undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code, or both.

## D. Confirmation Hearing

The Court has scheduled a hearing to consider confirmation of the Plan for _____ ___, 2011 at _____ Eastern Standard Time ("EST") in the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, NY 10004 (the "Confirmation Hearing"). The Court has directed that objections, if any, to confirmation of the Plan be served and filed on or before _____ ___, 2011 at _____ EST in the manner described in the Notice accompanying this Disclosure Statement. The date of the Confirmation Hearing may be adjourned from time to time without further notice except for an in-court announcement at the Confirmation Hearing of the date and time as to which the Confirmation Hearing has been adjourned.

THE PLAN IS PROPOSED BY THE DEBTORS. THE DEBTORS BELIEVE THE PLAN PROVIDES THE GREATEST POSSIBLE RECOVERY TO CREDITORS AND URGE ALL IMPAIRED CREDITORS TO VOTE IN FAVOR OF THE PLAN.

## II. BACKGROUND

## A. History of the Debtor

The Debtors, together with their affiliates (collectively, "Petra") are in the business of originating, investing in, structuring and trading loans secured by commercial real-estate. Offshore is an ultimate parent of REIT and substantially all of the assets of Offshore are invested in REIT. REIT is a real-estate investment trust whose assets include investments in real-estate and real-estate debt instruments. An important component of Petra is the direct and indirect ownership

of certain equity and debt interests in Petra CDO, which allows it to qualify for tax and other financial benefits available to real estate investment trusts and their subsidiaries. Petra CDO, as a qualified REIT subsidiary, is an effective financing entity for a substantial portion of Petra's real estate transactions. Petra CDO, in turn, has several senior noteholders who are primarily substantial financial and similar institutions.

## B. Events Leading to the Chapter 11 Filings

The extraordinary and unprecedented collapse of the credit and commercial real estate markets has severely impacted Petra, causing the mark-to-market value of its assets to plummet. Financing and liquidity, which was previously readily available through banks and the capital markets, evaporated as banks de-levered and investors withdrew from the market. This shift severely constrained and essentially ended the market for securitized debt, which had been a crucial source of financing for the commercial real estate market, of which REIT is a participant.

As a result of this unprecedented financial crisis, Petra's loan portfolio deteriorated due to the collapse of the market for securitized debt and resulted in insufficient capital to meet the needs of existing owners who need to refinance their current debt. For the past several years, Petra has made numerous attempts to negotiate with substantially all of its creditors in an effort to formulate a consensual restructuring. While certain of Petra's creditors were amenable to restructuring discussions and substantial progress was made toward finalizing various proposed transactions, progress was not made respecting other creditors. These negotiations were further complicated because several of Petra's assets are encumbered by liens and/or asserted liens or similar claims.

One creditor with whom Petra could not reach resolution was KBS Preferred Holding I, LLC ("KBS"). Ultimately, KBS sued the Debtors in New York state court to collect on its asserted debt, arising out of an unsecured loan extended to REIT. KBS obtained a judgment on this debt and had begun to commence enforcement proceedings and assert various rights as a judgment creditor.

To the extent KBS or any other creditor of the Debtors (all of whom are structurally subordinated to Petra CDO's senior noteholders) was able to interfere with the REIT qualified structure of the Petra enterprise and/or Petra CDO, there would be potentially devastating financial consequences for the investors and noteholders in Petra CDO and the underlying value of the entire enterprise would be substantially diminished, to the ultimate detriment of all involved, including the Debtors and their estates. Moreover, among the pre-bankruptcy restructuring discussions entered into by Petra, REIT and a secured creditor holding a lien on REIT's indirect equity interest in the CDO formulated a deal in principle set forth in the Plan Support Agreement (attached as an exhibit to the Affidavit of Lawrence Shelley Pursuant to Local Rule 1007-2 [ECF Docket No. 2]), which the Debtors believe provides the best hope to generate value for all parties. The transactions proposed in the Plan Support Agreement required the Debtors to file for bankruptcy to implement them and are now embodied in the Plan.

5

## C. The Chapter 11 Cases

On October 20, 2010 (the "Petition Date"), the Debtors commenced cases under chapter 11 of the Bankruptcy Code. The Debtors' chapter 11 cases are being jointly administered. No trustee or examiner has been appointed in these chapter 11 cases. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

On November 16, 2010, the Court entered certain "first day" orders, including an order approving of the Debtors' retention of Dickstein Shapiro to act as their counsel *nunc pro tunc* to the Petition Date. The Debtors selected Dickstein Shapiro because, among other reasons, Dickstein Shapiro's extensive experience and knowledge in (i) the field of debtors' and creditors' rights and business reorganizations under Chapter 11 of the Bankruptcy Code; and (ii) legal areas that would affect the Debtors' day-to-day operations and their reorganizations under Chapter 11 of the Bankruptcy Code. The Debtors also retained Pricewaterhousecoopers LLC to assist them in filing various tax returns and related papers, as well as to provide certain tax consulting services.

## III. REMAINING ASSETS OF THE ESTATES

The remaining assets of the Debtors' estates consist of: (i) approximately $500,000 in Cash; (ii) the Settlement Payments; (iii) the Class F Bonds; (iv) the Class G Bonds; (v) the Class J Bonds; (vi) the equity interests of PS SPV, which owns the Class K Bonds and the CDO Preferred Shares; and (v) the Sale Assets.[2] Although many of the remaining assets of the estate are ultimately investments in real-estate and real-estate debt instruments that have declined significantly as a result of the extraordinary and unprecedented collapse of the credit and commercial real estate, they remain assets of value with the potential for appreciation if there is a economic revival in the commercial real estate market. There are no assurances, however, that these assets will appreciate. See section IX - Risk Factors.

## IV. DESCRIPTION OF THE PLAN

THE FOLLOWING IS A BRIEF SUMMARY OF THE TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN. THE DESCRIPTION OF THE PLAN SET FORTH BELOW CONSTITUTES A SUMMARY ONLY. CREDITORS, INTEREST HOLDERS AND OTHER PARTIES IN INTEREST ARE URGED TO REVIEW THE MORE DETAILED DESCRIPTION OF THE PLAN CONTAINED IN THIS DISCLOSURE STATEMENT AND THE PLAN ITSELF, WHICH IS ANNEXED AS EXHIBIT A TO THIS DISCLOSURE STATEMENT. THE SUMMARIES OF THE PLAN AND THE DOCUMENTS RELATED THERETO ARE QUALIFIED IN THEIR ENTIRETY BY THE PLAN AND ITS EXHIBITS.

---

[2] The Sale Assets include investments in various other real estate-related assets and/or direct and indirect investments in companies that invest in real estate-related assets. Most are of minimal value, with others having value that is uncertain. See Section IV.F - Means for Implementation of the Plan, and its description of the Sale Assets.

DOCSNY-452583v2

## A. Overview of the Plan

The Plan provides for the reorganization of each of the Debtors and the treatment of each holder of a Claim against, or Equity Interests in, the Debtors. Such treatment includes the payment in full of all Administrative Claims; the exchange of Secured Claims for new secured debt instruments to be issued by a new qualified real estate investment trust to be formed in accordance with the Plan; the distribution to holders of General Unsecured Claims of a Pro Rata Share of either Cash or the Distributable Assets (depending on whether a Liquidation Trust is created); and cancellation of all existing Equity Interests. To the extent a Liquidation Trust is created (because not all Assets were converted to Cash on or prior to the Effective Date), the distributions to General Unsecured Claims will be made by a liquidation trust established for the benefit of such Claim holders.

Set forth below is a table summarizing the classification and treatment of Claims and Interests under the Plan and the estimated distributions to be received by the holders of such Claims and Interests thereunder. The actual distributions may differ from those set forth in the table depending on the amount of Claims ultimately allowed in each category or Class and the amount of cash ultimately available for distribution.

| DESCRIPTION/ CLASS | TREATMENT | ENTITLED TO VOTE | ESTIMATED AMOUNT |
|---|---|---|---|
| Administrative [UNCLASSIFIED] | Unimpaired | No | $1,000,000.00 |
| Priority Tax Claims [UNCLASSIFIED] | Unimpaired | No | $750,000.00[3] |
| Class 1 Claims: Secured Claims of JPM | Impaired | Yes | No cash; will receive new secured debt instrument |
| Class 1A Claims: Secured Claims of RBS | Impaired | Yes | No cash; will receive new secured debt instrument |
| Class 2 Claims: Other Secured Claims | Impaired | Yes | $0 |
| Class 3: General Unsecured Claims of Debtors | Impaired | Yes | $1,500,000.00 |
| Class 4: Interest in REIT | Impaired | No | $0 |
| Class 5: Interest in Offshore | Impaired | No | $0 |

[3] This amount may be reduced, possibly to $0. See subsection C below.

7

## B. Treatment of Allowed Administrative Claims

Except to the extent that an Allowed Administrative Claim has been paid prior to the Effective Date or a holder thereof agrees otherwise, each holder of an Allowed Administrative Claim shall be entitled to receive in full and complete settlement, release, and discharge of such Claim, payment in full in Cash of the unpaid portion of an Allowed Administrative Claim. Requests for payment of Administrative Claims that are to be sought through the Court, including, but not limited to, Fee Claims, must be Filed and served on the Debtors' counsel, the Liquidation Trust (to the extent it has come into existence) and the office of the United States Trustee, no later than thirty days after the Effective Date unless otherwise ordered by the Court (the "Administrative Claim Bar Date"). Any Person that is required to serve a request for payment of an Administrative Claim and fails to timely serve such request, shall be forever barred, estopped and enjoined from asserting such Claim or participating in distributions under the Plan on account thereof. The Liquidation Trust or the Debtors may object to requests for payment of Administrative Claims, other than Fee Claims, by Filing and serving such objection on the requesting party at any time. Any objection to Fee Claims must be Filed and served on Debtors' counsel and the office of the U.S. Trustee, as well as the Professional or other Person requesting allowance of such Claims, on or before the date that is fifteen (15) days (or such longer period as may be allowed by agreement of the Debtors or the Liquidation Trust or by order of the Bankruptcy Court) after the date on which the applicable application was served.

## C. Treatment of Allowed Priority Tax Claims.

To the extent there are any Allowed Priority Tax Claims, each holder of such Claim shall be paid in respect of such Allowed Claim either (a) the full amount thereof, without post-petition interest or penalty, in Cash, or (b) such lesser amount as the holder of an Allowed Priority Tax Claim, on the one hand, and the Debtors or the Liquidation Trust, on the other hand, might otherwise agree. Payment to the holders of an Allowed Priority Tax Claim will be made as soon as practicable after the later of (i) the Effective Date; (ii) the date on which such Claim becomes an Allowed Claim; or (iii) upon other agreed terms. Such Claims are not Impaired and thus the holders of such Claims are presumed to accept the Plan and are not entitled to vote on the Plan. Based on discussions with their tax professionals, Debtors do not currently believe there are any such Claims that will be Allowed in any substantial amount, if at all, but Debtors are currently in discussions with the Internal Revenue Service regarding an alleged claim for several hundred thousand dollars asserted against them that was set forth in Debtors' schedules as disputed, and Debtors (or the Liquidation Trust, as applicable) will reserve for that Claim prior to making any distributions to holders of Class 3 Claims.

## D. Classification of Claims and Interests

Administrative Claims and Priority Tax Claims are unclassified. For purposes of the Plan, all other Claims and Interests are classified as follows:

8

1.      Class 1 Claims shall consist of the Secured Claims of JPM.

2.      Class 1A Claims shall consist of the Secured Claims of RBS.

3.      Class 2 Claims shall consist of all Other Secured Claims.

4.      Class 3 Claims shall consist of all General Unsecured Claims of Debtors.

5.      Class 4 Claims shall consist of all Interests in REIT.

6.      Class 5 Claims shall consist of all Interests in Offshore.

## E.  **Treatment of Claims and Interests**

The treatment of and consideration to be received by holders of Allowed Claims and Interests pursuant to Article IV of the Plan shall be in full and complete satisfaction, settlement, release, discharge of and in exchange for such Claims and Interests. The Debtors' obligations in respect of such Claims and Interests shall be satisfied in accordance with the terms of the Plan.

1.      Treatment of Class 1 Claims - Secured Claims of JPM.

Class 1 Claims are Impaired. Based upon negotiations between the Debtors and JPM, JPM shall receive the following treatment: (a) JPM's Secured Claims shall be exchanged for the JPM Debt, which shall be secured by a first-priority Lien on New REIT's shares of New REIT QRS 1 as set forth more fully in Article VII of the Plan and its Liens on the JPM REIT Collateral will be extinguished, but (b) JPM shall not receive any additional distribution as a holder of a General Unsecured Claim with respect to any deficiency amount represented by the difference between the amount of JPM's Secured Claims and the JPM Stipulated Claim Amount. The holders of Claims in this Class are entitled to vote.

2.      Treatment of Class 1A Claims – Secured Claims of RBS.

Class 1A Claims are Impaired. RBS shall receive the following treatment: (a) RBS's Secured Claims shall be exchanged for the RBS Debt and RBS shall retain its lien on the RBS REIT Collateral being transferred to New REIT QRS 2 as set forth more fully in Article VII of the Plan, and (b) RBS shall hold a Class 3 General Unsecured Claim (and receive corresponding distribution as a holder of a General Unsecured Claim) to the extent there is any deficiency amount represented by the difference between the value of the Liens securing RBS's Secured Claims and the RBS Claim Amount. In the Debtors' assessment, the RBS REIT Collateral is currently worth approximately one hundred fifty thousand dollars ($150,000 USD). As described more fully in section 12.10 of the Plan, in the event RBS does not vote to reject the Plan, RBS and its affiliates, officers, directors, employees and agents shall also be included within the list of parties released under section 12.10(a) and 12.10(b) of the Plan. The holders of Claims in this Class are entitled to vote.

DOCSNY-452583v2

3.    Treatment of Class 2 Claims – Other Secured Claims.

Class 2 Claims are Impaired.  To the extent there are any Claims in this Class, each such Claim shall be deemed to be a separate subclass.  Each holder of an Allowed Class 2 Claim shall be paid from the balance of Liquidation Trust Funds, if any, or Debtors' Assets, as applicable, that are available only after payment of Administrative Claims, Priority Tax Claims and Liquidation Trust Expenses under the Liquidation Trust Agreement, as applicable, are paid in full.  The holders of Claims in this Class are entitled to vote.

4.    Treatment of Class 3 Claims – General Unsecured Claims of Debtors.

Class 3 Claims are Impaired.  Each holder of an Allowed Class 3 General Unsecured Claim shall receive from the Liquidation Trust, as soon as is reasonably practicable after the Effective Date, which is presumed to be not later than one hundred twenty (120) days after the Effective Date and then annually thereafter (assuming Distributable Assets exist at each such time), a pro rata share of the then Distributable Assets in a pro rata amount equal to 100% of such holders' Allowed Class 3 General Unsecured Claim.  To the extent there is not a Liquidation Trust, each holder of an Allowed Class 3 Claim shall receive from the Debtors, as soon as is reasonably practicable, which is presumed not to be later than one hundred twenty (120) days after the Effective Date, a pro rata share of remaining Debtors' Assets after payment of Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Other Secured Claims.  The holders of Claims in this Class are entitled to vote.

At this time, all Offshore Assets and many of the Remaining REIT Assets other than the Settlement Payments have either a zero or net negative value, while others have values that are at best uncertain, and are nonetheless difficult and cumbersome to manage.  Thus, Debtors will dispose of all identified Remaining REIT Assets (other than the Settlement Payments) and all Offshore Assets pursuant to the sale and auction procedures described in Article V of the Plan to reduce the administrative burden and expenses associated with owning such assets.  To the extent any Cash value is realized from such sales, and to the extent the Liquidation Trust is created, such cash will be transferred to the Liquidation Trust in accordance with the Plan, and each holder of an Allowed General Unsecured Claim shall receive from the Liquidation Trust a pro rata share of the then resulting Distributable Assets in a pro rata amount equal to 100% of such holders' Allowed Class 3 General Unsecured Claim, to be paid under the same "as soon as is reasonably practicable" timeline described immediately above.  Notwithstanding the foregoing, to the extent the Liquidation Trust is not created, then any such proceeds shall be distributed with the other Debtors' Assets being distributed, if any, to the holders of Allowed Class 3 Claims.

5.    Treatment of Class 4 Interests in REIT.

Class 4 Interests are Impaired.  The holders of Class 4 Interests shall receive no distributions whatsoever on account of such Class 4 Interests.  All Class 4 Interests shall be cancelled on the Effective Date.  As the holders of Class 4 Interests are receiving no distributions, they are conclusively presumed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

DOCSNY-452583v2

6.    Treatment of Class 5 Interests in Offshore.

Class 5 Interests are Impaired. The holders of Class 5 Interests shall receive no distributions whatsoever on account of such Class 5 Interests. All Class 5 Interests shall be cancelled on the Effective Date. As the holders of Class 5 Interests are receiving no distributions, they are conclusively presumed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

## F. **Means for Implementation of the Plan**

1.    Substantive Consolidation.

The day after the Effective Date, the estates of each of the Debtors will be substantively consolidated into a single estate for purposes of the Plan and the distributions thereunder. In accordance with the substantive consolidation of the Debtors' estates, (i) all assets and liabilities of the Debtors will be merged; (ii) any obligations of any Debtor will be deemed to be one obligation of the Debtors; (iii) any claims Filed or to be Filed in connection with any such obligations will be deemed one claim against the Debtors; (iv) each Claim Filed in the Chapter 11 Case of any Debtor will be deemed Filed against the Debtors' consolidated estate; (v) all transfers, disbursements and distributions made by any Debtor will be deemed to be made by all of the Debtors; and (vi) no amount will be paid on account of Intercompany Claims. Holders of Allowed Claims in each Class shall be entitled to their Pro Rata share of assets available for distribution to such Class without regard to which Debtor was originally liable for such Claim.

2.    Corporate Action.

Subject to sub-section 5.2(B) and section 5.14 of the Plan, the day after the Effective Date and automatically and without further action, (i) each existing executive, officer, director and employee of each Debtor will be deemed terminated by the Liquidation Trust; (ii) each Debtor shall be deemed dissolved for all purposes without the necessity for any further actions to be taken by or on behalf of each Debtor; (iii) the Debtors' Equity Interests shall be cancelled; and (iv) the Remaining REIT Assets and the Offshore Assets will be transferred to the Liquidation Trust. Notwithstanding the foregoing, the Liquidation Trust and/or the Liquidation Trustee may take such additional actions deemed necessary in its or his discretion, including based on consultation with Liquidation Trust Counsel or other Professionals, to implement the foregoing corporate actions. The Liquidation Trust will administer the Plan and all actions taken under the Plan in the name of the Post-Confirmation Debtors shall be taken through the Liquidation Trust.

Notwithstanding anything to the contrary in the Plan, on or the day after the Effective Date, the Debtors or the Liquidation Trust shall File a Notice of Effective Date indicating when the Effective Date has occurred; provided, however, that such notice may include a Continuation Addendum providing that the Debtors wish to remain in existence for the limited purposes of assisting with the winding down of their affairs and finalizing the administration of the Chapter 11 Cases (including objecting to Claims), in which case the actions described in sub-sections 5.2(A)(i) and (ii) of the Plan will not occur on the date after the Effective Date; provided, further, that if the Notice of Effective Date contains a Continuation Addendum, the Debtors or the Liquidation Trust shall subsequently File a Notice of Dissolution, at which time the actions

11

described in sub-sections 5.2(A)(i) and (ii) of the Plan will occur automatically and without further action.

> 3.     Liquidation Trustee.

As described in Article V of the Plan, Debtors are taking certain steps to try to avoid the need for a Liquidation Trust and a Liquidation Trustee. However, to the extent a Liquidation Trust is needed to implement the Plan, the Debtors are considering candidates for the position of Liquidation Trustee. The Debtors will provide additional details when there is more certainty that there will be a Liquidation Trust, but the Debtors are currently considering various candidates for the position of Liquidation Trustee. The candidate with whom the Debtors and their Professionals have had the most extensive discussions is James A. Goodman. Mr. Goodman was appointed, and served as, a U.S. Bankruptcy Judge for the District of Maine from 1981 until 2001. He served as the Chief Judge of the U.S. Bankruptcy Court for the District of Maine from 1990 until 1997.

In addition, Mr. Goodman has been appointed by the United States District Court for the Southern District of New York as receiver for PMCC Calpine of New England, Inc. and selected as the liquidation trustee in the following cases: (i) Bethlehem Steel chapter 11 cases, pending in the United States Bankruptcy Court for the Southern District of New York, (ii) LTV Copperweld, pending in the Northern District of Ohio, (iii) reorganized Reliance Financial Services and Reliance Group Holdings, pending in the United States Bankruptcy Court for the Southern District of New York and (iv) American Equities Group, Inc., et al., pending in the United States Bankruptcy Court for the Southern District of New York. Obviously, to the extent the Debtors choose a different candidate, they will provide further disclosure on that candidate in the Plan Supplement.

Subject to section 5.14 of the Plan, on the Effective Date, the Liquidation Trust shall begin acting for the Post-Confirmation Debtors in the same fiduciary capacity as applicable to a board of directors, subject to the provisions hereof and of the Plan. The Liquidation Trust shall act through the Liquidation Trustee and all actions referenced in the Plan for which the Liquidation Trust is authorized to perform, the Liquidation Trustee shall be so authorized to perform. The Liquidation Trustee and Liquidation Trust Counsel shall not be liable for any action taken or omitted believed in good faith to be authorized or within their rights or powers unless it is ultimately and finally determined by a court of final jurisdiction that such action or inaction was the result of fraud, gross negligence or willful misconduct.

> 4.     Powers and Duties of the Liquidation Trustee.

Subject to section 5.14 of the Plan, all distributions to be made to holders of Allowed Claims and Allowed Interests under the Plan shall be made by the Liquidation Trustee, who shall deposit and hold all Cash and other Property in trust for the benefit of holders of such Allowed Claims (including Professionals). Subject to the foregoing, the duties and powers of the Liquidation Trust (if it comes into existence) shall include the following:

> a)     To exercise all power and authority that may be exercised, commence all proceedings that may be commenced and take all actions that may be taken by any officer, director or shareholder of the Post-Confirmation Debtors with like effect as if authorized, exercised and taken by unanimous action of such officers, directors and shareholders, including consummating the Plan and all transfers thereunder on behalf of the Post-Confirmation Debtors;

DOCSNY-452583v2

b) To maintain all accounts, invest cash of the Post-Confirmation Debtors and/or the Liquidation Trust, make interim and final distributions and take other actions consistent with the Plan, including the maintenance of appropriate reserves, in the name of the Debtors, Post-Confirmation Debtors or Liquidation Trust;

c) To take all steps necessary to wind up the affairs of the Debtors, Post-Confirmation Debtors and Liquidation Trust;

d) To prosecute, cease to prosecute, compromise or settle (i) the Settlement Payments and (ii) objections to Claims and Interests, including Administrative Claims, Priority Tax Claims, Secured Claims, and General Unsecured Claims (disputed or otherwise);

e) To make decisions regarding the retention or engagement of Professionals or other Persons by the Liquidation Trust;

f) To pay, without court order, all reasonable fees and expenses of the Liquidation Trust's' Professionals incurred and unpaid after the Effective Date;

g) To pay, without court order, (i) all Allowed and unpaid fees and expenses of the Debtors' Professionals incurred and unpaid after the Petition Date and (ii) all reasonable fees and expenses of the Debtors' Professionals incurred after the Effective Date;

h) To file with the Court the reports and other documents required by the Plan or otherwise required to close the Chapter 11 Cases;

i) To prepare and file tax and other informational returns for the Debtors, Post-Confirmation Debtors and/or Liquidation Trust;

j) To set off amounts owed to the Debtors or Post-Confirmation Debtors against any and all amounts otherwise due to be distributed to the holder of an Allowed Claim under the Plan;

k) To abandon any Remaining REIT Assets, Offshore Assets, or any other assets of the Debtors, Post-Confirmation Debtors or Liquidation Trust within its control, which cannot be sold or otherwise disposed of for value and whose distribution to holders of Allowed Claims and Interests would not be feasible or cost-effective in the reasonable judgment of the Liquidation Trustee;

l) To provide for storage and destruction of records, as deemed appropriate by the Liquidation Trustee and without Court approval; and

m) To take all other actions not inconsistent with the provisions of the Plan which the Liquidation Trustee deems reasonably necessary or desirable in connection with the administration of the Plan.

DOCSNY-452583v2

5.    Investments.

All Cash and Liquidation Trust Funds held by the Liquidation Trust in any accounts or otherwise may be invested in any investment the Liquidation Trustee deems appropriate.

6.    Resignation, Death or Removal.

Upon application and for good cause shown and upon prior notice to the Liquidation Trust Counsel, the Court may remove the Liquidation Trustee from his role as Liquidation Trustee. Except as otherwise provided herein, in the event of the resignation or removal, death or incapacity of the Liquidation Trustee, the Liquidation Trust Counsel shall designate another Person to become Liquidation Trustee. Any successor to the Liquidation Trustee shall be bound by the provisions of the Plan, the Liquidation Trust Agreement and the order appointing the Liquidation Trustee. Thereupon the successor Liquidation Trustee, without any further act, shall become fully vested with all of the rights, powers, duties and obligations of his predecessor under terms to be agreed by the Liquidation Trust Counsel. In the event of the resignation of the Liquidation Trustee, the Liquidation Trustee shall remain as the Liquidation Trustee until such time as the Liquidation Trust Counsel designates a successor. Notwithstanding anything to the contrary in the Plan, a Person or Persons representing greater than sixty percent (60%) of the beneficial interests in the Liquidation Trust may seek removal of the Liquidation Trustee without cause, provided that such Person or Persons designates a successor Liquidation Trustee who is willing to serve pursuant to terms agreeable to the Person or Persons seeking removal of the current Liquidation Trustee.

7.    Winding Up Affairs.

Following the Confirmation Date, the Post- Confirmation Debtors shall take any actions reasonably necessary to effectuate the Plan, including, but not limited to, transferring the Remaining REIT Assets and the Offshore Assets to the Liquidation Trust for the benefit of holders of Allowed Claims. Subject to section 5.14 of the Plan, on and after the Effective Date, the Liquidation Trustee may, in the name of the Debtors or Post-Confirmation Debtors or the Liquidation Trust, take such actions without supervision or approval by the Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than any restrictions expressly imposed by the Plan or the Confirmation Order. Without limiting the foregoing, assuming there is a Liquidation Trust, the Liquidation Trustee may, without application to or approval of the Court, (i) pay charges for Professional fees and expenses that constitute Allowed Administrative Claims that were incurred by the Debtors after the Petition Date and (ii) pay charges for Professional fees and expenses that were incurred by the Post-Confirmation Debtors or Liquidation Trust after the Effective Date. If there is not a Liquidation Trust, the Post-Confirmation Debtors may, without application to or approval by the Court, pay the same fees and expenses, to the extent they relate to the Debtors or Post-Confirmation Debtors.

8.    Release of Liens.

Except as otherwise provided in the Plan (including Article VII) or in any contract, instrument or other agreement or document created in connection with the Plan, on the Effective Date, all mortgages, deeds of trust, liens or other security interests against the property of the Debtors' estates shall be released.

14

9.    Preservation of Causes of Action.

Any pending litigation claims in favor of the Debtors are preserved under the Plan, as well as the rights to enforce the Settlement Payments and related claims.

10.    Assignment of Causes of Action.

On the day after the Effective Date or as otherwise provided in the Plan and without further order of the Court, the causes of action described in section 5.9 of the Plan shall be transferred to the Liquidation Trust (if it exists) for the purpose of enforcing, settling, litigating, liquidating or releasing, as appropriate, such causes of action for the benefit of the holders of Allowed Claims. The Liquidation Trustee may pursue, settle or release all retained rights of action, as appropriate, in accordance with the best interest of and for the benefit of the holders of Allowed Claims.

**11.    Injunction.**

**All Persons who have held, hold or may hold Claims against or Equity Interests in the Debtors, are permanently enjoined, on and after the Effective Date, from directly or indirectly: (i) commencing or continuing in any manner any action or other proceeding of any kind against the Liquidation Trust or the New REIT Companies or their assets or properties with respect to any such Claim or Equity Interest; (ii) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against the Liquidation Trust or the New REIT Companies on account of any such Claim or Equity Interest; (iii) creating, perfecting or enforcing any encumbrance of any kind against the Liquidation Trust or the New REIT Companies or their assets or properties on account of any such Claim or Equity Interest; (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtors against the property or interests in property of the Liquidation Trust or the New REIT Companies on account of any such Claim or Equity Interest; and (v) commencing or continuing in any manner any action or other proceeding of any kind against the Liquidation Trust or the New REIT Companies or their assets or properties. Nothing in the foregoing paragraph, however, shall interfere with any remedy available to JPM or RBS under the new debt instruments to be issued under Article VII of the Plan.**

12.    Exemption from Registration.

To the extent the Liquidation Trust is created, holders of Allowed Claims in Class 3 will receive beneficial interests in the Liquidation Trust. Section 1145 provides certain exemptions from the requirements of federal and state securities laws with respect to the distribution of securities under a chapter 11 plan.

It is believed by the Debtors that the Liquidation Trust (and the related beneficial interests to be distributed) will not need to register and make public filings because, among other things, they satisfy the requirements of section 1145 of the Bankruptcy Code and also because the beneficial interests in the Liquidation Trust will be noncertificated and not transferable or assignable (except by operation of law or the death of the beneficiary). The purpose of the Liquidation Trust is limited to holding, protecting, and selling or settling the assets transferred to it and distributing the

proceeds, and will not engage in any ongoing trade or business. If a federal or state regulatory body determines that such interests must be registered or that the Liquidation Trust must file with the applicable agency, the Liquidation Trust will take appropriate actions at that time.

13.     Post-Confirmation Sale of Assets.

Unless an auction is to occur pursuant to section 5.13 of the Plan, on or before the Effective Date, New REIT shall buy the following Sale Assets in cash, free and clear of any liens and claims, for the collective Sale Price of one hundred thousand dollars ($100,000 USD).

| Applicable Debtor | Asset |
|---|---|
| **Offshore** | |
| | Equity Interests in Petra Fund Master REIT Corp. |
| | Equity Interests in Petra Fund Holdings LLC |
| **REIT** | |
| | Detwiler Loan Participation |
| | Fort Tryon Loan Participation |
| | Equity Interests in PFRC Sub, LLC |
| | Equity Interests in Petra Offshore TRS L.P. |
| | |

The Sale Assets referenced above are listed on the Debtors' publicly filed schedules. Further descriptions of the Sale Assets are being included as part of the Plan Supplement and further additional details and descriptions may be obtained upon request made to Debtors' counsel.

14.     Auction Procedure

If any person other than New REIT is interested in purchasing the Sale Assets, then by the deadlines set forth below, such Potential Bidder must submit to Debtors' counsel, in writing, the following documents:

16

(i)     on or before ten days after the Confirmation Date, its bid for the Sale Assets, which bid must meet the following criteria to be considered a Qualified Bid: (a) must be an all cash offer; (b) must be a minimum of ten thousand dollars ($10,000.00) greater than the Sale Price; and (c) must be for all of the Sale Assets;

(ii)    subject to sub-section (iii) below, whichever Potential Bidder, if any, that submits the highest and best Qualified Bid shall be declared the Highest Bidder and such Highest Bidder shall be declared the Winning Bidder of the auction; provided, however, that in lieu of any other "stalking horse" protections, New REIT shall have the right to match the Qualified Bid of the Highest Bidder and, if it elects to submit such a matching bid, shall be deemed to be the Winning Bidder; and

(iii)    subject to sub-section (iv) below, if the Winning Bidder is the Highest Bidder, payment in full for such bid must be made not later than three days after being declared by Debtors that was the Winning Bidder. If such payment is not made, the Potential Bidder (if any) with the next highest Qualified Bid shall be declared the Winning Bidder (the "Substitute Winning Bidder"); provided, however, that the Substitute Winning Bidder shall also be required to submit payment in full for its bid not later than three days after being declared by Debtors as the new Winning Bidder; and

(iv)    Notwithstanding anything to the contrary, New REIT shall be deemed the Winning Bidder if any of the following occur: (a) there are no Qualified Bids; (b) New REIT submits a matching bid pursuant to sub-section (ii) above, (c) the Highest Bidder fails to make timely payment in full for its bid and there is no other Potential Bidder with a Qualified Bid who can become the Substitute Winning Bidder; or (d) the Substitute Winning Bidder fails to make timely payment in full for its bid. If New REIT is the Winning Bidder, payment in full shall be made on or before the Effective Date.

15.    Monetization of Settlement Payments.

Notwithstanding anything to the contrary in the Plan, Debtors are attempting to convert the Settlement Payments into Cash prior to the Effective Date, either via (1) a discounted pre-payment by the payors of the Settlement Payments or (2) selling or assigning the right to collect the Settlement Payments to a third party, which may occur by a sale or assignment using the procedures similar to those described in sections 5.12 and 5.13 of the Plan for the Sale Assets. To the extent the terms of any such transaction are finalized prior to the Confirmation Hearing, the material terms will be included in the Plan Supplement and approved in connection with

DOCSNY-452583v2

Confirmation of the Plan. To the extent the terms are not finalized until after the Confirmation Hearing, Debtors shall move this Court for such approval, as appropriate, on an expedited basis (not less than two business days' notice). To the extent either of such transactions is consummated prior to the Effective Date, any such settlement or sale would remove the need for the Liquidation Trust and Liquidation Trustee because there would be no further Assets of Debtors to be liquidated.

## G. Liquidation Trust

1.      Transfer by Debtors to Liquidation Trust.

On or the day after the Effective Date, but in no event prior to all transfers of New REIT Assets described herein, subject to section 5.14 of the Plan, the Debtors shall transfer to the Liquidation Trust for the benefit of all Allowed Claims free of all liens, claims and encumbrances (i) all rights, title and interest in the causes of action described in section 5.9 of the Plan (ii) the Remaining REIT Assets and (iii) the Offshore Assets.

2.      Ratification.

On the Effective Date, each holder of Claims or Interests in Classes 1, 1A, 2, 3, 4 and 5 will be deemed to have ratified and become bound by the terms of the Liquidation Trust Agreement, to the extent that the Liquidation Trust is created.

3.      Liquidation of Liquidation Trust Assets.

Subject to section 5.14 of the Plan, the Liquidation Trust shall be authorized to pursue, litigate or settle the causes of action, if any, transferred to it, in accordance with the Plan and the Liquidation Trust Agreement and pay all associated costs.

4.      Powers.

The rights, powers and duties of the Liquidation Trust are set forth in the Liquidation Trust Agreement, which is incorporated in the Plan by reference. Such rights, powers and duties are to be carried out by the Liquidation Trustee as set forth in the Liquidation Trust Agreement and shall vest without the need to obtain further Court approval.

5.      Compensation.

Subject to section 5.14 of the Plan, the Liquidation Trustee and his retained professionals shall be compensated out of the Liquidation Trust Funds pursuant to the Liquidation Trustee Employment Agreement.

6.      Appointment of Successor Liquidation Trustee.

In the event of the resignation or removal, death or incapacity of the Liquidation Trustee, the Liquidation Trust Counsel shall designate another Person to become Liquidation

DOCSNY-452583v2

Trustee. Any such successor to the Liquidation Trustee shall be bound by the provisions of the Plan, the Liquidation Trust Agreement and the order appointing the Liquidation Trustee.

7.    Termination of Liquidation Trustee.

After the Effective Date, and upon final resolution and collection of any funds obtained from any of the Assets transferred to the Liquidation Trust or the proceeds thereof, reconciliation of all Claims, distribution of all Liquidation Trust Funds, and any other action necessary under the Plan to wind down or dissolve the Liquidation Trust, the Liquidation Trust shall be dissolved and the Liquidation Trustee and the Liquidation Trust Counsel (along with any other Professionals employed by the Liquidation Trust or the Liquidation Trustee) shall be relieved of further responsibility. Notwithstanding the foregoing, the Liquidation Trustee, in its absolute discretion, may dissolve the Liquidation Trust and distribute any remaining Liquidation Trust Funds pursuant to the terms of the Liquidation Trust Agreement at any time the Liquidation Trustee determines such dissolution would be in the best interest of the beneficiaries of the Liquidation Trust.

8.    Applicability of Securities Law; Restrictions on Transfer.

The issuance of the noncertificated, beneficial interests in the Liquidation Trust shall, including pursuant to section 1145 of the Bankruptcy Code, be exempt from registration under the Securities Act of 1933 and applicable state and local laws requiring registration of securities. Such interests in the Liquidation Trust will not be listed on any securities exchange or any quotation system, will not be represented by certificates, and will not be transferable except pursuant to the laws of descent and distribution or otherwise by operation of law.

9.    Indemnification of Liquidation Trustee.

New REIT shall indemnify, hold harmless and reimburse the Liquidation Trustee against and from any and all loss, liability or expense which he may sustain or incur in the exercise and performance of any of his powers and duties under the Liquidation Trust Agreement, or for any act or omission in connection with or arising out of the administration of the Plan or the property to be distributed under the Liquidation Trust; provided, however, there shall be no such indemnification for the Liquidation Trustee's fraud, gross negligence, or willful misconduct; provided, further, that such indemnification shall be personal to the person initially serving as Liquidation Trustee, if any, and shall not extend to any successor Liquidation Trustee, unless (1) agreed to in writing by New REIT and (2) to the extent the JPM Debt remains outstanding, agreed to in writing by JPM. To the extent the Liquidation Trustee or the Court determines this indemnification to be insufficient, any Liquidation Trustee is authorized to obtain an insurance policy to provide similar protections.

## H. Provisions Regarding the New REIT

1.    Formation of New REIT Companies and Organization.

On or before the Effective Date, the Debtors and/or New REIT Collateral Manager shall cause the formation of New REIT, New REIT QRS 1, and New REIT QRS 2, and each of the

19

New REIT Companies shall have an appropriate number of shareholders in order to qualify as a real estate investment trust or subsidiary thereof as that term is used in 26 U.S.C. § 856, including as set forth in section 7.2 of the Plan. New REIT shall be a new real estate investment trust, and shall own 100% of the equity interests of both New REIT QRS 1 and New REIT QRS 2, each of which shall be treated as a qualified real estate investment trust subsidiary, as that term is used in 26 U.S.C. § 856. Subsequent to transactions described in section 7.3 of Plan, New REIT QRS 1 shall own 100% of the equity interests of PS SPV which shall continue to own the JPM REIT Collateral.

## 2. Equity Structure of New REIT.

The organizational documents of New REIT shall provide for the issuance of one class of common stock, the holders of which shall be identified in the Plan Supplement. In addition, the New REIT shall issue Class P Preferred Stock to at least ninety-nine additional stockholders (identified in the Plan Supplement.)

## 3. Transfers to New REIT.

On the Effective Date, REIT shall (i) transfer, subsequent to the release of the existing Liens held by JPM pursuant to section 4.2 of the Plan, (a) the JPM REIT Collateral and (b) all of REIT's shares of PS SPV, to New REIT QRS 1, and the shares of New REIT QRS 1 shall be subject to a valid, first-priority Lien in favor of JPM as set forth in section 7. 5 of the Plan as part of the exchange of JPM's Claims and related Liens under the Plan; and (ii) transfer the RBS REIT Collateral to New REIT QRS 2, subject to RBS retaining a Lien on the RBS REIT Collateral, as set forth in section 7.6 of the Plan, in an amount equal to the current value of the RBS REIT Collateral.

## 4. REIT Opinion.

Transfers in section 7.3 of the Plan are conditioned on delivery of an opinion addressed to JPM and RBS, substantially in the form attached in the Plan Supplement, which shall be substantially in the same form as the opinion attached to the Term Sheet, that the New REIT will qualify as a real estate investment trust, and that during and following the transfers contemplated under section 7.3 of the Plan, the issuer under the Petra CDO will continue to be treated as a qualified real estate investment trust subsidiary.

## 5. JPM Debt.

On or before the Effective Date, New REIT shall issue a debt instrument to JPM in the original principal amount of the JPM Stipulated Claim Amount. The JPM Debt will be non-recourse debt secured only by a perfected first-priority Lien on, and payable solely from proceeds of, New REIT's shares of New REIT QRS 1, which shall consist of 100% of the shares of New REIT QRS 1. The shares of New REIT QRS 1 shall be delivered to the Escrow Agent pursuant to the related escrow agreement (the "Escrow Agreement"). The Escrow Agreement shall provide that so long as any JPM Debt remains outstanding, the Escrow Agent shall receive and distribute the JPM REIT Collateral Cash Flow to JPM to apply towards the repayment of the principal of the JPM Debt and any interest accrued thereon. Upon the repayment of the JPM Debt in full in cash, the Escrow Agent shall be instructed to release the shares of New REIT QRS 1 to New REIT, and all liens in favor of JPM relating thereto shall be released.

DOCSNY-452583v2

Until the JPM Debt is repaid in full, promptly following each "Payment Date" under the Petra CDO indenture, New REIT shall distribute the JPM REIT Collateral Cash Flow to the holders of the JPM Debt (which may include payment through the Escrow Agent). The JPM REIT Collateral Cash Flow shall be distributed to the holders of the JPM Debt on a monthly basis.

6.     RBS Debt.

On or before the Effective Date, New REIT shall issue a debt instrument for the repayment of Debtor's reduced indebtedness to RBS in the outstanding principal amount of the then current value of the RBS REIT Collateral at the time of confirmation of the Plan, which amount shall be indicated in the Plan Supplement (or at the Confirmation Hearing, as applicable). Notwithstanding the foregoing, in the event RBS makes an election under section 1111(b) of the Bankruptcy Code (provided such election is timely in accordance with applicable law, including Bankruptcy Rule 3014) to have its claims and the RBS REIT Collateral treated in accordance therewith (the "1111(b) Election"), (i) the RBS Debt shall be in the face amount of the RBS Claim Amount, regardless of the current value of the RBS REIT Collateral, but (ii) the debt instrument governing the payment of such RBS Debt (the "1111(b) Note") shall be calculated and structured such that the annual payments to RBS shall be limited to an amount such that the net present value of the total aggregate payments under the entirety of the 1111(b) Note are no greater than the current value of the RBS REIT Collateral at the time of confirmation of the Plan. The RBS Debt will be non-recourse debt secured only by, and payable solely from proceeds of, the continuing lien of RBS on the RBS Debt Collateral, which is the RBS REIT Collateral. The RBS REIT Collateral shall be delivered to the Escrow Agent pursuant to the Escrow Agreement. The Escrow Agreement shall provide that so long as any RBS Debt remains outstanding, the Escrow Agent shall receive and distribute RBS's allocation of the RBS REIT Collateral Cash Flow to RBS in reduction of the RBS Debt. Upon the repayment of the RBS Debt in full, the Escrow Agent shall be instructed to release the RBS REIT Collateral to New REIT QRS 2, and all liens in favor of RBS relating thereto shall be released.

Until the RBS Debt is repaid in full, promptly following each "Payment Date" under the Petra CDO indenture, New REIT shall distribute the RBS REIT Collateral Cash Flow to the holders of the RBS Debt. This distribution can be through the Escrow Agent. Notwithstanding the foregoing, in the event RBS makes a 1111(b) Election, New REIT shall distribute to RBS an annual amount equal to the amount needed to satisfy that year's obligation under the 1111(b) Note, with any remaining RBS REIT Collateral Cash Flow being distributed to New REIT for distribution to the holders of New REIT's common stock.

7.     New REIT Collateral Manager.

New REIT shall enter into the New REIT Management Agreement with New REIT Collateral Manager and, pursuant to the terms of such agreement, shall retain New REIT Collateral Manager to diligently manage all assets of New REIT that it receives pursuant to the Plan or it otherwise acquires. As set forth in the New REIT Management Agreement, fees shall be payable to the New REIT Collateral Manager on a non-cumulative basis and shall be deducted from the related JPM REIT Collateral Cash Flow before such JPM REIT Collateral Cash Flow is distributed to the holders of the JPM Debt.

DOCSNY-452583v2

# I. Provisions Regarding Voting and Distributions Under the Plan

## 1. Voting of Claims and Interests.

Each holder of record as of the Voting Record Date of an Allowed Claim in an Impaired Class of Claims set forth in Article III of the Plan shall be entitled to vote separately to accept or reject the Plan with regard to each Impaired Class of Claims as provided in the Procedures Order. If the Debtors or the Liquidation Trust object to a Claim, the Claim becomes a Disputed Claim. The holder of a Disputed Claim is not entitled to vote on the Plan unless the Debtors or such holder of the Disputed Claim obtains an order of the Court estimating the amount of the Disputed Claim for voting purposes. If the Debtors do not object to a Claim prior to the date on which the Disclosure Statement and Ballots are transmitted to holders of Claims or Interests entitled to vote, then the holder of such Claim will be permitted to vote on the Plan in the full amount of the Claim as filed.

## 2. Elimination of Vacant Classes.

Any Class of Claims that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or a Claim temporarily allowed under Bankruptcy Rule 3018 or as to which no vote is cast shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

## 3. Nonconsensual Confirmation.

If any Impaired Class of Claims or Interests entitled to vote shall not accept the Plan by the requisite statutory majorities provided in section 1126(c) of the Bankruptcy Code, then the Debtors reserve the right to amend the Plan in accordance with section 12.1 of the Plan or to undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code, or both.

## 4. Distribution to the Liquidation Trustee.

Subject to section 5.14 of the Plan, on the day after the Effective Date or as soon thereafter as is practicable, the Liquidation Trustee shall distribute Cash in the amount of $50,000 to himself from the Liquidation Trust Funds in accordance with the terms of the Liquidation Trustee Employee Agreement, which shall constitute an irrevocable payment of the first half of his annual salary, which shall be deemed fully earned even if he is removed during that period.

## 5. Reserve for Certain Liquidation Trust Expenses.

Subject to section 5.14 of the Plan, on the Effective Date or as soon thereafter as is practicable, prior to the establishment of any other Liquidation Trust Reserve, the Liquidation Trustee shall establish and maintain a reserve in the amount of $100,000 related to Liquidation Trust Expenses that constitute working capital, including the potential future or current retention and employment of Professionals needed in connection with (a) the collection and/or enforcement of the Settlement Payments, as well as (b) the prosecution and/or settlement of any other litigation

transferred to the Liquidation Trust pursuant to section 5.9 of the Plan. Upon retention and employment of such Professionals, the Liquidation Trustee shall disburse (as well as replenish) such reserve as appropriate. This reserve may be part of a larger reserve established for all Liquidation Trust Expenses, including compensation of the Liquidation Trustee and basic operational expenses, both of which expenses may also be reserved for at any time, including on or shortly after the Effective Date.

### 6. Objections to Claims.

Subject to the provisions of Article II of the Plan, objections to Claims, including, but not limited to, Administrative Claims and Fee Claims, shall be Filed by the Debtors or the Liquidation Trust (acting through the Liquidation Trustee) and served upon each affected Creditor at any time.

### 7. Litigation of Claims.

Subject to Court approval, objections to Claims may be litigated to judgment, settled or withdrawn.

### 8. Distribution of Objected Claims.

Distributions with respect to and on account of Claims to which objections have been filed will be made as soon as practicable after an order, judgment, decree or settlement agreement with respect to such Claim becomes a Final Order and such Claim becomes an Allowed Claim, and the applicable holder of such Claim shall not receive interest on its Allowed Claim.

### 9. Reserves for Disputed Class 3 Claims.

Prior to any distributions to the holders of Allowed Class 3 Claims from Liquidation Trust Funds, if any, the Liquidation Trustee shall establish and maintain reserves out of such distribution for all Disputed Class 3 Claims equal to the Pro Rata share of the Disputed Class 3 Claims, and similar reserves shall be created by Debtors to the extent the Liquidation Trust is not formed.

### 10. Unclaimed Property.

If any distribution remains unclaimed for a period of ninety (90) days after it has been delivered (or attempted to be delivered) in accordance with the Plan to the holder of an Allowed Claim, Allowed Interest, Allowed Administrative Claim, Allowed Priority Tax Claim, Allowed Secured Claim, or any other Claim entitled thereto, such unclaimed property shall be forfeited by such holder and returned to the Liquidation Trust or to the Debtors, as applicable, to be distributed in accordance with the Plan.

### 11. Withholding Taxes.

Any federal, state, or local withholding taxes or other amounts required to be withheld under applicable law shall be deducted from distributions hereunder. All Persons holding Claims shall be required to provide any information necessary to determine if such taxes must be

withheld by the Liquidation Trust or the Post-Confirmation Debtors. All Person holding Claims that fail to respond to the Liquidation Trust or the Debtors, as applicable, within sixty (60) days of a request by the Liquidation Trustee (or Debtors' counsel) to provide information necessary to make such determination shall be deemed to have forfeited the right to receive a distribution under the Plan.

12.     Fractional Cents or Shares.

Any other provision of the Plan to the contrary notwithstanding, no payment of fractions of cents will be made or fractional shares of securities issued under the Plan. Whenever any payment of a fraction of a cent or the issuance of a fraction of a share of a security would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole cent or share.

13.     Setoffs.

Except as otherwise provided for herein with respect to Claims released by the Debtors and their estates pursuant to the Plan and the Confirmation Order, the Liquidation Trustee (or the Debtors to the extent they are making distributions under the Plan) may, but shall not be required to, set off against any Claim and the payments to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever the Debtors or their estate may have against the applicable holder of such Claim, but neither the failure to do so nor the allowance of a Claim hereunder shall constitute a waiver or release by the Debtors or their estates of any Claim they may have against any such holder of Claims.

## J. **Unexpired Leases and Executory Contracts**

1.     Rejection of Unexpired Leases and Executory Contracts.

Other than as set forth in the Plan or any exhibit or supplement thereto identifying contracts and or leases to be assumed and/or assigned, any and all pre-petition unexpired leases or executory contracts not previously rejected by the Debtors, unless specifically assumed pursuant to orders of the Court prior to the Confirmation Date or the subject of a motion to assume or assume and assign pending on the Confirmation Date, shall be deemed rejected by the Debtors on the Confirmation Date.

2.     Claims Arising out of Rejection of Unexpired Leases and Executory Contracts.

All proofs of claim with respect to claims arising from the rejection of executory contracts or unexpired leases shall, unless another order of the Court provides for an earlier date, be Filed with the Court within thirty (30) days after the mailing of notice of entry of the Confirmation Order. All proofs of claim with respect to claims arising from the rejection of executory contracts shall be treated as Class 3 Claims for purposes of a distribution pursuant to the Plan, unless and until the party asserting such Claim obtains an order of the Court upon notice to the Liquidation Trust and the Debtors that allows the Claims in another Class under the Plan. Unless otherwise permitted by Final Order, any proof of claim with respect to claims arising from the rejection of executory

DOCSNY-452583v2

contracts or leases that is not filed within 30 days after mailing of the notice of entry of Confirmation Order shall automatically be disallowed as a late filed claim, without any action by the Liquidation Trust or the Debtors, and the holder of such Claim shall be forever barred from asserting such Claim against the Debtors, the New REIT Companies or the Liquidation Trust.

3. Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.

(a) Except to the extent that less favorable treatment has been agreed to by the non-Debtor party or parties to each such executory contract or unexpired lease, any monetary defaults arising under each executory contract or unexpired lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the appropriate amount (the "Cure Amount") in Cash on the later of thirty (30) days after (i) the Effective Date or (ii) the date on which the Cure Amount has been resolved (either consensually or through judicial decision.).

(b) No later than five (5) days prior to the commencement of the Confirmation Hearing, the Debtors shall file a schedule (the "Cure Schedule") setting forth the Cure Amount, if any, for each executory contract or unexpired lease to be assumed pursuant to section 9.1 of the Plan. Any party that fails to object to the applicable Cure Amount listed on the Cure Schedule within twenty (20) days of the filing thereof, shall be forever barred, estopped and enjoined from disputing the Cure Amount set forth on the Cure Schedule (including a Cure Amount of $0.00) and/or from asserting any Claim against the applicable Debtor arising under section 365(b)(1) of the Bankruptcy Code except as set forth on the Cure Schedule.

(c) In the event of a dispute (each, a "Cure Dispute") regarding: (i) the Cure Amount; (ii) the ability of the applicable New REIT Company or Liquidation Trust to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed; or (iii) any other matter pertaining to the proposed assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving such Cure Dispute and approving the assumption. To the extent a Cure Dispute relates solely to the Cure Amount, the applicable Debtor may assume and/or assume and assign the applicable contract or lease prior to the resolution of the Cure Dispute provided that such Debtor (or the applicable New REIT Company or Liquidation Trust, if applicable) reserves Cash in the amount sufficient to pay the full amount asserted as cure payment by the non-Debtor party to such contract or lease (or such smaller amount as may be fixed or estimated by the Bankruptcy Court).

## K. **Effectiveness of the Plan**

1. Conditions Precedent to Effectiveness of the Plan.

The Plan shall not become effective unless and until each of the following conditions has been satisfied or waived: (i) the Court shall have entered the Confirmation Order in form and substance satisfactory to the Debtors; (ii) the Confirmation Order shall have become a Final Order; and (iii) all transactions contemplated by Article VII of the Plan shall be consummated, including issuance of the REIT Opinion.

DOCSNY-452583v2

2.      Waiver of Conditions.

The Debtors may at any time, without notice or authorization of the Court, waive the conditions set forth in section 10.1(ii) above. The Debtors reserve the right to assert that any appeal from the Confirmation Order shall be moot after consummation of the Plan.

3.      Effect of Failure of Conditions.

In the event that the condition specified in section 10.1(ii) of the Plan has not occurred or been waived on or before sixty (60) days after the Confirmation Date, the Confirmation Order may be vacated upon order of the Court after motion made by the Debtors or any party in interest and an opportunity for parties in interest to be heard.

## L.  Retention of Jurisdiction

Following the Confirmation Date and until such time as all payments and distributions required to be made and all other obligations required to be performed under the Plan have been made and performed by the Liquidation Trustee or the Post-Confirmation Debtors, as applicable, the Court shall retain jurisdiction as is legally permissible over issues relating to the Plan, including but not limited, to adjudication of Claims pursuant to sections 2.3, 2.4 and 8.6 thereof.

## M. Miscellaneous Provisions

1.      Pre-Confirmation Modification.

On notice to and with an opportunity to be heard by the United States Trustee, the Plan may be altered, amended or modified by the Debtors before the Confirmation Date as provided in section 1127 of the Bankruptcy Code.

2.      Post-Confirmation Immaterial Modification.

With the approval of the Court and on notice to and an opportunity to be heard by the United States Trustee, and without notice to all holders of Claims and Interests, the Debtors or Post-Confirmation Debtors may, insofar as it does not materially and adversely affect the interest of holders of Claims, correct any defect, omission or inconsistency in the Plan in such manner and to such extent as may be necessary to expedite consummation of the Plan.

3.      Post-Confirmation Material Modification.

On notice to and with an opportunity to be heard by the United States Trustee, the Plan may be altered or amended after the Confirmation Date by the Debtors or Post-Confirmation Debtors in a manner which, in the opinion of the Court, materially and adversely affects holders of Claims, provided that such alteration or modification is made after a hearing and otherwise meets the requirements of section 1127 of the Bankruptcy Code.

DOCSNY-452583v2

4.     Withdrawal or Revocation of the Plan.

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan, then the Plan shall be deemed null and void.

5.     Payment of Statutory Fees.

All fees payable pursuant to section 1930 of Title 28 of the United States Code shall be paid on the Effective Date (if due) or by the Liquidation Trustee when otherwise due.

6.     Role of Committees.

Upon the Effective Date, the appointment and existence of any statutorily appointed committee in the Chapter 11 Cases, such as an official creditors' committee, shall terminate for all purposes and to the extent no such committees exist, no such committee may be subsequently appointed.

7.     Successors and Assigns.

The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors and/or assigns of such Person.

8.     Term of Injunctions or Stays.

Unless otherwise provided, all injunctions or stays arising under or entered during the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

9.     Injunction Against Interference With Plan.

Upon the entry of the Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective present or former affiliates, employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

10.     Releases.

(a)     *Releases by the Debtors. Except as otherwise provided in the Plan or the Confirmation Order, in consideration for each of the Debtor-Released Party's efforts and contributions to implement the restructuring reflected in the Plan, as of the Effective Date, each Debtor, in its individual capacity and as a debtor in possession, shall be deemed to forever have released, waived and discharged all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities (other than the rights of the Debtors to enforce the Plan and the contracts, instruments, releases, indentures and other agreement or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known*

DOCSNY-452583v2

*or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the parties released pursuant to section 12.1(a) of the Plan (as being described in section IV. M. 10(a)), the Chapter 11 Cases, the Plan or the Disclosure Statement and that could have been asserted by or on behalf of the Debtors or their estates, whether directly, indirectly, derivatively or in any representative or any other capacity, against any Debtor-Released Party; provided, however, that: (i) that the releases set forth in section 12.10(a) of the Plan shall not release any Debtor's claims, rights, or causes of action for money borrowed from or owed to a Debtor by any of its directors, officers or former employees as set forth in such Debtors' books and records; (ii) that the releases set forth in section 12.10(a)of the Plan shall not release any Claims against any Person to the extent such Person asserts a crossclaim, counterclaim and/or Claim for setoff pursuant to which such Person seeks affirmative relief against a Debtor or any of its officers, directors, or representatives; and (iii) in no event shall anything in section 12.10(a) of the Plan be construed as a release of any Person's fraud, gross negligence or willful misconduct for matters with respect to the Debtors and their affiliates.*

(b)     *Releases by Holders of Claims and Interests. Except as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, each Releasing Party, in consideration for the obligations of the Debtors and the other Released Parties under the Plan, their efforts and contributions to implement the restructuring reflected in the Plan, and contracts, instruments, releases, agreements or documents executed and delivered in connection with the Plan, will be deemed to have consented to the Plan for all purposes and the restructuring embodied herein and deemed forever to have released, waived and discharged all claims, demands, debts, rights, causes of actions or liabilities (other than the right to enforce the obligations of any party under the Plan and the contracts, instruments, releases, agreements and documents delivered under or in connection with the Plan), including, without limitation, any claims for any such loss such holder may suffer, have suffered or be alleged to suffer as a result of the Debtors' commencement of the Chapter 11 Cases or as a result of the Plan having been consummated, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act or omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, the Plan or the Disclosure Statement against any Released Party.*

(c)     *Entry of the Confirmation Order will constitute the Bankruptcy Court's approval pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 of the releases contained in sections 12.10 (a) and 12.10(b) of the Plan which includes by reference each of the related provisions and definitions contained herein, and further, will constitute the Bankruptcy Court's finding that these releases are (i) in exchange for the good and valuable consideration provided by the Debtors and each of the other Released Parties, representing good faith settlement and compromise of the claims released herein; (ii) in the best interest of the Debtors and all holders of Claims; (iii) fair, equitable, and reasonable; (iv) approved after due notice and opportunity for hearing, and (v) a bar to any assertion by any of the Releasing Parties of any claim released by such Releasing Party against any of the Debtors and the other Released Parties or their respective property.*

DOCSNY-452583v2

(d)     *Notwithstanding anything to the contrary contained in the Plan, except to the extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, nothing in the Confirmation Order or the Plan shall effect a release of any claim by the United States Government or any of its agencies or any state and local authority whatsoever, including without limitation any claim arising under The Employee Retirement Income Security Act of 1974 ("ERISA"), federal securities laws, the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against any Non-Debtor Released Party, nor shall anything in the Confirmation Order or the Plan enjoin the United States or any state or local authority from bringing any claim, suit, action or other proceeding against any Non-Debtor Released Party for any liability whatever, including without limitation any claim, suit or action arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state or local authority, nor shall anything in the Confirmation Order or the Plan exculpate any party from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under ERISA, federal securities laws, the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against any Non-Debtor Released Party.*

11.     Exculpation and Limitation of Liability.

*None of the Exculpated Parties shall have or incur any liability to the Debtors and to any holder of any Claim or Interest for any act or omission in connection with, or arising out of the Debtors' restructuring, including without limitation the negotiation, drafting, execution and Filing of the Plan, the commencement and conduct of the Chapter 11 Cases, the negotiation, drafting and Filing of this Disclosure Statement, the solicitation of votes for and the pursuit of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, including, without limitation, all documents ancillary thereto, all decisions, actions, inactions and alleged negligence or misconduct relating thereto and all prepetition activities leading to the negotiation, promulgation and confirmation of the Plan except fraud, gross negligence, or willful misconduct as determined by a Final Order of the Bankruptcy Court. The Exculpated Parties shall be entitled to rely upon the advice of counsel with respect to duties and responsibilities under the Plan.*

12.     Injunction Related to Releases and Exculpation.

*The Confirmation Order shall permanently enjoin the commencement or prosecution by any person or entity, whether directly, or derivatively or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities released pursuant to the Plan, including but not limited to the claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities released in sections 12.10 and 12.11 of the Plan.*

13.     Retention of Causes of Action/Reservations of Rights.

Subject to section 12.10 of the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims or causes of action, rights of setoff, or other legal or equitable defenses (including, for avoidance of doubt, any cause of actions to avoid a transfer under sections 303(c), 544, 547, 548, or 553(b) of the

29

Bankruptcy Code, or any similar state law) that the Debtors had immediately prior to the Effective Date on behalf of the Debtors' estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable non-bankruptcy law. In connection with objecting to Claims, the Debtors shall have, retain, reserve, and be entitled to assert all such claims, causes of action, rights of setoff, or other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and the Liquidation Trust (as applicable) shall be similarly entitled to assert them on behalf of the Debtors (or their estates) in connection with any objection to Claims, as applicable. All of the Debtors' legal and/or equitable rights respecting any Claim left unimpaired, as set forth in section 2.1 of the Plan, may be asserted after the Confirmation Date (by the Debtors or the Liquidation Trust, as applicable) to the same extent as if the Chapter 11 Cases had not been commenced.

14.     Governing Law.

Except to the extent that the Bankruptcy Code is applicable, the rights and obligations arising under the Plan shall be governed by and construed and enforced in accordance with the laws of the State of New York.

15.     Notices.

Any notice required or permitted to be provided under the Plan shall be in writing and served by either (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery or (c) reputable overnight courier service, freight prepaid, to be addressed as follows:

  If to the Debtors or the Post-Confirmation Debtors:
    Dickstein Shapiro LLP
    1633 Broadway
    New York, New York 10019
    Attention: Brian E. Goldberg or Shaya M. Berger

  If to the Liquidation Trust (only for notices after the Effective Date if there is a Liquidation Trust):
    Dickstein Shapiro LLP
    1633 Broadway
    New York, New York 10019
    Attention: Brian E. Goldberg or Shaya M. Berger

16.     Saturday, Sunday or Legal Holiday.

If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

DOCSNY-452583v2

17. **Section 1146 Exemption.**

Pursuant to section 1146 of the Bankruptcy Code, (i) the issuance, transfer or exchange of any security under or in connection with the Plan or (ii) the making or delivery of any instrument of transfer pursuant to, in implementation of, or as contemplated by, the Plan or (iii) the revesting, transfer or sale of any real or personal property of the Debtors or Post-Confirmation Debtors pursuant to, in implementation of, or as contemplated by, the Plan, in each case including but not limited to any transactions relating to the New REIT Companies, shall not be taxed under any state or local law imposing a stamp tax, transfer tax, real estate transfer tax, mortgage recording tax or similar tax or fee or government assessment. State or local government officials or agents are directed to forego the collection of any such tax or governmental assessment and to accept for Filing and recordation any of the foregoing instruments or other documents without payment of any such tax or governmental assessment.

18. **Severability.**

If any term or provision of the Plan is held by the Court prior to or at the time of Confirmation to be invalid, void or unenforceable, the Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as so altered or interpreted. In the event of any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan may, at the Debtors' option, remain in full force and effect and not be deemed affected. However, the Debtors reserve the right not to proceed to Confirmation or consummation of the Plan if any such ruling occurs. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

19. **Headings.**

The headings used in the Plan are inserted for convenience only and neither constitutes a portion of the Plan nor in any manner affect the provisions of the Plan.

20. **Plan Supplement.**

The complete contents of the Plan Supplement shall be filed not later than seven days prior to the Confirmation Hearing and shall include: (i) the Liquidation Trust Agreement; (ii) the Liquidation Trustee Employment Agreement; (iii) the form of the New REIT Management Agreement; (iv) the current total value of the RBS Claim, secured and unsecured (if any); (v) the description of the Sale Assets; (vi) the terms of the sale, assignment or other monetization of the Settlement Payments, to the extent there is an agreement for any such transaction; (vii) the identity of the holders of New REIT Common Stock; (viii) the form of the REIT Opinion; and (ix) any executory contracts being assumed and/or assigned.

DOCSNY-452583v2

## V. VOTING REQUIREMENTS, ACCEPTANCE AND CONFIRMATION OF THE PLAN

The Bankruptcy Code requires that, in order to confirm the Plan, the Court must make a series of findings concerning the Plan and the Debtors, including that (i) the Plan has classified Claims and Interests in a permissible manner; (ii) the Plan complies with applicable provisions of the Bankruptcy Code; (iii) the Debtors have complied with applicable provisions of the Bankruptcy Code; (iv) the Debtors have proposed the Plan in good faith and not by any means forbidden by law; (v) the disclosure required by section 1125 of the Bankruptcy Code has been made; (vi) the Plan has been accepted by the requisite votes of creditors (except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code) (see "Acceptance of Plan" and "Confirmation Without Acceptance of All Impaired Classes,"); (vii) the Plan is feasible and confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors under the Plan unless such liquidation or reorganization is proposed in the Plan; (viii) the Plan is in the "best interests" of all holders of Claims or Interests in an impaired Class by providing to such holders on account of their Claims or Interests property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain in a chapter 7 liquidation, unless each holder of a Claim or Interest in such Class has accepted the Plan; and (ix) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Court at the hearing on confirmation, have been paid or the Plan provides for the payment of such fees on the Effective Date.

### A. Parties Entitled to Vote

Pursuant to the Bankruptcy Code, only Classes of Claims and Interests that are "impaired" (as defined in section 1124 of the Bankruptcy Code) under the Plan are entitled to vote to accept or reject the Plan. A Class is Impaired if the legal, equitable or contractual rights to which the Claims or Interests of that Class entitled the holders of such Claims or Interests are modified, other than by curing defaults and reinstating the debt. Classes of Claims and Interests that are Unimpaired are not entitled to vote on the Plan and are conclusively presumed to have accepted the Plan. In addition, Classes of Claims and Interests that receive no distributions under the Plan are not entitled to vote on the Plan and are deemed to have rejected the Plan.

### B. Classes Impaired Under the Plan

Classes 1, 1A, 2 and 3 of Claims and Interests are impaired under the Plan and are entitled to vote on the Plan. Acceptances of the Plan are being solicited only from those holders of Claims and Interests in Impaired Classes that will or may receive a distribution under the Plan. Accordingly, the Debtors are soliciting acceptances from members of Class 1, Class 1A, Class 2 and Class 3. The holders of Classes 4 and 5 Claims and Interests are deemed to reject the plan.

### C. Voting Procedures and Requirements

VOTING ON THE PLAN BY EACH HOLDER OF AN IMPAIRED CLAIM OR INTEREST ENTITLED TO VOTE ON THE PLAN IS IMPORTANT. IF YOU HOLD CLAIMS OR

32

INTERESTS IN MORE THAN ONE CLASS, YOU MAY RECEIVE MORE THAN ONE BALLOT. YOU SHOULD COMPLETE, SIGN AND RETURN EACH BALLOT YOU RECEIVE.

a)  Ballots

In voting for or against the Plan, please use only the Ballot or Ballots sent to you with this Disclosure Statement.  If you are a member of Classes 1, 1A, 2 or 3 and did not receive a Ballot, if your Ballot is damaged or lost or if you have any questions concerning voting procedures, please call Debtors' Counsel, Dickstein Shapiro, 212-277-6746.

PLEASE FOLLOW THE DIRECTIONS CONTAINED ON THE ENCLOSED BALLOT CAREFULLY.

b)  Returning ballots

IF YOU ARE A HOLDER OF A CLASS 1, CLASS 2 OR CLASS 3 CLAIM ENTITLED TO VOTE, YOU SHOULD COMPLETE AND SIGN YOUR BALLOT AND RETURN IT IN THE ENCLOSED ENVELOPE TO:

Dickstein Shapiro LLP
Attention: Brian E. Goldberg
and Shaya M. Berger
1633 Broadway
New York, New York 10019.

VOTES CANNOT BE TRANSMITTED ORALLY.  TO BE COUNTED, ORIGINAL SIGNED BALLOTS MUST BE RECEIVED ON OR BEFORE _____ __, 2011 AT 2:00 P.M., EST.  IT IS OF THE UTMOST IMPORTANCE TO THE DEBTORS THAT YOU VOTE PROMPTLY TO ACCEPT THE PLAN.

**D.  Confirmation Hearing**

The Bankruptcy Code requires the Court, after notice, to conduct a hearing regarding whether the Plan and the Debtors have fulfilled the confirmation requirements of section 1129 of the Bankruptcy Code.  The Confirmation Hearing has been scheduled for _____ __, 2011 at [] EST before the Honorable Shelley C. Chapman, United States Bankruptcy Judge, United States Bankruptcy Court, One Bowling Green, New York, New York 10004. The Confirmation Hearing may be adjourned from time to time by the Court without further notice, except for an announcement at the Confirmation Hearing of the date to which the Confirmation Hearing has been adjourned.

**E.  Confirmation**

At the Confirmation Hearing, the Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for Confirmation are that the Plan (i) is accepted by the requisite holders of Claims and Interests or, if

DOCSNY-452583v2

not so accepted, is "fair and equitable" and "does not discriminate unfairly" as to the non-accepting Class of Claims or Interests, (ii) is in the "best interests" of each holder of a Claim or Interest that does not vote to accept the Plan in each impaired Class under the Plan, (iii) is feasible and (iv) complies with the applicable provisions of the Bankruptcy Code.

## F.  Acceptance of Plan

As a condition to confirmation, the Bankruptcy Code requires that each class of impaired claims or interests votes to accept the Plan, except under certain circumstances.  See "Confirmation Without Acceptance of All Impaired Classes" below.  A plan is accepted by an impaired class of claims if holders of at least two-thirds in dollar amount and more than one-half in number of voted claims of that class vote to accept the plan.  A plan is accepted by an impaired class of interests if holders of at least two-thirds of the number of voted shares in such class vote to accept the plan.  Only those holders of claims or interests who actually vote count in these tabulations.  Holders of claims and interests who fail to vote are not counted as either accepting or rejecting a plan.

In addition to this voting requirement, section 1129 of the Bankruptcy Code requires that a plan be accepted by each holder of a claim or interest in an impaired class or that the plan otherwise be found by the Court to be in the best interests of each holder of a claim or interest in such class.  See "Best Interests Test" below.  In addition, each impaired class must accept the plan for the plan to be confirmed without application of the "fair and equitable" and "unfair discrimination" tests in section 1129(b) of the Bankruptcy Code discussed below.  See "Confirmation Without Acceptance of All Impaired Classes" below.

## G.  Confirmation Without Acceptance of All Impaired Classes

The Bankruptcy Code contains provisions for confirmation of the Plan even if the Plan is not accepted by all Impaired Classes, as long as at least one Impaired Class of Claims has accepted it.  These so-called "cramdown" provisions are set forth in section 1129(b) of the Bankruptcy Code.

A plan may be confirmed under the cramdown provisions if, in addition to satisfying all other requirements of section 1129(a) of the Bankruptcy Code, it (a) "does not discriminate unfairly" and (b) is "fair and equitable," with respect to each class of claims or interests that is impaired under, and has not accepted, the Plan.  As used by the Bankruptcy Code, the phrases "discriminate unfairly" and "fair and equitable" have specific meanings unique to bankruptcy law.

In general, the cramdown standard requires that a dissenting class receive full compensation for its allowed claim or interests before any junior class receives any distribution. More specifically, section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed under that section if: (a) with respect to a secured class, (i) the holders of such claims retain the liens securing such claims to the extent of the allowed amount of such claims and that each holder of a claim of such class receives deferred Cash payments equaling the allowed amount of such claim as of the Plan's effective date or (ii) such holders realize the indubitable equivalent of such claims; (b) with respect to an unsecured claim, either (i) the impaired unsecured creditor must receive property

34

of a value equal to the amount of its allowed claim, or (ii) the holders of claims and interests that are junior to the claims of the dissenting class do not receive any properly under the plan; or (c) with respect to a class of interests, either (i) each holder of an interest of such class must receive or retain on account of such interest property of a value, equal to the greater of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled or the value of such interest, or (ii) the holder of any interest that is junior to the interest of such class does not receive or retain any property on account of such junior interest.

The "fair and equitable" standard, also known as the "absolute priority rule," requires, among other things, that unless a dissenting unsecured class of claims or a class of interests receives full compensation for its allowed claims or allowed interests, no holder of claims or interests in any junior class may receive or retain any property on account of such claims or interests. With respect to a dissenting class of secured claims, the "fair and equitable" standard requires, among other things, that holders either (i) retain their liens and receive deferred Cash payments with a value as of the plan's effective date equal to the value of their interest in property of the estate or (ii) otherwise receive the indubitable equivalent of these secured claims. The "fair and equitable" standard has also been interpreted to prohibit any class senior to a dissenting class from receiving under a plan more than 100% of its allowed claims. The requirement that a plan not "discriminate unfairly" means, among other things, that a dissenting class must be treated substantially equally with respect to other classes of equal rank.

BECAUSE CLASSES 4 AND 5 ARE DEEMED TO REJECT THE PLAN, THE DEBTORS INTEND TO SEEK CONFIRMATION OF THE PLAN UNDER THE CRAMDOWN PROVISIONS OF SECTION 1129(b) OF THE BANKRUPTCY CODE WITH RESPECT TO SUCH CLASSES. IN ADDITION, IF ANY OF THE CLASSES ENTITLED TO VOTE ON THE PLAN VOTE TO REJECT THE PLAN, THE DEBTORS RESERVE THE RIGHT TO SEEK CONFIRMATION OF THE PLAN UNDER THE CRAMDOWN PROVISIONS OF THE BANKRUPTCY CODE WITH RESPECT TO SUCH CLASS(ES).

## H. Best Interests Test

In order to confirm the Plan, the Court must independently determine that the Plan is in the best interests of each holder of a Claim or Interest in any such impaired Class who has not voted to accept the Plan. Accordingly, if an impaired Class does not unanimously accept the Plan, the best interests test requires the Court to find that the Plan provides to each member of such impaired Class a recovery on account of the Class member's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the distribution that each such member would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code on such date.

## I. Liquidation Analysis

The Debtors believe that in the event of liquidation under Chapter 7 of the Bankruptcy Code, the full value of the Debtors' assets will not be realized. In order for the full value of the Assets to be realized, the Debtors' estates need to be administered in the most efficient manner possible to limit further administrative expenses. The Plan places all Allowed Claims holders in the best position to obtain, in the most efficient manner, payments for their claims. Under

35

liquidation under Chapter 7, on the other hand, the Debtors would incur the costs of payment of a statutorily allowed commission to the chapter 7 trustee, as well as the costs of counsel and other professionals retained by the trustee. These expenses would be exacerbated due to the unfamiliarity that such Chapter 7 trustee and its counsel and other professionals would have with the Debtors, Petra and its affiliates and the Chapter 11 Cases. The estates would also still be obligated for all unpaid expenses incurred by the Debtors during these Bankruptcy Cases (such as compensation for Professionals), as those expenses are allowed in the Chapter 7 cases.

Moreover, in a chapter 7 liquidation, the Debtors would be liquidated, thereby likely causing a change in the corporate structure of Petra that could jeopardize REIT's status as a qualified real estate investment trust. The assets encumbered by the holders of Class 1 and Class 1A claims that are being used to repay these claims under the Plan are REIT's direct and indirect ownership of certain equity and debt interests in Petra CDO that qualify for tax and other financial benefits only as a result of REIT being a qualified real estate investment trust. To the extent that liquidation of the Debtors' estates pursuant to a chapter 7 would cause REIT to lose its status as a qualified real estate investment trust, the value of those assets would be severely diminished, as would the value of any repayment to holders of Class 1 and 1A claims. Moreover, the Debtors would likely face additional tax obligations and general administrative expenses relating to addressing the disqualification of its real estate investment trust status, diminishing, if not entirely eliminating, the Distributable Assets available to holders of Class 3 claims.

Finally, although not direct parties in interest in the Chapter 11 Cases, the senior noteholders of Petra CDO could suffer substantial negative financial consequences if a chapter 7 liquidation jeopardized REIT's status as a qualified real estate investment trust. On information and belief, several of the senior noteholders of Petra CDO have historically been, and continue to be, substantial financial and similar institutions.

Based on the foregoing, the Debtors believe that holders of Allowed Claims will receive more under the Plan than they would receive if the Chapter 11 Cases were converted to Chapter 7 cases.

## J. **Feasibility**

Under section 1129(a)(l) of the Bankruptcy Code, the Debtors must show that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors (unless such liquidation or reorganization is proposed in the Plan).

The Plan complies with this requirement. The JPM REIT Collateral and RBS REIT Collateral will be transferred to New REIT QRS 1 and NEW REIT QRS 2, respectively. These entities will be wholly owned by New REIT and will be managed by New REIT Collateral Manager, and the company anticipated to fill this role has extensive experience in real estate investment and was chosen by Debtors with the consent of JPM. Additionally, the Debtors will have satisfied their unsecured debt by the distributions to be made by the Post-Confirmation Debtors (or the Liquidation Trust, as applicable) in accordance with the terms of the Plan and such distribution will free New REIT from any claims or judgments arising out of the Debtors' unsecured

DOCSNY-452583v2

debt. Furthermore, the Class 1 and Class 1A claims will be payable only from proceeds of the shares of New REIT QRS 1 and RBS REIT Collateral, respectively, in accordance with the terms of the new debt instruments described in Article VII of the Plan. Because the Class 1 and Class 1A claims will only be payable when and if proceeds are generated by the shares of New REIT QRS 1 and RBS REIT Collateral (which assets are anticipated to generate proceeds), there are no foreseen risks that the Plan will cause any liquidation or further reorganization.

## K. Compliance with the Applicable Provisions of the Bankruptcy Code

Section 1129(a)(1) of the Bankruptcy Code requires that the Plan comply with the applicable provisions of the Bankruptcy Code. The Debtors have considered each of these issues in the development of the Plan and believe that the Plan complies with all applicable provisions of the Bankruptcy Code.

## VI. ALTERNATIVE TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors believe the Plan affords Allowed Claim holders the potential for the greatest realization on the Debtors' assets and, therefore, is in the best interests of such holders. If the Plan is not confirmed, the only viable alternatives are dismissal of these Chapter 11 Cases or conversion to a case under chapter 7 of the Bankruptcy Code. Neither of these alternatives is preferable to the confirmation and consummation of the Plan.

If the Chapter 11 Cases were dismissed, Creditors and Interest holders would revert to a "race to the courthouse," the result being that Creditors and Interest holders would not receive a fair and equitable distribution of the Debtors' remaining assets. Specifically, a dismissal would allow KBS or any other Creditor or Interest holder of the Debtors to assert its claims against the Debtors and would most likely result in a change to the corporate structure of Petra and its affiliates, causing REIT to lose its status as a qualified real estate investment trust. Similarly, a chapter 7 liquidation would also likely result in a change of the corporate structure of Petra and its affiliates, causing REIT to lose its status as a qualified real estate investment trust. Under these scenarios, the assets of the Estates will be severely diminished, resulting in a material reduction in the distributions to all Claim holders. See section V subsection I - "Liquidation Analysis." Therefore, neither a chapter 7 case nor the dismissal of this chapter 11 case is a superior alternative to the Plan and the Plan represents the best available alternative for maximizing returns to creditors.

## VII. SECURITIES REGISTRATION EXEMPTION

## A. Securities Registration Exemption

Except as otherwise provided, to the extent the law would deem securities are being issued pursuant to the Plan, such securities will be issued without registration under the Securities Act or any similar federal, state, or local law to the fullest extent permitted by section 1145 of the Bankruptcy Code. These issuances would also be exempt from registration under the Securities Act or any similar federal, state, or local law in reliance on the exemption set forth in section 4(2) of the Securities Act or Regulation D promulgated thereunder.

37

## B. **Section 1145 of the Bankruptcy Code**

Section 1145(c) of the Bankruptcy Code provides that securities issued pursuant to a registration exemption under section 1145(a)(1) of the Bankruptcy Code are deemed to have been issued pursuant to a public offering. Therefore, the securities issued pursuant to a section 1145 exemption may generally be resold by any holder thereof without registration under the Securities Act pursuant to the exemption provided by section 4(1) thereof, unless the holder is an "underwriter" with respect to such securities, as such term is defined in section 1145(b)(1) of the Bankruptcy Code. In addition, such securities generally may be resold by the recipients thereof without registration under state securities or "blue sky" laws pursuant to various exemptions provided by the respective laws of the individual states. However, recipients of securities issued under the Plan are advised to consult with their own counsel as to the availability of any such exemption from registration under federal securities laws and any relevant state securities laws in any given instance and as to any applicable requirements or conditions to the availability thereof.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" for purposes of the Securities Act as one who, subject to certain exceptions, (a) purchases a claim with a view to distribution of any security to be received in exchange for such claim, or (b) offers to sell securities offered or sold under the plan for the holders of such securities, or (c) offers to buy securities issued under the plan from the holders of such securities, if the offer to buy is made with a view to distribution of such securities, and if such offer is under an agreement made in connection with the plan, with the consummation of the plan or with the offer or sale of securities under the plan, or (d) is an issuer, as used in section 2(11) of the Securities Act, with respect to such securities.

The term "issuer," as used in section 2(11) of the Securities Act, includes any person directly or indirectly controlling or controlled by, an issuer of securities, or any person under direct or indirect common control with such issuer. "Control" (as defined in Rule 405 under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be "in control" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. Moreover, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns at least ten percent (10%) of the voting securities of a reorganized debtor may be presumed to be a "control person."

To the extent that persons deemed "underwriters" receive securities under the Plan, resales of such securities would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Holders of such restricted securities may, however, be able, at a future time and under certain conditions described below, to sell securities without registration pursuant to the resale provisions of Rule 144 and Rule 144A under the Securities Act; provided, however, that any sale will be subject to the restrictions on transfer and assignment contained in the operating, limited liability company and or shareholders agreement of applicable companies, and applicable law.

## C.  Section 4(2) of the Securities Act/Regulation D

Section 4(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving any public offering are exempt from registration under the Securities Act. Regulation D is a non-exclusive safe harbor promulgated by the United States Securities and Exchange Commission under the Securities Act related to, among others, section 4(2) of the Securities Act.

The term "issuer," as used in section 4(2) of the Securities Act, means, among other things, a person who issues or proposes to issue any security. Securities issued pursuant to the exemption provided by section 4(2) of the Securities Act or Regulation D promulgated thereunder are considered "restricted securities." As a result, resales of such securities may not be exempt from the registration requirements of the Securities Act or other applicable law. Holders of such restricted securities may, however, be able, at a future time and under certain conditions described below, to sell securities without registration pursuant to the resale provisions of Rule 144 and Rule 144A under the Securities Act; provided, however, that any sale will be subject to the restrictions on transfer and assignment contained in the operating agreement, limited liability company and or shareholders agreement of applicable companies, and applicable law.

## D.  Rule 144 and Rule 144A

Under certain circumstances, affiliated holders of restricted securities may be entitled to resell their securities pursuant to the limited safe harbor resale provisions of Rule 144. Generally, Rule 144 provides that if certain conditions are met (e.g., that the availability of current public information with respect to the issuer, volume limitations, and notice and manner of sale requirements), specified persons who resell restricted securities or who resell securities which are not restricted but who are "affiliates" of the issuer of the securities sought to be resold, will not be deemed to be "underwriters" as defined in section 2(11) of the Securities Act. Rule144 provides that: (i) a non-affiliate who has not been an affiliate during the preceding three months may resell restricted securities after a six-month holding period if at the time of the sale there is current public information regarding the issuer and after a one year holding period if there is not current public information regarding the issuer at the time of the sale; and (ii) an affiliate may sell restricted securities after a six month holding period if at the time of the sale there is current public information regarding the issuer and after a year holding period if there is not current public information regarding the issuer at the time of the sale, provided that in each case the affiliate otherwise complies with the volume, manner of sale and notice requirements of Rule 144.

Rule 144A provides a non-exclusive safe harbor exemption from the registration requirements of the Securities Act for resales to certain "qualified institutional buyers" of securities that are "restricted securities" within the meaning of the Securities Act, irrespective of whether the seller of such securities purchased its securities with a view towards reselling such securities, if certain other conditions are met (e.g., the availability of information required by paragraph 4(d) of Rule 144A and certain notice provisions). Under Rule 144A, a "qualified institutional buyer" is defined to include, among other persons, "dealers" registered as such pursuant to section 15 of the Exchange Act, and entities that purchase securities for their own account or for the account of another qualified institutional buyer and that, in the aggregate, own and invest on a discretionary

basis at least $100 million in the securities of unaffiliated issuers. Subject to certain qualifications, Rule 144A does not exempt the offer or sale of securities that, at the time of their issuance, were securities of the same class of securities then listed on a national securities exchange (registered as such pursuant to section 6 of the Exchange Act) or quoted in a United States automated inter-dealer quotation system.

IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A RECIPIENT OF SECURITIES PURSUANT TO THE PLAN MAY BE AN UNDERWRITER OR AN AFFILIATE OF THE ISSUER OF SUCH SECURITIES, THE PROPONENT MAKES NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRANSFER THE SECURITIES TO BE DISTRIBUTED PURSUANT TO THE PLAN. ACCORDINGLY, THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF SECURITIES UNDER THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRANSFER SUCH SECURITIES.

## VIII. CERTAIN FEDERAL INCOME TAX
## CONSEQUENCES OF THE PLAN

The following discussion summarizes certain significant U.S. federal income tax consequences of the implementation of the Plan to the Debtors and certain holders of Allowed Claims. This summary is based upon the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury regulations promulgated thereunder, judicial decisions and published rulings and pronouncements of the Internal Revenue Service ("IRS"), all as in effect on the date hereof and all of which are subject to change, possibly with retroactive effect. Due to the unsettled nature of several of the tax issues presented by the Plan and differences in the nature of the creditors' Claims, the tax consequences described below are only general descriptions that are subject to significant uncertainties.

This discussion does not address the tax treatment of certain persons that may be subject to special treatment under the Tax Code (for example, foreign taxpayers, government authorities or agencies, broker-dealers, banks, mutual funds, insurance companies, other financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, including qualified plans, and investors in pass-through entities), or any aspect of state, local or foreign taxation. In addition, this discussion does not address the U.S. federal income tax consequences to holders whose Claims are entitled to reinstatement or are otherwise unimpaired under the Plan. No opinion has been requested, and the Debtors have not sought, nor do they intend to seek, a ruling from the IRS regarding the tax consequences of the Plan. Consequently, there can be no assurance that the treatment set forth below will be accepted by the IRS.

Accordingly, the following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a holder of an Allowed Claim. All holders of Allowed Claims are urged to consult their own tax advisors for the federal, state, local and other tax consequences applicable to them under the Plan.

Because the holders of equity interests in the Debtors are not receiving any distributions under the Plan and thus are not entitled to vote on the Plan, this tax discussion is not

40

intended to address their issues and circumstances, either generally or specifically. Debtors have not engaged in any significant review of their tax consequences. However, Debtors urge such holders to consult their individual tax advisors regarding any tax consequences of the Plan.

**IRS Circular 230 Notice: To ensure compliance with IRS Circular 230, holders of Allowed Claims are hereby notified that: (i) any discussion of federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by holders of Allowed Claims for the purpose of avoiding penalties that may be imposed on them under federal, state or local tax laws, (ii) such discussion is written in connection with the promotion or marketing of the transactions or matters discussed herein, and (iii) holders of Allowed Claims should seek advice based on their particular circumstances from an independent tax advisor.**

THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES OF THE PLAN TO THE HOLDERS OF CLAIMS AND EQUITY INTERESTS MAY VARY BASED ON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER. HOLDERS OF CLAIMS OR EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER (INCLUDING APPLICABLE FOREIGN) TAX CONSEQUENCES PARTICULAR TO THEM UNDER THE PLAN.

## A. **Tax Consequences to the Debtors**

1.  Treatment of transfer to New REIT Companies as Tax-Free Reorganization

The Debtors and the New REIT Companies intend that the transfers of assets from REIT to the New REIT Companies will qualify for U.S. federal income tax purposes as a tax-free "G" reorganization pursuant to section 368(a)(1)(G) of the Tax Code. However, no assurance can be given that the transaction will so qualify and holders of Allowed Claims are urged to consult their own tax advisors as to the consequences if the transaction does not constitute a "G" reorganization.

If a reorganization constitutes a "G" reorganization, the transferor recognizes no gain or loss for U.S. federal income tax purposes upon the transfer of its assets to the acquirer in exchange for stock of the acquirer or on the distribution of the stock acquired to certain parties. In addition, subject to various limitations including those under Tax Code section 382 and 269 discussed below, the transferor's tax attributes, such as net operating loss carryforwards ("NOLs") as of the end of the date of the transfer, will transfer to the acquirer. If the transferor sells or distributes to its creditors any property not transferred to the acquirer, the transferor will recognize gain or loss with respect to the property so sold or distributed. Accordingly, assuming the transfers to the New REIT Companies qualify as a "G" reorganization: (i) REIT will recognize no gain or loss upon the transfer of its assets to the New REIT Companies, and (ii) all of REIT's tax attributes as of the date of transfer will be transferred to New REIT Companies, after taking into account any applicable reduction of such attributes as a result of the discharge of REIT's indebtedness, and subject to any applicable limitations on the subsequent utilization of such attributes (such as under section 382 and 269 of the Tax Code, discussed below).

41

If the transfers do not qualify as a "G" reorganization, REIT may be required to recognize gain or loss with respect to the assets transferred to the New REIT Companies, and any NOLs and other tax attributes will not be transferred to the New REIT Companies. The remainder of this discussion on tax consequences assumes that the transfers qualify as a "G" reorganization.

2.      Cancellation of Indebtedness and Net Operating Losses.

In general, the discharge of a debt obligation by a debtor for an amount less than its adjusted issue price gives rise to cancellation-of-indebtedness ("COI") income which generally must be included in the debtor's income for federal income tax purposes. A debtor that transfers property other than cash to a creditor in satisfaction of a creditor's claim is generally treated as having retired the debt for an amount equal to the fair market value of the property at the time it is transferred to the creditor. The quantification of the amount of COI income that will be realized by the Debtors in connection with the implementation of the Plan will turn at least in part on the value of the non-cash consideration received by Holders of Claims.

However, because REIT will be in a bankruptcy case at the time it realizes the COI income, REIT will not be required to include such COI income in its taxable gross income. However, if REIT excludes COI income pursuant to this bankruptcy exception, it may be required to reduce certain of its tax attributes, which can include NOLs. REIT may also be able to make certain elections regarding the reduction of its basis in depreciable property prior to reducing its NOLs or other tax attributes. REIT, in consultation with Professionals, will determine the appropriate methodology and elections under their interpretation of law as in effect when the tax returns are filed and given the facts as they are known at that time. The Debtors cannot guarantee that the IRS will agree with such methodology or elections or how the Debtors ultimately chose which tax attributes should be reduced.

Additionally, Offshore is a company organized under Cayman Islands law, which has elected to be treated as a partnership for U.S. income tax purposes. A partnership is not entitled to the benefit of the bankruptcy exception regarding COI income. However, because Offshore is merely a guarantor and is not primarily liable for any of the discharged debt, it may not recognize COI income. In certain instances, however, a guarantor may recognize COI income and, therefore, all parties are urged to consult their individual tax advisors.

3.      Sections 269 and 382 Limitations on the Utilization of NOLs.

Section 269 of the Tax Code can disallow the use of losses (including NOLs) in connection with certain transactions, the principal purpose of which is the evasion or avoidance of federal income tax by securing the benefit of a deduction, credit or other similar allowance (which includes NOLs).

Section 382 of the Tax Code severely limits the rate at which a corporation can utilize its NOLs (and, in certain cases, its net unrealized built-in losses and/or deductions) if it undergoes an "ownership change", as described and set forth pursuant to a variety of applicable tax statutory and regulatory provisions. Additionally, a corporation must meet certain continuity of business enterprise requirements for at least two years following an ownership change or risk substantial if not complete reduction of its ability to utilize its NOLs.

DOCSNY-452583v2

To the extent an ownership change occurs within the context of a bankruptcy case, there are certain exceptions that may apply to the otherwise applicable limitations of section 382 relating to a corporation's historic shareholders and/or creditors that held certain qualified indebtedness continuing to own the post-bankruptcy stock of the corporation. However, there are certain considerations that may dictate against a corporation electing to use this bankruptcy-related exception.

Even if the transactions contemplated by the Plan constitute a "G" reorganization, sections 269 and 382 may limit the ability of the New REIT Companies to utilize REIT's NOLs and other tax attributes. It will be necessary to analyze whether the indirect or direct ownership of the New REIT Companies constitutes an ownership change as compared to REIT, and whether any such possible change is impacted by potentially applicable exceptions relating to changes occurring in the context of a bankruptcy case. No assurance can be given that the New REIT Companies will be able to utilize the NOLs and other tax attributes of REIT without limitation. The tax impact of the transaction on the New REIT Companies is a highly complex and fact-dependent analysis, and parties with a going-forward stake in them are urged to consult their individual tax advisors.

4.     Liquidation Trust.

On or about the time of the Effective Date, to the extent the Debtors create the Liquidation Trust because their Assets have not all been converted to Cash on or prior to the Effective Date, Debtors will transfer certain assets to the Liquidation Trust. In connection with this transfer, Debtors will recognize gain or loss measured by the difference between the fair market value of each of the assets transferred to the Liquidation Trust and their basis in each of such assets at the time of transfer.

Debtors intend that the Liquidation Trust will constitute a liquidating trust for federal income tax purposes, such that the beneficiaries of the trust will be treated as having received a pro rata share of the assets and liabilities contributed to the trust, and then as having contributed such assets and liabilities to the trust in exchange for the beneficial interests therein. Assuming the Liquidation Trust is properly classified as a liquidating trust for federal income tax purposes, the beneficiaries of the trust will be treated as the grantors and deemed owners of the assets of the trust, and the trust itself will not be subject to federal income tax. However, if the trust were to be classified at the Effective Date or at a later date as an association taxable as a corporation, the trust would become subject to federal (and possibly state) income taxes, which would reduce the availability of proceeds for distribution. In order to reduce the likelihood of this occurring, the Liquidation Trust is prohibited from electing to be treated as an association taxable as a corporation, the transferability of the interests in the trust have been substantially restricted, and the trustee shall make continued efforts to dispose of the property of the trust, make timely distributions, and not unduly prolong the duration of the Liquidation Trust. However, no assurance can be given that the Liquidation Trust will initially qualify or will continue to qualify as a grantor trust for federal income tax purposes.

DOCSNY-452583v2

## B.  Tax Considerations for All Claim Holders.

This discussion is generally limited to the impact on U.S. holders of Claims, and other holders are urged to consult their own tax advisors and professionals for further information or advice.  In addition, as noted at the beginning of the discussion of tax consequences, parties entitled to special treatment under the Tax Code or subject to unique provisions (such as tax-exempt organizations, financial institutions, and broker-dealers, as well as holders of Claims that are, or who hold claims through, a partnership or other pass-through entity) should consult their own tax advisors.  Moreover, all holders of Claims should nonetheless consult their own tax advisors because of the general informational and summary nature of the discussion contained herein.

### 1.  Holders of Class 1 and 1A Claims

A holder of a Class 1 or 1A Claim who receives JPM Debt or RBS Debt, as the case may be, with respect to such Claim pursuant to the Plan generally will be required to recognize gain or loss for U.S. federal income tax purposes in an amount equal to the difference, if any, between (i) the "issue price" of such new debt instruments received in exchange therefor (other than property received in respect of accrued interest) and (ii) such holder's adjusted basis in the Claim (other than any portion of the Claim attributable to accrued interest).  Assuming the new debt instruments have "adequate stated interest," the issue price of the new debt instruments will be the stated principal amount of such new debt instrument.  To the extent the underlying debt instruments of Class 1 and 1A Claims and the new debt of the New REIT Companies are treated as securities for federal income tax purposes, then the exchange of such debt instruments may be non-taxable as part of the proposed tax-free "G" reorganization.  The rules regarding the treatment of the Claims for U.S. income tax purposes are highly complex, and holders of Class 1 and 1A Claims are urged to consult their individual tax advisors.

### 2.  Holders of Class 3 Claims

A holder of a Class 3 Claim who receives a pro rata portion of the Distributable Assets or other Assets with respect to such Claim pursuant to the Plan (whether directly or in the form of an interest in the Liquidation Trust) generally will be required to recognize gain or loss for U.S. federal income tax purposes in an amount equal to the difference, if any, between (i) the amount of value received with respect to such Claim and (ii) such holder's adjusted basis in the Claim, except to the extent that such amount is attributable to accrued interest.  All holders are urged to consult their own tax advisors for further information and detail.

### 3.  Post-Effective Date Cash Distributions.

Because certain holders of Claims may receive Cash distributions subsequent to the Effective Date of the Plan, the imputed interest provisions of the Tax Code may apply to treat a portion of the subsequent distributions as imputed interest.  Additionally, because holders of Claims may receive distributions with respect to a Claim in a taxable year or years following the year of initial distribution, any loss and a portion of any gain realized by the holder may be deferred.  All holders of Claims are urged to consult their own tax advisors regarding these issues and the possible application of the "installment method" of reporting gains (if any) with respect to their Claims.

4. Accrued but Unpaid Interest.

To the extent that any Claim entitled to a distribution under the Plan is treated as a debt instrument for U.S. federal income tax purposes and comprises principal and accrued but unpaid interest thereon, a portion of the distribution may be treated as representing the payment of such accrued but unpaid interest, which could result in the holder of a Claim realizing ordinary income with respect to the distribution in an amount equal to the accrued but unpaid interest not already taken into income by the holder, regardless of whether the holder otherwise realizes a loss as a result of the Plan.

5. Withholding.

All distributions to holders of Allowed Claims under the Plan are subject to applicable withholding. Under federal income tax law, interest, dividends, and other payments may, under certain circumstances, be subject to "backup withholding". Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails to report properly interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding.

6. **<u>IMPORTANCE OF OBTAINING INDIVIDUAL PROFESSIONAL TAX ASSISTANCE</u>**

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY AND IS NOT INTENDED AS A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A PARTY'S OWN TAX PROFESSIONAL. **<u>THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE</u>**. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND DEPEND ON THE INDIVIDUAL CONSEQUENCES AND CIRCUMSTANCES OF A PARTICULAR CLAIM OR INTEREST HOLDER.

ADDITIONALLY, ONE OF THE DEBTORS IS A COMPANY ORGANIZED UNDER THE LAWS OF A FOREIGN COUNTRY, AND THIS DEBTOR IS ALSO A PARTNERSHIP, WHICH MAY RESULT IN VERY UNIQUE AND COMPLICATED TAX IMPLICATIONS FOR IT, ITS CREDITORS, AND ANY OTHER PARTIES IN INTEREST.

ACCORDINGLY, ALL PARTIES ARE URGED TO CONSULT THEIR OWN TAX ADVISORS ABOUT FEDERAL, STATE, LOCAL AND ANY APPLICABLE FOREIGN INCOME OR OTHER TAX CONSEQUENCES OF THE PLAN.

## IX. RISK FACTORS

The risk factors identified below should not be regarded as constituting the only risks involved in connection with the Plan and its implementation.

## A. **Bankruptcy Considerations**

Although the Debtors believe that the Plan satisfies all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Moreover, there can be no assurance that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate the re-solicitation of votes.

## B. **Business Risks (Inherent Uncertainty of Financial Projections)**

The current crisis in the global credit and financial markets and the inability of corporate borrowers to access the debt markets may materially and adversely affect New REIT's ability to obtain sufficient financing to operate their business on a going forward basis.

The business of New REIT, and the Sale Assets to be sold under the Plan, involve the direct and indirect ownership and lending against and/or leasing of real properties, which is subject to a varying degree of risks. The yield available from any such real property depends on the amount of revenue generated and expenses incurred. The revenues generated by, expenses incurred with respect to, and the value of, a particular real property may be adversely affected by a number of factors, including, without limitation: the cyclical nature of the real estate market; national, regional and local economic climates; local real estate market conditions; fluctuations in operating costs; changes in interest rates; tenant creditworthiness; and the availability, cost and terms of financing. Real estate values are also affected by such factors as government regulations (including those governing usage, improvements, zoning and taxes), interest rate levels, the availability of financing and potential liability under changing environmental and other laws.

New REIT's investment strategy relies upon the stabilization and strengthening of the real estate market over the near future. While the Debtors believe that the market may be showing signs of recovery, there is no assurance that the market will in fact sufficiently strengthen within the needed timeframe to allow for the generation material value. Similarly, the value of any future investments by New REIT will depend in part on any economic recovery. No assurance can be given that there will be any stabilization or strengthening in the real estate market or continued recovery in the broader economy. Any such recoveries will depend, in part, upon events and factors outside the control of New REIT.

## C. **Natural Disasters**

Natural disasters, such as fires and earthquakes, or other catastrophic events could adversely affect New REIT's business and operating results, as well as the Sale Assets. New REIT and the Debtors cannot predict the impact that any future natural disasters or catastrophic events will have on the ability of New REIT and the businesses conducted with or through the Sales Assets to sustain their business activities. The Debtors also cannot ensure that New REIT or the businesses operated with or through the Sale Assets will be able to obtain any insurance coverage with respect to occurrences of natural disasters or catastrophic events and any losses that could result from these acts.

46

## D. **Tax-Related Risks**

There are a number of income tax considerations, risks, and uncertainties associated with consummation of the Plan. Interested parties should read carefully the discussions set forth in section VIII of this Disclosure Statement regarding certain U.S. federal income tax consequences of the transactions proposed by the Plan to the Debtors and the New REIT Companies and to certain holders of Claims who are entitled to vote to accept or reject the Plan, and then should discuss these issues with their individual tax professionals because the discussion is not tax advice. Similarly, although the below discussion contains some information relating to risks associated with parties attempting to qualify as a real estate investment trust for federal income tax purposes, the below discussion is for informational purposes only and does not constitute tax advice. Parties are urged to carefully read and analyze the transactions contemplated by the Plan, and are further urged to consult with their own individual tax advisors and professionals. The discussion that follows assumes that the transfers of assets from REIT to the New REIT Companies will qualify for U.S. federal income tax purposes as a tax-free reorganization pursuant to section 368 of the Tax Code..

### 1. REIT Status.

Even assuming New REIT qualifies as a real estate investment trust for federal income tax purposes, if the value or income of New REIT's indirect and direct real estate related investments declines as a result of increased interest rates, prepayment rates or other factors, it may need to increase its real estate investments and income and/or liquidate its non-qualifying assets in order to maintain its status as a real estate investment trust. Whether such fluctuations impact New REIT's ability to continue to qualify as a real estate investment trust will depend on whether New REIT has significant amounts of nonqualified assets and whether it can meet the applicable statutory or regulatory requirements, including the provisions of section 856(c)(4) of the Tax Code regarding discrepancies or fluctuations in asset values. If the decline in real estate asset values and/or income occurs quickly, remedial action may be especially difficult to accomplish. This difficulty may be exacerbated by the illiquid nature of many of New REIT's assets. New REIT may have to make investment decisions that it would otherwise not make absent considerations involving its status as a real estate investment trust.

Although the Debtors believe that New REIT will be organized and operated as to qualify as a real estate investment trust for federal income tax purposes and that Petra CDO will continue to qualify as a qualified real estate investment trust subsidiary, and that each will continue to be organized and operated in such a manner, Debtors cannot assure this result. Qualification as a real estate investment trust for federal income tax purposes is governed by highly technical and complex provisions of the Code for which there are only limited judicial or administrative interpretations. New REIT's qualification as a real estate investment trust also depends on various facts and circumstances that are not entirely within the control of either Debtors or New REIT. In addition, legislation, new regulations, administrative interpretations or court decisions might change the tax laws with respect to the requirements for qualification as a real estate investment trust or the federal income tax consequences of qualification as a REIT.

If, with respect to any taxable year, New REIT fails to maintain its qualification as a real estate investment trust and/or Petra CDO fails to qualify as a qualified real estate investment trust subsidiary and certain relief provisions do not apply, New REIT could not deduct distributions

DOCSNY-452583v2

to shareholders in computing its taxable income and would have to pay federal corporate income tax (including any applicable alternative minimum tax) on its taxable income. If New REIT had to pay federal income tax, the amount of money available to distribute to shareholders (and possibly Creditors) would be reduced for the year or years involved, but it would no longer be required to pay dividends to shareholders. In addition, New REIT would be disqualified from treatment as a real estate investment trust for the four taxable years following the year during which qualification was lost and thus its cash available for distribution to shareholders would be reduced in each of those years, unless it was entitled to relief under relevant statutory provisions.

Although under the Plan it is intended that New REIT and Petra CDO will be operated in a manner designed to allow each to continue to qualify as a real estate investment trust and qualified real estate investment trust subsidiary, respectively, future economic, market, legal, tax or other considerations may cause them to revoke the real estate investment trust election. In that event, New REIT, its subsidiaries, and their respective shareholders and other investors would no longer be entitled to the federal income tax benefits applicable to a real estate investment trust.

## X. RECOMMENDATION AND CONCLUSION

THE DEBTORS BELIEVE THAT CONFIRMATION AND CONSUMMATION OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS AND INTEREST HOLDERS AND THAT THE PLAN SHOULD BE CONFIRMED. THE DEBTORS ALSO BELIEVE THAT CONFIRMATION OF THE PLAN IS PREFERABLE TO ALL OTHER ALTERNATIVES BECAUSE IT WILL PROVIDE RECOVERIES TO CREDITORS IN EXCESS OF THOSE WHICH WOULD OTHERWISE BE AVAILABLE IF THE CHAPTER 11 CASES WERE DISMISSED OR CONVERTED TO CASES UNDER CHAPTER 7 OF THE BANKRUPTCY CODE. THE DEBTORS STRONGLY RECOMMEND THAT ALL CREDITORS RECEIVING A BALLOT VOTE IN FAVOR OF THE PLAN.

Dated: February 17, 2011

Respectfully submitted,

By: /s/ Lawrence Shelley
　　 Lawrence Shelley as authorized
　　 signatory for Debtors Petra Fund REIT
　　 Corp. and Petra Offshore Fund, L.P.

Counsel for Debtors and Debtors-in-possession:

Arnold Gulkowitz, Esq.
Brian E. Goldberg, Esq.
Shaya M. Berger, Esq
DICKSTEIN SHAPIRO LLP
1633 Broadway
New York, New York 10019
(212) 277-6500 (Telephone)
(212) 277-6501 (Facsimile)

DOCSNY-452583v2