DLA PIPER LLP (US)  
Timothy W. Walsh (TW 7409)

Vincent J. Roldan (VR 7450)  
1251 Avenue of the Americas  
New York, NY 10020  
(212) 335-4500

Richard M. Kremen  
Jodie E. Buchman  
6225 Smith Avenue  
Baltimore, MD 21209  
(410) 580-3000

Hearing Date: April 12, 2011 at 10:00 A.M.  
Objection Deadline: April 8, 2011 at 5:00 P.M.

UNITED STATES BANKRUPTCY COURT  
SOUTHERN DISTRICT OF NEW YORK

_____

| | |
|---|---|
| In re: : | |
| : | |
| PETRA FUND REIT CORP., et al. : | Case No. 10-15500 |
| : | (Jointly Administered) |
| Debtors. : | |
|_____: | |

# MOTION OF KBS PREFERRED HOLDING I, LLC
# FOR APPOINTMENT OF EXAMINER PURSUANT TO
# <u>SECTION 1104(c) OF TITLE 11 OF THE UNITED STATES CODE</u>

Pursuant to section 1104(c) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), KBS Preferred Holding I, LLC ("<u>KBS</u>"), by its counsel, DLA Piper LLP (US), hereby moves for an order appointing an examiner to conduct an investigation of Petra Fund REIT Corp. ("<u>Petra REIT</u>") and Petra Offshore Fund, LP ("<u>Petra Offshore</u>") (collectively, the "<u>Debtors</u>"). In support of this motion, KBS states:

## <u>Jurisdiction</u>

1. This Court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 157 and 1334. The statutory predicate for this motion is section 1104(c) of the Bankruptcy Code.

2. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

3. On October 20, 2010, (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

**Factual Background**

*The KBS Loan*

4. On October 26, 2007, Petra REIT entered into the Loan Agreement with KBS whereby KBS agreed to make a loan to Petra REIT in the amount of $50 million, comprised of a $25 million Tranche A and a $25 million Tranche B loan. Each Tranche was evidenced by a promissory note (collectively, the "Notes").

5. In connection with the loan, Petra Offshore executed an unconditional and unlimited guaranty to KBS (the "Guaranty").

6. The Debtors defaulted on their obligations under the Notes and Guaranty.

*Pre-Petition Lawsuit Against the Debtors and the Debtors' Continuing Strategy of Delay*

7. KBS subsequently filed a Motion for Summary Judgment in Lieu of Complaint against the Debtors in the Supreme Court for the State of New York, Case No. 601384/2009 ("Action 1") on May 5, 2009.

8. The Debtors have pursued a strategy of delay from the outset of this litigation as evidenced by the following:

- In response to Action 1, the Debtors filed a declaratory judgment lawsuit against KBS in the Supreme Court for the State of New York, Case No. 610836/2009 ("Action 2") on June 15, 2009.

- In Action 1 and Action 2 (collectively, the "KBS Lawsuits"), the Debtors argued that they should be excused from paying the debt owed to KBS under the Notes and Guaranty based on the doctrine of impossibility because they allegedly lacked the funds to repay the debt because of the current economic crisis.

- On June 29, 2010, the Court in the KBS Lawsuits entered the Final Order and Judgment (the "Judgment") in favor of KBS and against the Debtors in the KBS Lawsuits in the amount of $65,922,650.21. A true and correct copy of the Judgment is attached hereto as **Exhibit 1** and incorporated by reference herein.

- The Debtors did not appeal the entry of the Judgment.

- After the Judgment was entered, KBS began investigating the Debtors' assets in order to execute on the Judgment.

- Upon discovery of a number of questionable transactions and transfers, KBS sought immediate post-judgment discovery from the Debtors (including document requests and deposition notices).

- The Debtors refused to produce documents on grounds of alleged confidentiality concerns. In an attempt to amicably resolve the matter and address their concerns, for months KBS drafted a series of protective orders for the Debtor's review.

- On October 15, 2010, after yet another call with Petra's Counsel, KBS sent what it believed was a final agreed to form of protective order to the Debtors.

- On October 19, 2010, after receiving no response from the Debtors to the October 15, 2010, email, KBS followed up with the Debtors regarding the proposed protective order.

- Immediately upon realizing that it was not going to be able to delay the matter any longer, the Debtors filed for bankruptcy.

9. The Debtors have purposefully delayed KBS from obtaining its post-judgment discovery by dragging the matter out as long as possible and then filing bankruptcy.

*The Transactions and Transfers in the Years Before Bankruptcy*

10. During its investigation, KBS discovered a number of questionable transactions and transfers by the Debtors in the years before the Petition Date. These discoveries are discussed in general below and in more detail in KBS's Motion for Rule 2004 Examination filed in this case.

11. As of the summer of 2008, the Debtors had an interest in assets that, upon information and belief, are now either further encumbered or were transferred out of the Debtors' portfolio. These assets include, inter alia, the Debtors' interest in notes and/or mortgages, with balances, as of August 2008, totaling $136,018,664, in the numerous multi-million dollar real estate projects.

12. KBS has also uncovered information detailing a significant amount of transfers involving millions of dollars since 2007 from the Debtors to, among others, their affiliates. These affiliates include, but are not limited to, Petra CRE CDO-2007-1, Ltd., Petra Management LLC, Petra Mortgage Capital Corp, LLC, Petra Fund TRS Corp., PFRC Chestnut Holding LLC and Petra Fund Offshore TRS LP (collectively, the "Affiliated Parties").

13. These transfers included, among other things, transfers of the Debtors' interests in multi-million dollar loans and real properties worth millions of dollars to the Affiliated Parties.

14. In particular, KBS's investigation has revealed that, since 2007, Petra REIT has had interests in loans securing and/or in the real properties. These real properties are located in New York, Texas, Pennsylvania, Florida, New Jersey and California.

15. Many, if not all, of these assets have been transferred from Petra REIT to non-Debtor affiliates.

16. In addition, KBS believes that Petra REIT has improperly preferred certain creditors over other creditors. For instance, in 2007, Millennium Partners, LP ("Millennium") made a loan to Petra REIT in the amount of thirty million dollars ($30,000,000) (the "Millennium Loan").

17. Upon information and belief, in or about June 2008, Petra REIT, when insolvent, repaid this debt. The circumstances surrounding the timing and reasons for this payment are questionable.

18. Upon information and belief, Petra REIT has taken additional detrimental actions to its creditors with respect to its relationship with certain of its warehouse lenders including JP Morgan Chase which have directly negatively impacted its financial condition. In particular, KBS believes that Petra REIT dissipated its assets by allowing JP Morgan Chase to re-possess collateral that was not secured by its warehouse lending facilities. In addition, JP Morgan Chase improperly removed cash flow from the Bear Stearns cash account which was not part of its collateral and set off this collateral against its debt. These funds were cash flow distributions from CDOs and should not have been removed by JP Morgan Chase.

19. Upon information and belief, the Debtors' actions in favoring creditors and transferring assets occurred when the Debtors were insolvent or rendered the Debtors insolvent.

## *Discovery Efforts After the Petition Date*

20. On November 15, 2010, KBS filed a Motion for Rule 2004 Examination. The Debtors opposed the motion.

21. Once again, the Debtors refused to produce documents and delayed the matter for several months. On January 7, 2011, KBS and the Debtors were finally able to resolve the Motion for Rule 2004 Examination but only after the Court intervened. Pursuant to the parties' agreement, after Court intervention, the Debtors were ordered to produce, among other things, documents dating back to October 20, 2008. A true and correct copy of a letter confirming the agreement, sent by Vincent Roldan to Arnold Gulkowitz on January 7, 2011, is attached hereto

as **Exhibit 2** and incorporated by reference herein. The Debtors have still not agreed to appear for an examination on the topics identified in the Motion for Rule 2004 Examination.

22. As part of the parties' agreement they agreed to execute a confidentiality agreement (the "Confidentiality Agreement") on January 13, 2011. The Debtors had forty-five (45) days from the execution of the Confidentiality Agreement to produce the responsive documents. The 45 day period expired on February 27, 2011.

23. In total the Debtors produced less than 1,000 pages of documents in response to KBS's requests. This production is woefully inadequate.

24. The Debtors failed to produce, among other things, the following categories of documents:

- Any and all supporting documents regarding the transfers from the Debtors to affiliated parties, JP Morgan, Bear Stearns and third-parties since October 20, 2008. The Debtors provided only a list of a few transfers since October 2008. Based on KBS's investigation, this list barely scratches the surface and does not include the Debtors' prior interest in numerous loans and real properties;

- The closing documents from the payoff of the Millennium loan including, but not limited to, a copy of the wire confirmation or check, any settlement statement and correspondence regarding the maturity date (other than the 2 emails which were produced);

- The Debtors produced an incomplete organizational chart by excluding some affiliated parties and identification of officers and directors including, but not limited to, Petra Capital Management, Petra Capital REIT Fund and Petra Capital Offshore Fund;

- A list of bank accounts since 2007;

- Any financial statements of the Debtors other than from 2007;

- The tax return for 2010 (if filed);

- The dates of the balance sheets that were produced;

- The Petra Capital REIT Fund general ledger since September 2010;

- Confirmation that the Petra Capital REIT Fund includes Petra REIT;

- Return of Partnership Income for Petra Offshore for the time period October 2008 through present other than what was provided;

- The outstanding amounts allegedly due and owing to JP Morgan and Bear Stearns;

- Documents relating to the Debtors' proposed financing of their reorganization and any correspondence with JP Morgan and/or Bear Stearns regarding the proposed financing.

25. Without these documents creditors may never have the ability to investigate additional assets of the Debtors' estate. Although numerous proofs of claim that were filed provide that their claims are contingent, the claims register provides that the total amount of (a) unsecured claims are $888,922,650.21 and (b) secured claims of $141,233,391.53 rendering a total claims amount of $1,030,156,041.74. If the Debtors purposefully divested themselves of hundreds of millions of dollars in assets, creditors should have the right to fully investigate any potential causes of action and the validity of any claims.

26. To date, the Debtors have not filed any objections to any claims.

### *The Debtors' Disclosure Statement and Plan*

27. On February 17, 2011, the Debtors filed their proposed disclosure statement (the "Disclosure Statement") and related plan of reorganization (the "Plan").

28. The Plan provides for a pro rata distribution to unsecured creditors of approximately $1.5 million. The Plan is completely silent on the pursuit potential avoidance actions and other causes of action. In addition, by the Plan, the Debtors impermissibly seek to obtain releases of third-party non-debtors including their warehouse lenders JP Morgan Chase and RBS/Greenwich.

29. The Disclosure Statement does not provide adequate information for creditors to make an informed judgment about the Plan on at least five (5) grounds: (1) there is inadequate

disclosure regarding the history of the Debtors; (2) there is inadequate disclosure regarding the relationship between the Debtors' and their related entities, (3) there is in of adequate disclosure regarding the proposed distributions to creditors under the Plan, (4) there is inadequate disclosure regarding avoidance actions and the transfers from the Debtors to related entities in the applicable years before the Petition Date, and (5) the Plan is not confirmable on its face because, among other things, it improperly provides for releases of third-party non-debtors. KBS reserves the right to object to the Disclosure Statement.

30. The hearing on approval of the Disclosure Statement is scheduled for April 6, 2011.

## Legal Analysis and Argument

33. Section 1104(c) of the Bankruptcy Code provides:

> (c) If the court does not order the appointment of a trustee under this section, then at any time before the confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and hearing, the court ***shall*** order the appointment of an examiner to conduct such investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor, if –
>
> (1) such appointment is in the interest of creditors, any equity security holders, and other interests of the estate; ***or***
>
> (2) the debtor's fixed, liquidated unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000.

11 U.S.C. § 1104(c) (emphasis added).

34. No trustee is appointed to the case, nor is the appointment of a trustee pending.

37. KBS, one of the largest unsecured creditors, is a party in interest in this case.

## A. Appointment of an Examiner is Mandatory Under § 1104(c)(2).

38. The Debtors do not dispute that their debt to KBS exceeds $5,000,000. Indeed, the Debtors owe KBS more than $65,000,000 pursuant to the Judgment. This Judgment is unsecured, and not a debt for goods, services, or taxes, or owing to an insider.

39. Therefore, pursuant to § 1104(c)(2), an examiner **shall** be appointed to conduct an investigation. The appointment of an examiner when the requirements of § 1104(c)(2) have been met is mandatory. *See In re Loral Space and Commc'n Ltd.*, 2004 WL 2979785 (S.D.N.Y. Dec. 23, 2004) (holding that the Bankruptcy Court had no discretion to deny appointment of an examiner pursuant to § 1104(c)(2) where the $5,000,000 debt threshold was met); *In re Keene Corp.*, 164 B.R. at 854 (stating that § 1104(b)(2), now § 1104(c)(2), is an "objective test"); *In re Revco D.S., Inc.*, 898 F.2d 498 (6th Cir. 1990) (holding that the plain language of § 1104(c)(2) requires the court to appoint an examiner).

## B. The Appointment of an Examiner is Justified Under § 1104(c)(1).

40. Even assuming the appointment of an examiner was not mandatory in this case, the appointment of an examiner is justified under § 1104(c)(1). The appointment of an examiner is appropriate and necessary to effectively investigate possible fraud, dishonesty, incompetence, misconduct, mismanagement, and irregularity in the management of the Debtors by current and former management.

41. In particular, the appointment of an examiner is necessary to investigate possible fraud, dishonesty, incompetence, mismanagement, misconduct, and irregularity regarding the hurried disposal, transfer, and encumbrance of Debtors' assets in the years prior to the bankruptcy filing. Specifically, these actions include:

- Disposal of the Debtors' unencumbered interest in multi-million dollar real estate assets. As of August 2008, the Debtors' interest in notes

and/or mortgages in real estate projects totaled $136,018,664. Upon information and belief, these assets are now either encumbered or were transferred out of the Debtor's portfolio. *See supra* at ¶ 13.

- The Debtors' transfer, since 2007, of millions of dollars worth of assets to the Affiliated Parties. *See supra* at ¶ 14.

- The Debtors' transfer in 2007 of interest in loans securing millions of dollars worth of real property to non-Debtor affiliates. *See supra* at ¶¶ 16-17.

42. Upon information and belief, the Debtors' actions purposefully and voluntarily impoverished the Debtors, to the detriment of their creditors.

43. In addition, the appointment of an examiner is necessary to investigate possible fraud, dishonesty, incompetence, misconduct, mismanagement, and irregularity regarding the Debtors' preferential payments to certain creditors over other creditors.

44. The Debtors' preference for certain creditors has resulted in the depletion of millions of dollars worth of assets, to the detriment of non-preferred creditors. *See supra* at ¶¶ 18

45. An examiner's investigation likely will uncover additional improper payments, transfers of assets, and re-possessions of collateral. It is unlikely that the Debtors will provide KBS will all of the categories of documents that it requested in the Motion for Rule 2004 Examination.

46. The appointment of an examiner pursuant to § 1104(c)(1) is appropriate when there are allegation of multiple instances of fraud, dishonesty, incompetence, misconduct, mismanagement, and irregularity in the management of the debtor. *See In re Grand Jury Subpoena Duces Tecum Dated Apr. 19, 1991*, 945 F.2d 1221, 1222 (2nd Cir. 1991) (acknowledging the Bankruptcy Court for the Southern District of New York appointed an examiner to investigate and review allegedly fraudulent pre-Chapter 11 transactions involving the debtor, its affiliate corporation, and its parent corporation); *In re Keene Corp.*, 164 B.R. 844, 856

(Bkrtcy. S.D.N.Y. 1994) (stating the case was a "textbook case calling for the appointment of an examiner in the interest of creditors" where "the allegations in connection with this motion center around the transfer of the [debtor's] property in fraud of creditors by [the debtor's] present and former officers and directors"); *In re Ionosphere Club, Inc.*, 156 B.R. 414, 432 (Bkrtcy. S.D.N.Y. 1993) (discussing appointment of examiner to investigate certain pre-petition transactions, including allegations the debtor "systematically transferred a wide variety of assets from [the debtor] to [an affiliated corporation]").

47. An examiner's investigation is in the interest of all creditors because the examiner will confirm whether the Debtors failed to disclose assets, made improper payments, and improperly transferred and encumbered assets and interests. The examiner may uncover additional instances of such conduct, completely unknown to KBS or other creditors at this time. This investigation will benefit creditors because it will aid in the recovery of assets to pay the Debtors' debt and ensure all creditors are treated fairly. "The purpose of an examiner's investigation in bankruptcy is to discover whatever assets may exist for the estate of the bankrupt;" the record compiled by the examiner is "a source of information designed for the purpose of identifying the assets of the estate for the eventual benefit of the debtor and its creditors." *In re Ionosphere Club, Inc.*, 156 B.R. at 432.

48. An examiner's investigation is in the interest of all creditors because the examiner's record aids the court in determining the rights of each creditor. "Once the assets have been identified by the Examiner, it is the role of the Bankruptcy Court to determine. . . the distribution of these assets and the determination of the parties' rights to them in accordance with the priorities set out by the Bankruptcy Code." *Id.*

49. In addition, the Debtors have continually engaged in delay tactics which have prevented any discovery. When the Debtors realized their delay tactics could not be extended any longer, they immediately filed for bankruptcy. Although the Debtors have delayed discovery by KBS for many months, they have hurried to rush a plan and disclosure statement through confirmation, thus assuring its improper and fraudulent transactions would remain hidden and unaccounted for. The Debtors' attempt to do so should not be tolerated because "[w]here bankruptcy creditors are concerned, the race is not supposed to belong to the swift; equality rather than expedition is the governing principle." *In re Keene Corporation*, 164 B.R. at 849.

50. Moreover, the appointment of an examiner is necessary and appropriate. Indeed, "[t]he main purpose of an examiner. . . is primarily investigative." *In re Bradlees Stores, Inc.*, 209 B.R. 36, 39 (Bkrtcy S.D.N.Y. 1997). *See also In re Ionosphere Clubs, Inc.*, 156 B.R. at 432 ("The primary function of an examiner is to investigate the debtor's actions, financial condition, as is appropriate under the particular circumstances.") (*quoting In re Apex Oil Co.*, 101 B.R. 92, 95 (E.D.Mo. 1989)).

51. The appointment of an examiner to prevent the Debtors from rushing a plan through confirmation while simultaneously blocking full discovery by creditors is in the interest of all creditors. Without such discovery it is impossible for any creditors to conduct an informed assessment of the plan and disclosure statement.

52. KBS, in lieu of submitting a memorandum in support of this motion, will rely upon the grounds and authorities set forth herein, as well as upon any argument made at a hearing.

WHEREFORE, KBS requests that the Court:

(a) Order the appointment of an examiner pursuant to § 1104(c) subject to notice and a hearing on this matter; and

(b) Grant such other and further relief as is just and appropriate under the circumstances.

Dated: March 21, 2011

Respectfully submitted,

DLA PIPER LLP (US)

    /s/ Timothy W. Walsh
Timothy W. Walsh
Vincent J. Roldan
1251 Avenue of the Americas
New York, NY 10020
(212) 335-4500

and

Richard M. Kremen (Md. Fed. Bar No. 532)
Jodie E. Buchman (Md. Fed. Bar No. 26004)
DLA Piper LLP (US)
6225 Smith Avenue
Baltimore, MD 21209
(410) 580-3000 (*telephone*)
(410) 580-3001 (*facsimile*)
Attorneys for KBS Preferred Holding, LLC

# **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on this 22nd day of March, 2011, copies of the foregoing *Motion of KBS Preferred Holding, LLC for Appointment of an Examiner Pursuant to section 1104(c) of the United States Code* and accompanying proposed *Order Granting Motion of KBS Preferred Holding, LLC for Appointment of an Examiner Purs*uant to Section 1104(c) of the United States Code were sent by first-class mail, postage prepaid, to the following on the annexed service list.

                                                /s/ Vincent J. Roldan
                                                Vincent J. Roldan

## Service List

**Petra Fund REIT Corp.**
1370 Avenue of the Americas
23d Floor
New York, NY 10019

**Dickstein Shapiro LLP**
1633 Broadway
New York, NY 10019
Attn:   Brian Edward Goldberg, Esq.
           Shaya M. Berger, Esq.

*U.S. Trustee*
**United States Trustee**
33 Whitehall Street
21st Floor
New York, NY 10004

**Kaye Scholer LLP**
425 Park Avenue
New York, New York 10022
Attn:   Benjamin Mintz, Esq.
(Attorneys for The Royal Bank of Scotland plc)

**Cadwalader, Wickersham & Taft LLP**
700 Sixth Street, N.W.
Washington, DC  20001
Attn:   Mark C. Ellenberg, Esq.
(Attorneys for J.P. Morgan Securities, Inc.)

**Cadwalader, Wickersham & Taft LLP**
One World Financial Center
New York, New York  10281
Attn:   Michael J. Cohen, Esq.
(Attorneys for J.P. Morgan Securities, Inc.)