KAYE SCHOLER LLP
425 Park Avenue
New York, New York  10022
(212) 836-8000 (Telephone)
(212) 836-8689 (Facsimile)
Benjamin Mintz, Esq.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| PETRA FUND REIT CORP, *et al.*, | : Case No. 10-15500 (SCC) |
| | : |
| Debtors. | : Jointly Administered |

-----------------------------------------------------------------

**OBJECTION OF THE ROYAL BANK OF SCOTLAND PLC TO
THE MOTION OF DEBTORS FOR ORDER (A) APPROVING
(I) ADEQUACY OF DISCLOSURE STATEMENT AND (II) SOLICITATION
AND TABULATION PROCEDURES; (B) ESTABLISHING VOTING RECORD
DATE; (C) ESTABLISHING VOTING DEADLINE; (D) SCHEDULING, AND
APPROVING FORM AND MANNER OF NOTICE OF, HEARING TO
CONFIRM PLAN; AND (E) ESTABLISHING DEADLINE AND
<u>PROCEDURES FOR OBJECTIONS TO CONFIRMATION OF THE PLAN</u>**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................. 1

BACKGROUND ................................................................................. 2

    A.    The Chapter 11 Cases; the Plan and Disclosure Statement ....................... 2

    B.    RBS's Relationship With the Debtors ....................................... 3

    C.    Summary of the Plan ......................................................... 7

ARGUMENT ..................................................................................... 9

    I.    THE DISCLOSURE STATEMENT FAILS TO PROVIDE ADEQUATE INFORMATION AS REQUIRED BY BANKRUPTCY CODE SECTION 1125 ................................................................................. 9

    II.    THE DISCLOSURE STATEMENT SHOULD NOT BE APPROVED BECAUSE THE PROPOSED PLAN IS UNCONFIRMABLE ON ITS FACE ............................................................................... 13

    A.    The Plan Is Patently Unconfirmable Because the Plan Seeks to Administer Assets In Which the Debtors Do Not Have Any Right, Title or Interest ............................................................... 14

    B.    The Plan Is Patently Unconfirmable Because the Plan Plainly Fails to Satisfy the Cramdown Requirements of Section 1129(b) ................... 15

        1.    The Plan Unfairly Discriminates Against RBS ........................... 16

        2.    The Plan is Not Fair and Equitable .................................... 17

        3.    The Plan Does Not Meet the Cramdown Requirements With Respect to RBS's Secured Claim and Further Violates the Fair and Equitable Requirement ............................... 19

    C.    The Plan Clearly Is Not Feasible ........................................ 24

    D.    The Plan Was Not Proposed in Good Faith ................................. 26

    E.    The Plan Violates the Absolute Priority Rule ........................... 29

CONCLUSION ................................................................................. 31

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*CoreStates Bank, N.A. v. United Chem. Techs.*,
    202 B.R. 33 (E.D. Pa. 1996) .......................................................................20, 21

*Dish Network Corp. v. DBSD N. Am., Inc. (In re DBSD N. Am., Inc.)*,
    2010 U.S. App. LEXIS 27007 (2d Cir. Dec. 6, 2010) ...........................................30

*Ford Prods. Corp. v. Bank of New York (In re Ford Prods. Corp.)*,
    159 B.R. 693 (Bankr. S.D.N.Y. 1993) ..................................................................20

*In re Apple Tree Partners, L.P.*,
    131 B.R. 380 (Bankr. W.D. Tenn. 1991) ....................................11, 18, 19, 22, 24, 25

*In re Beyond.com Corp.*,
    289 B.R. 138 (Bankr. N.D. Cal. 2003) ...................................................................14

*In re Central Medical Center, Inc.*,
    122 B.R. 568 (Bankr. E.D. Mo. 1990) ...................................................................15

*In re D & F Constr., Inc.*,
    865 F.2d 673 (5th Cir. 1989) ...........................................................................18, 24

*In re Edgewater Motel, Inc.*,
    85 B.R. 989 (Bankr. E.D. Tenn. 1988) ..................................................................25

*In re Exide Techs.*,
    303 B.R. 48 (Bankr. D. Del. 2003) .......................................................................17

*In re Filex, Inc.*,
    116 B.R. 37 (Bankr. S.D.N.Y. 1990) ....................................................................13

*In re Hoffman*,
    52 B.R. 212 (Bankr. D.N.D. 1985) ..................................................................20, 21

*In re Lakeside Global II, Ltd.*,
    116 B.R. 499 (Bankr. S.D. Tex. 1989) .............................................................11, 25

*In re Landmark at Plaza Park, Ltd.*,
    7 B.R. 653 (Bankr. D.N.J. 1980) ..........................................................................24

*In re Miami Ctr. Assoc., Ltd.*,
    144 B.R. 937 (Bankr. S.D. Fla. 1992) ..............................................................19, 21

*In re Momentum Mfg. Corp.*,
25 F.3d 1132 (2d Cir. 1994) ............................................................................9

*In re Phoenix Petroleum Co.*,
278 B.R. 385 (Bankr. E.D. Pa. 2001) .........................................................10, 13

*In re Spanish Lake Associates*,
92 B.R. 875 (Bankr. E.D. Mo. 1988) ..........................................................18, 19

*In re Stanley*,
185 B.R. 417 (Bankr. D. Conn. 1995) ..............................................................22

*In re United States Brass Corp.*,
194 B.R. 420 (Bankr. E.D. Tex. 1996) .............................................................10

*In re White*,
36 B.R. 199 (Bankr. D. Kan. 1983) ................................................................25

*In re Young Broad., Inc.*,
430 B.R. 99 (Bankr. S.D.N.Y. 2010) ..............................................................16

*Kane v. Johns-Manville Corp.*,
843 F.2d 636 (2d Cir. 1988) ............................................................................24

*Menard-Sanford v. Mabey (In re A.H. Robins Co.)*,
880 F.2d 694 (4th Cir. 1989) ..........................................................................10

*Norwest Bank Worthington v. Ahlers*,
485 U.S. 197 (1988) .......................................................................................30

*Oneida Motor Freight, Inc. v. United Jersey Bank*,
848 F.2d 414 (3d Cir. 1988) ..............................................................................9

*Sunflower Racing v. Mid-Continent Racing & Gaming Co. (In re Sunflower Racing)*,
226 B.R. 673 (D. Kan. 1998) ..........................................................................18

## OTHER AUTHORITIES

COLLIER ON BANKRUPTCY ¶ 1129.05(5) (Alan N. Resnick & Henry J. Sommer eds., 15th
ed. rev.) ........................................................................................................25

The Royal Bank of Scotland plc ("**RBS**") hereby files this objection to the motion filed by Petra Fund REIT Corp. ("**Petra REIT**") and Petra Offshore Fund, L.P. ("**Petra Offshore**" and together with Petra REIT, the "**Debtors**") seeking an order, among other things, approving the adequacy of the Debtors' disclosure statement (the "**Motion**") [Docket No. 59], and respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      The Court should not approve the Motion because the Debtors' disclosure statement fails to provide "adequate information" in a number of important respects.  For example, the disclosure statement should address the impact of RBS's delivery of a notice of default in accordance with the safe harbor rules of the Bankruptcy Code and the fact that the Debtors do not have any right, title or interest in the Class F Notes, the Class G Notes or the Class J Notes (each as defined below) that are sought to be administered under the plan.

2.      Importantly, the Debtors' plan and disclosure statement also fail to provide any meaningful disclosure regarding the terms of the New RBS Note or the 1111(b) Note (each as defined below), including the applicable interest rate, maturity date, amortization, and other relevant terms and conditions.  Those notes are the principal recovery provided to RBS under the Plan on account of its secured claim.  The disclosure statement also fails to provide any basis for the Debtors' determination that RBS's collateral is worth a mere $150,000, when in contrast the JPM REIT Collateral (as defined below), which is contractually subordinated to RBS's collateral, is valued by the Debtors under the Plan at $14.6 million.  The disclosure statement also fails to disclose the new equity holders of the restructured Debtors, their relationship to the Debtors, the existing equity holders, and certain non-debtor affiliates, and the anticipated value that is being allocated under the plan to such equity holders.  Other areas in

which the Disclosure Statement falls short of providing adequate information are described below.

3.     The Court should also deny the Motion because the plan is patently unconfirmable.  While RBS recognizes that courts do not typically address confirmation-related issues at the disclosure stage, here the defects in the plan are so fundamental and serious that the continued prosecution of the plan would be an undue waste of time and estate and judicial resources and should not be permitted.  Among other fatal flaws, the plan seeks to administer non-estate assets, the plan clearly fails to satisfy the requirements of section 1129(b) (*e.g.*, under the Plan, the Debtors seek to unilaterally determine the value of RBS's collateral and the amount of RBS's claim rather than have the Court make such determinations as required by the Bankruptcy Code), the Plan is facially not feasible, and the Plan is not proposed in good faith. Therefore, the Motion should be denied.

## BACKGROUND

**A.     The Chapter 11 Cases; the Plan and Disclosure Statement**

4.     On October 20, 2010 (the "**Petition Date**"), each of the Debtors filed a petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").  No trustee or committee has been appointed in the Debtors' cases (the "**Chapter 11 Cases**").

5.     On February 17, 2011, the Debtors filed the Plan of Reorganization of Petra Fund REIT Corp. and Petra Offshore Fund L.P. (the "**Plan**") along with the accompanying

Disclosure Statement of Petra Fund REIT Corp. and Petra Offshore Fund L.P. (the "**Disclosure Statement**") [Docket No. 57].[1]

      6.      On March 3, 2011, the Debtors filed the Motion seeking, among other things, approval of the adequacy of the Disclosure Statement.  The objection deadline for the Motion is March 31, 2011 and the hearing date for the Motion is April 6, 2011.

      7.      By motion dated March 21, 2011, KBS Preferred Holding I, LLC ("**KBS**") filed a motion for the appointment of an examiner to conduct an investigation into the Debtors' business practices, management, current assets, liabilities, assets that were transferred or disposed of in the years before the bankruptcy proceeding, and other potential sources of recovery for creditors (the "**Examiner Motion**") [Docket No. 69].  In the Examiner Motion, KBS, the Debtor's largest unsecured creditor after RBS, indicated that it too intended to oppose the Motion.

      **B.**      **RBS's Relationship With the Debtors**

      8.      Prior to the Petition Date, RBS and Petra REIT entered into that certain Master Repurchase Agreement dated August 10, 2006 (as amended by that certain First Omnibus Amendment to Repurchase Documents dated as of March 16, 2007, as further amended by that certain letter agreement dated as of October 6, 2008, as further amended by that certain letter agreement dated as of November 4, 2008, the "**Repurchase Agreement**").[2]  Copies of the Repurchase Agreement, the First Omnibus Amendment dated as of March 16, 2007, the letter agreement dated as of October 6, 2008 and that certain letter agreement dated as of November 4,

---

[1] Capitalized terms not otherwise defined herein shall have the definitions ascribed thereto in the Plan and Disclosure Statement.

[2] RBS's predecessor in interest, Greenwich Capital Financial Products, Inc., entered into the Repurchase Agreement. All references in this Objection to RBS are intended to refer to RBS including its predecessor in interest, Greenwich Capital Financial Products, Inc.

2008 are attached to the Declaration of Benjamin Mintz (the "**Mintz Declaration**") submitted herewith as Exhibits A, B, C and D, respectively.

9.     Pursuant to the terms of the Repurchase Agreement, Petra REIT pledged certain assets to RBS in exchange for cash in an amount set forth on the confirmation statement for each asset pledged to RBS.  Petra REIT then had the right and obligation to repurchase such assets from RBS on August 9, 2009 (or an earlier date if accelerated pursuant to the terms of the Repurchase Agreement).

10.     Included in the collateral pledged in connection with the Repurchase Agreement were Class F Notes due 2047 in the original principal amount of $33,000,000 (the "**Class F Notes**"), Class G Notes due 2047 in the original principal amount of $20,000,000 (the "**Class G Notes**") and Class J Notes due 2047 in the original principal amount of $42,500,000 (the "**Class J Notes**") issued by Petra CRE CDO 2007-1, Ltd. ("**Petra CDO**"), a non-debtor subsidiary of Petra REIT, pursuant to that certain Indenture dated as of June 27, 2007 (the "**CDO Indenture**").  A copy of the CDO Indenture is attached to the Mintz Declaration as Exhibit E. The Class F Notes, the Class G Notes and the Class J Notes were pledged by Petra REIT to RBS on June 27, 2007 in return for $72,575,000.  A copy of the applicable confirmation statement is attached to the Mintz Declaration as Exhibit F.  The Class F Notes and the Class G Notes were issued (and remain issued) directly in the name of RBS and are held by the Depository Trust & Clearing Corporation ("**DTC**") on behalf of RBS.  The Class J Notes were delivered to RBS's custodian pursuant to the terms of the Repurchase Agreement, together with an assignment in blank executed by an officer of Petra REIT.

11.     The CDO Indenture provides that the Class F Notes are senior in right of payment to, among others, the Class G Notes, the Class J Notes, the Class K Notes and the CDO

Preferred Shares.  Indenture §§ 11.1(a)(i)(33), 13.1(g)-(j).  As discussed below, the Class K

Notes and the CDO Preferred Shares constitute the JPM REIT Collateral.  Similarly, pursuant to

the CDO Indenture, the Class G Notes are senior in right of payment to, among others, the Class

J Notes, the Class K Notes and the CDO Preferred Shares and the Class J Notes are senior in

right of payment to the Class K Notes and the CDO Preferred Shares.  Indenture

§§ 11.1(a)(i)(33), 13.1(h)-(j).  Accordingly, the JPM REIT Collateral is in all respects

contractually subordinated to the RBS REIT Collateral.

    12.  On April 27, 2009, RBS provided written notice to Petra REIT that due to

an uncured event of default under the Repurchase Agreement, the repurchase date for all assets

was being accelerated to such date (the "**April 27, 2009 Notice**").  A copy of the April 27, 2009

Notice is attached to the Mintz Declaration as Exhibit G.  Pursuant to the terms of the

Repurchase Agreement, Petra REIT was then required to repurchase all assets held by RBS in

connection with the Repurchase Agreement.  Petra REIT did not repurchase the assets, and in

accordance with the terms of the Repurchase Agreement RBS was vested with full title to all

such assets and RBS's title was no longer subject to any right of repurchase or any other right,

title or interest in favor of Petra REIT.  Thereafter, from time to time, RBS sold certain of such

assets.  The proceeds of those sales have been applied by RBS to reduce the outstanding debt

under the Repurchase Facility.

    13.  As of the Petition Date, RBS has a claim under the Repurchase Agreement

of approximately $123.6 million, which amount gives effect to the proceeds of assets sold by

RBS and applied against RBS's claim, but does not give effect to the remaining unliquidated

assets owned outright by RBS (which RBS estimates to have a value of approximately $33.7

million).[3]  Accordingly, as of the Petition Date, RBS had a net claim of approximately $90

million against Petra REIT and against Petra Offshore (which guaranteed Petra REIT's

obligations under the Repurchase Agreement pursuant to that certain Parent Guaranty and

Indemnity dated as of August 10, 2006).  RBS has filed proofs of claim against each of the

Debtors consistent with the foregoing.  A copy of RBS's proofs of claim against Petra REIT and

Petra Offshore are attached to the Mintz Declaration as Exhibits H and I, respectively.

14.     On March 31, 2011, RBS provided written notice to Petra REIT (the

"**March 31, 2011 Notice**") that (i) Petra REIT's filing of a petition for relief under the

Bankruptcy Code was a further event of default under the Repurchase Agreement and (ii) in

accordance with section 14(B)(iii) of the Repurchase Agreement, RBS elected to provide Petra

REIT credit for (a) the Class F Notes, the Class G Notes and the Class J Notes in an amount

equal to $30 million and (b) the remaining unliquidated purchased loans in an amount equal to

$33,690,829 (in each case an amount reasonably determined by RBS to constitute the value of

such assets) against the outstanding amounts owing by Petra REIT under the terms of the

Repurchase Agreement.[4]  Repurchase Agreement § 14(B)(iii).[5]  A copy of the March 31, 2011

Notice is attached to the Mintz Declaration as Exhibit J.  Because the Repurchase Agreement

constitutes a "securities contract" and RBS is a "financial institution" within the meaning of the

---

[3] This estimate does not include the value of the Class F Notes, the Class G Notes and the Class J Notes (each as defined below).  As discussed below, following the Petition Date, RBS credited value for the Class F Notes, Class G Notes and Class J Notes against the outstanding obligations under the Repurchase Agreement.

[4] By comparison, in the Plan and Disclosure Statement, the Debtors have asserted that the aggregate value of the Class F Notes, the Class G Notes and the Class J Notes, is $150,000.

RBS intends to file amended proofs of claim reflecting a reduction of its aggregate claim based on the crediting set forth in the March 31, 2011 Notice.

[5] RBS recognizes that the Class J Notes remain subject to certain transfer requirements for which Petra REIT failed to comply including the delivery of a tax opinion to the effect that after such pledge, transfer or financing Petra CDO will continue to qualify for certain preferential tax treatment under federal tax law.

Bankruptcy Code, RBS was permitted pursuant to section 362(b)(6) and section 555 of the Bankruptcy Code to take such actions.

15.     More than a year before the commencement of the Chapter 11 Cases, the Debtors, J.P. Morgan Securities, Inc., as successor in interest to Bear Stearns Funding, Inc. ("**JPM**") and RBS engaged in restructuring discussions.  Ultimately, JPM and the Debtors reached agreement on the form of a plan support agreement, which was attached as an exhibit to the Affidavit of Lawrence Shelley Pursuant to Local Rule 1007-2 [Docket No. 2], but the Debtors were unable to reach an agreement with RBS.

C.     **Summary of the Plan**

16.     In an utter departure of its good faith obligations and its fiduciary duties, the Debtors' principal goal in respect of the Chapter 11 Cases and the Plan is apparently not maximizing value for the benefit of their creditors and their estates, but rather to protect the REIT qualified structure of non-debtor entities -- Petra CDO and other unspecified entities comprising the so-called "Petra enterprise" -- in order to avoid "potentially devastating financial consequences for the investors and noteholders in Petra CDO and [because] the underlying value of the entire [non-debtor] enterprise would be substantially diminished."  Disclosure Statement at 5.  Although the Debtors contend that the diminution in the value of the entire non-debtor Petra enterprise would also harm the Debtors and their estates, Disclosure Statement at 5, neither the particular harm nor the resulting benefit to the Debtors' creditors is at all explained in the Disclosure Statement.  In fact, the Plan notably fails to provide for the unsecured creditors to realize the benefit that the Debtors' estates purportedly realize from the preservation of the Petra enterprise including Petra CDO.  Rather, the unsecured creditors are left with recoveries that expressly do not include any of the residual benefits  or value that may be realized from preserving the Petra enterprise and Petra CDO.

17.     The Plan provides, among other things, for the following treatment:

- **RBS**: Under the Plan, RBS's secured claim will be exchanged for a new note (the "**New RBS Note**") secured by the Class F Notes, the Class G Notes and the Class J Notes (referred to in the Plan as the "**RBS REIT Collateral**"). The Debtors have valued the RBS REIT Collateral in the amount of $150,000, meaning that the New RBS Note will provide a stream of payments with a present value equal to $150,000. The Plan does not otherwise describe the terms of the New RBS Note. RBS's substantial deficiency claim will be treated as a general unsecured claim and participate in the general unsecured claim class (described below).

  The Plan also contemplates that RBS may make an election under section 1111(b) of the Bankruptcy Code to have its claims and the RBS REIT Collateral treated in accordance therewith (the "**1111(b) Election**"). In the event that RBS makes the 1111(b) Election, the Plan provides that the new note (the "**1111(b) Note**") (i) shall be in the face amount of RBS's claim, (ii) shall be calculated and structured so that the net present value of the total aggregate payments under the note shall be limited to the $150,000 present value that the Debtors have ascribed to the RBS REIT Collateral, and (iii) shall provide that annual cash flow from the RBS REIT Collateral in excess of the annual amount required to satisfy that year's obligation under the 1111(b) Note will be distributed to New REIT for distribution to New REIT's common stock holders.

  To the extent that RBS does not vote to reject the Plan, RBS and its affiliates, officers, directors, employees and agents will be included in the list of parties released under the Plan.

- **JPM**: Under the Plan, JPM's secured claim will be exchanged for a new note (the "**New JPM Note**") secured by a first priority lien on New REIT's shares of New REIT QRS 1 which will own JPM's existing collateral consisting of those certain Class K Notes due 2047 in the original principal amount of $32.5 million issued by Petra CDO pursuant to the CDO Indenture (the "**Class K Notes**") and those certain preferred shares in the original notional amount of $130 million issued by Petra CDO (the "**CDO Preferred Shares**" and together with the Class K Notes, the "**JPM REIT Collateral**"). The Debtors and JPM have stipulated in connection with the Plan that the amount of the New JPM Note to be provided to JPM will equal $14,598,737. The Plan does not otherwise describe the terms of the New JPM Note. JPM has agreed to waive its unsecured deficiency claim.[6] JPM and its

---

[6] JPM filed a proof of claim asserting a $17.7 million claim, meaning that its waived unsecured deficiency claim is approximately $3.1 million.

affiliates, officers, directors, employees and agents will be included in the list of parties released under the Plan.

- **General Unsecured Creditors**:  The Plan provides that the unsecured creditors will receive their pro rata share of the Debtors' other assets (*i.e.*, excluding the assets to be indirectly held by New REIT) which the Debtors estimate will result in a total distribution to unsecured creditors of approximately $1.5 million.  The Debtors have not provided an estimate of total general unsecured claims in the Plan but RBS believes that the total general unsecured claims exceed $150 million, meaning that the estimated distribution percentage for unsecured creditors under the Plan is less than 1%.

- **New Equity Holders**: The Plan calls for the creation of three new entities -- New REIT, New REIT QRS 1 and New REIT QRS 2.  New REIT QRS 1 will own PS SPV which shall continue to hold the JPM REIT Collateral, and New REIT QRS 2 will hold the RBS REIT Collateral (subject to RBS's lien securing the New RBS Note or the 1111(b) Note, as applicable).  New REIT will own 100% of the equity interests of New REIT QRS 1 and New REIT QRS 2.  The unspecified new equity holders will own 100% of New REIT and will be entitled to the excess cash flow and value in excess of the notes to be provided to RBS and JPM.

## ARGUMENT

### I.    THE DISCLOSURE STATEMENT FAILS TO PROVIDE ADEQUATE INFORMATION AS REQUIRED BY BANKRUPTCY CODE SECTION 1125

18.    The Disclosure Statement lacks information reasonably necessary to allow creditors including RBS to make an informed judgment regarding whether to support or oppose the Plan.  A disclosure statement must provide the information that is reasonably necessary to permit an informed judgment by creditors and parties-in-interest whether to vote in favor of or against a proposed plan of reorganization.  *In re Momentum Mfg. Corp.*, 25 F.3d 1132, 1136 (2d Cir. 1994).  Section 1125 of the Bankruptcy Code defines "adequate information," in pertinent part, as "information of a kind and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . .

that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant Class to make an informed judgment about the plan[.]"  11 U.S.C. § 1125(a)(1).

19.    The obligation to provide adequate information in a disclosure statement is a "pivotal concept in reorganization procedure" under the Bankruptcy Code.  *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988).  The determination of whether the disclosure statement has adequate information is made on a case by case basis. *Menard-Sanford v. Mabey (In re A.H. Robins Co.)*, 880 F.2d 694, 696 (4th Cir. 1989).  Relevant factors for evaluating the adequacy of a disclosure statement may include:

- a description of the available assets and their value;
- the anticipated future of the company;
- the estimated return to creditors under a Chapter 7 liquidation;
- the scheduled claims;
- the source of information stated in the disclosure statement;
- the present condition of the debtor while in Chapter 11;
- the future management of the debtor;
- financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the Chapter 11 plan; and
- information relevant to the risks posed to creditors under the plan.

*See In re Phoenix Petroleum Co.*, 278 B.R. 385, 394 n.6 (Bankr. E.D. Pa. 2001); *In re United States Brass Corp.*, 194 B.R. 420, 424-25 (Bankr. E.D. Tex. 1996).

20.    Here, the Disclosure Statement is deficient in a number of significant respects.  The Disclosure Statement should disclose, and analyze the implications on the viability of the Plan of, RBS's position, discussed below, that it owns the Class F Notes, the Class G Notes and the Class J Notes, and also disclose and analyze the effects of the March 31, 2011 Notice and RBS's actions in furtherance thereof.  Those events fundamentally alter the Debtors' ability to proceed with the Plan and should be disclosed and analyzed for the benefit of all creditors.

21.     The Disclosure Statement does not describe the terms of the New RBS Note or the 1111(b) Note in sufficient detail for RBS to meaningfully evaluate the proposed treatment of its secured claim.  For one, the Disclosure Statement does not specify the interest rate, maturity date, amortization schedule, and other relevant material terms of the New RBS Note or the 1111(b) Note.

22.     Further, the Debtors should explain how they expect to satisfy the feasibility requirement with respect to the 1111(b) Note.  Since RBS's claim is approximately $60 million (after giving effect to the $30 million credit for the Class F Notes, the Class G Notes and the Class J Notes and the $33.7 million credit for the other remaining unliquidated assets), it is hard to conceive how the Debtors can possibly provide for a feasible 1111(b) Note in view of the de minimis valuation that the Debtors have ascribed to the RBS REIT Collateral coupled by the fact that the Debtors are proposing to divert the annual cash flow from the RBS REIT Collateral for the benefit of the New REIT shareholders.  *See In re Apple Tree Partners, L.P.*, 131 B.R. 380, 395 (Bankr. W.D. Tenn. 1991) (plan not feasible where secured creditor was to be paid over seven years while debtor's use of rents depleted collateral); *In re Lakeside Global II, Ltd.*, 116 B.R. 499, 508 (Bankr. S.D. Tex. 1989) (plan calling for balloon payment after three years not feasible where court could only speculate as to where the funds would come from).  Similarly, the Debtors should explain how they expect to satisfy the feasibility requirement with respect to the New JPM Note.  In furtherance of the foregoing, the Debtors should provide detailed projections of the anticipated cash flow to be received by the RBS REIT Collateral and the JPM REIT Collateral from Petra CDO.

23.     The Debtors intend to disclose the value of the RBS REIT Collateral at confirmation and the amount of the RBS Claim Amount in the Plan Supplement (to be filed 7

days prior to the confirmation hearing) or at the confirmation hearing.  Under the Plan, the value

of the RBS REIT Collateral will constitute the principal amount of the New RBS Note as well as

the present value of payments to be made under the 1111(b) Note,[7] and the RBS Claim Amount

will constitute the face amount of the 1111(b) Note.  RBS should be provided that critical

information sufficiently in advance of the Plan voting deadline to be able to make an informed

voting decision.

24.     In sum, the Debtors need to provide significantly more detail regarding the

material terms of the New RBS Note and the 1111(b) Note for RBS in a meaningful and

intelligent manner to be able to evaluate the Plan and its proposed treatment of RBS's secured

claim, to determine whether to accept or reject the Plan, and to determine whether to make the

1111(b) Election.[8]

25.     The Disclosure Statement should also provide the factual and legal basis

for the Debtors' agreement to the $14.6 million JPM Stipulated Claim Amount, as well as the

factual and legal basis for the Debtors' valuation of the RBS REIT Collateral in the amount of

$150,000, particularly in view of JPM REIT Collateral's subordinated status to the RBS REIT

Collateral.

26.     The Disclosure Statement should disclose the identity of New REIT's

equity holders, their relationship to the Debtors, the Debtors' existing equity holders, the so-

called Petra enterprise and/or Petra CDO, and the estimated projected value of the equity

interests they will be receiving under the Plan.  The Disclosure Statement provides that the

---

[7] The Debtors assert a $150,000 value for the RBS REIT Collateral in the Disclosure Statement but also state that the value at confirmation will be disclosed in the Plan Supplement creating uncertainty.  It is unclear whether the Debtors intend to use the $150,000 value for purposes of the Plan Supplement.

[8] By separate motion filed contemporaneously herewith, RBS requests that the Court grant additional time for RBS to determine whether to make the 1111(b) Election because RBS has not been provided sufficient information to make an intelligent determination on the matter.

identity of the New REIT equity holders will be identified in the Plan Supplement. RBS and other creditors should be provided the identity and relevant relationship of the New REIT equity holders sufficiently in advance of the Plan voting deadline. The Disclosure Statement provides no detail on the anticipated value that is being diverted from creditors to the benefit of the new equity holders of New REIT.

27.     The Disclosure Statement should provide the Debtors' reasonable estimate of the amount of unsecured claims. The Disclosure Statement only states that the estimated distribution to Class 3 General Unsecured Claim totals $1.5 million, but does not provide any detail on the aggregate claims in Class 3. Unsecured creditors must know the total amount of unsecured claims in order to effectively evaluate their proposed treatment.

28.     Finally, the Disclosure Statement should provide additional details regarding the Settlement Payments including the source thereof and the Debtors' estimated value thereof.

29.     Based on the foregoing, the Disclosure Statement does not contain adequate information sufficient to enable RBS and other creditors to meaningfully and intelligently evaluate the Plan, determine whether to accept or reject the Plan, and in the case of RBS, determine whether to make the 1111(b) Election. Accordingly, the Motion should be denied or the Debtors directed to modify the Disclosure Statement to provide the information described above.

## II.     THE DISCLOSURE STATEMENT SHOULD NOT BE APPROVED BECAUSE THE PROPOSED PLAN IS UNCONFIRMABLE ON ITS FACE

30.     As explained by the court in *In re Phoenix Petroleum Co.*, 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001), "[i]f the disclosure statement describes a plan that is so 'fatally flawed' that confirmation is 'impossible,' the court should exercise its discretion to refuse to

consider the adequacy of disclosures." *Id.* (citations omitted); *see also In re Filex, Inc.*, 116 B.R. 37, 41 (Bankr. S.D.N.Y. 1990) ("Only those plans which have been proposed in good faith and patently comply with the applicable provisions of the Bankruptcy Code will pass muster for disclosure purposes."); *In re Beyond.com Corp.*, 289 B.R. 138, 140 (Bankr. N.D. Cal. 2003) ("Because the underlying plan is patently unconfirmable, the disclosure statement may not be approved."). As discussed below, the Plan is fatally flawed and patently unconfirmable.[9]

**A.** **The Plan Is Patently Unconfirmable Because the Plan Seeks to Administer Assets In Which the Debtors Do Not Have Any Right, Title or Interest**

31. The Plan is premised on the mistaken notion that Petra REIT owns the Class F Notes, Class G Notes and Class J Notes (*i.e.*, the RBS REIT Collateral) and that such notes serve as collateral securing RBS's claims under the Repurchase Agreement. *See* Disclosure Statement at 6, 9; Plan § 4.3. In that regard, the Plan provides that the Class F, Class G and Class J Notes will be transferred from Petra REIT to New REIT QRS 2 and that RBS will have a lien on the Class F Notes, the Class G Notes and the Class J Notes, which lien shall secure the obligations to RBS under the New RBS Note or the 1111(b) Note, as applicable. Plan § 4.3.

32. As of the date hereof, RBS, rather than the Debtor, in fact owns, possesses and holds all exclusive right, title and interest in the Class F Notes, Class G Notes and Class J Notes. Prior to the Petition Date, Petra delivered the April 27, 2009 Notice to Petra REIT which provided a notice of default and acceleration under the Repurchase Agreement. As of the Petition Date, the Class F Notes and Class G Notes were held by DTC, on behalf of RBS, and were registered in the exclusive name of RBS without condition, qualification or other limitation, and the Class J Notes were held in physical form, together with an assignment executed in blank,

---

[9] RBS believes that there are additional bases for denying confirmation of the Plan beyond those set forth in this Objection and reserves all of its rights to raise those objections at the confirmation hearing.

by RBS's custodian.  On March 31, 2011, RBS delivered Petra REIT the March 31, 2011 Notice

that (i) Petra REIT's filing of a petition for relief under the Bankruptcy Code was a further event

of default and (ii) RBS elected to provide Petra REIT credit for (a) the Class F Notes, the Class

G Notes and the Class J Notes in an amount equal to $30 million and (b) the remaining

unliquidated purchased loans in an amount equal to $33,690,829 against the outstanding amounts

owing by Petra REIT under the terms of the Repurchase Agreement.  Therefore, as of the date

hereof, the Debtors do not have any right, title or interest in the Class F Notes, the Class G Notes

or the Class J Notes.

        33.     As a consequence, the Plan on its face is fundamentally flawed and not

confirmable because it seeks to administer the Class F Notes, the Class G Notes and the Class J

Notes, which are not assets of the Debtors' estates within the meaning of section 541 of the

Bankruptcy Code.  *See In re Central Medical Center, Inc.*, 122 B.R. 568, 573 (Bankr. E.D. Mo.

1990) (plan was not confirmable because it improperly expanded the estate's reversionary

interest in a bond fund to a present possessory interest in violation of section 541(a)).

**B.      The Plan Is Patently Unconfirmable Because the Plan Plainly Fails to Satisfy
the Cramdown Requirements of Section 1129(b)**

        34.     Even assuming that the Debtors are permitted to administer the Class F

Notes, Class G Notes and Class J Notes, the Plan is otherwise unconfirmable in a number of

important respects.  RBS, the sole member of Class 1A, does not consent to the treatment set

forth in the Plan with respect to Class 1A.  Accordingly, the Plan cannot be confirmed unless,

among other things, the requirements of section 1129(b) are satisfied with respect to Class 1A.

The Plan unquestionably fails to satisfy section 1129(b) in numerous respects including that the

Plan is not fair and equitable, it provides for unfair discrimination and does not otherwise comply

with either section 1129(b)(2)(A)(i)(I) or section 1129(b)(2)(A)(i)(II) of the Bankruptcy Code. As such, the Plan is patently unconfirmable.

### 1.     *The Plan Unfairly Discriminates Against RBS*

35.     To satisfy the requirements of section 1129(b)(2), a plan cannot unfairly discriminate with respect to impaired classes that have not accepted the plan.  A plan unfairly discriminates when it treats similarly situated classes differently without a reasonable basis for the disparate treatment.  *In re Young Broad., Inc.*, 430 B.R. 99, 139-140 (Bankr. S.D.N.Y. 2010). Courts have considered the following factors to determine whether a plan discriminates unfairly: (1) whether there is a reasonable basis for discriminating; (2) whether the debtor can consummate the plan without discriminating; (3) whether the discrimination is proposed in good faith; and (4) whether the degree of discrimination is in direct proportion to its rationale.  *Id.* at 140 n.54.

36.     The Plan values the RBS REIT Collateral at $150,000 and the JPM REIT Collateral at $14.6 million, notwithstanding the fact that the RBS REIT Collateral is senior in right of payment pursuant to the terms of the CDO Indenture and notwithstanding the fact that the RBS REIT Collateral and the JPM REIT Collateral have the same obligor (Petra CDO) and are backstopped by the very same assets of Petra CDO.  There is no reasonable basis for this discriminatory treatment between JPM and RBS.  Nor is there any reason that the Debtors could not consummate a plan that did not unfairly discriminate against RBS.  Further, as discussed below, the Plan and the treatment set forth therein is not proposed in good faith.  Finally, the degree of discrimination -- $14.6 million vs. $150,000 -- is shockingly large and there is no apparent rationale that could support such a large disparity in treatment.  That substantial disparity cannot be justified by virtue of JPM's waiver of its unsecured deficiency claim, because only $1.5 million is to be distributed to unsecured creditors.  JPM's unsecured deficiency claim

is approximately $3 million and, by RBS's estimate, JPM would receive a recovery of no more than $300,000 based on its pro rata share of the estimated $1.5 million to be distributed to unsecured creditors.

37.     Based on the foregoing, the Plan quite clearly unfairly discriminates against RBS (even without regard to the fact that the subordination provisions of the CDO Indenture grant the RBS REIT Collateral a senior right of payment ahead of the JPM REIT Collateral).

### 2.     *The Plan is Not Fair and Equitable*

38.     The substantial disparity between the valuations of the RBS REIT Collateral and JPM REIT Collateral also contravenes the requirement that the Plan be fair and equitable.  A plan violates 1129(b)(2) if a senior creditor class receives more than the amount of its claims.  *In re Exide Techs.*, 303 B.R. 48, 61 (Bankr. D. Del. 2003) ("Courts have decided that 'a corollary of the absolute priority rule is that a senior class cannot receive more than full compensation for its claims'") (citation omitted).  If the RBS REIT Collateral is worth $150,000, as the Debtors have posited in the Disclosure Statement, then the JPM REIT Collateral cannot conceivably be worth more (let alone $14 million more) in view of its subordinated status to the RBS REIT Collateral and the fact that the obligor and underlying assets for the JPM REIT Collateral and the RBS REIT Collateral are the same.  Assuming that the Debtors' valuation on the RBS REIT Collateral is correct, the Plan necessarily violates 1129(b) by paying a premium to JPM above the value of its collateral.[10]

---

[10] Conversely, if the JPM Stipulated Claim Amount of $14.6 million in fact reflects the present value of the JPM REIT Collateral, that clearly demonstrates the extent to which the Debtors and the Plan have undervalued the RBS REIT Collateral.  In that case, RBS is not receiving the present value of its collateral because the New RBS Note and 1111(b) Note provide present value payments of only $150,000 and section 1129(b)(2) would remain unsatisfied.

39.     The Plan is also not fair and equitable with respect to the treatment proposed in connection with the 1111(b) Election.  Although the Debtors have not disclosed the proposed terms of the 1111(b) Note, due to the large disparity between the RBS claim amount (approximately $90 million, assuming that the Class F Notes, Class G Notes and Class J Notes are held to be property of the Debtors' estates) and the collateral value as posited by the Debtors ($150,000), the 1111(b) Note would likely provide for little to no current interest or amortization and have a significant balloon payment years or decades in the future.  Bankruptcy courts typically view negative amortization plans as highly suspect and rarely confirm such plans on the grounds that such treatment is not fair and equitable because of the substantial risk-shifting to the secured creditor, particularly where the Debtors have no apparent ability to make the substantial balloon payment based on the value of the collateral and its anticipated cash flow.  *E.g.*, *Sunflower Racing v. Mid-Continent Racing & Gaming Co. (In re Sunflower Racing)*, 226 B.R. 673, 688 (D. Kan. 1998) (negative amortization plan not fair and equitable where creditor would receive no principal payments for two years); *In re D & F Constr., Inc.*, 865 F.2d 673 (5th Cir. 1989) (negative amortization plan calling for a balloon payment after fifteen years was neither fair nor equitable); *In re Apple Tree Partners, L.P.*, 131 B.R. 380, 398 (Bankr.W.D.Tenn.1991) (seven year negative amortization plan not fair and equitable)*; In re Spanish Lake Associates*, 92 B.R. 875, 879 (Bankr. E.D. Mo. 1988) (plan calling for deferral and capitalization of interest for seven years not fair and equitable).

40.     In *In re D & F Constr., Inc.*, the secured creditor made the 1111(b) election and the debtor proposed a 15-year plan in which the outstanding amount of debt would drop below the principal amount only after twelve years.  *In re D & F Constr., Inc.*, 865 F.2d at 676.  The Fifth Circuit concluded that the plan was not fair and equitable where the payment

terms placed the secured creditor in a worse financial position than it was in at the time of confirmation.  *Id.*  Similarly, the plan in *Spanish Lake Associates* called for a balloon payment seven years after confirmation.  *In re Spanish Lake Associates*, 92 B.R. at 879.  The court noted that it would take 11 years for the level of debt to return to where it was on the date of confirmation, "and the Debtor's Plan provides no guarantees to ensure performance of the Debtor's projections."  *Id.*  The court concluded the plan's treatment of the secured creditor was not fair and equitable.  *Id.*

41.     Exacerbating the situation here is the fact that the Plan provides that "in the event RBS makes a 1111(b) Election, New REIT shall distribute to RBS an annual amount equal to the amount needed to satisfy that year's obligation under the 1111(b) Note, with any remaining RBS REIT Collateral Cash Flow being distributed to New REIT for distribution to the holders of New REIT's common stock."  Plan § 7.6.  Diverting annual cash flow from the RBS REIT Collateral to New REIT's shareholders is likewise not fair and equitable to RBS.  Every payment to New REIT common stock holders increases the likelihood that the 1111(b) Note will not be complied with and further unfairly shifts risk of the Plan's failure onto RBS.  *In re Miami Ctr. Assoc., Ltd.*, 144 B.R. 937, 942 (Bankr. S.D. Fla. 1992) (plan unfairly shifted risk onto secured creditor where creditor was required to wait ten years to be paid its secured claim, while potential upside went to the equity or residual claimants); *In re Apple Tree Partners, L.P.*, 131 B.R. at 405 (plan that deferred principal and interest payments to secured creditor, while utilizing rent collateral to fund plan, unduly shifted risk to secured creditor).

### 3.     The Plan Does Not Meet the Cramdown Requirements With Respect to RBS's Secured Claim and Further Violates the Fair and Equitable Requirement

42.     With respect to Class 1(A) (Secured Claims of RBS), the Plan provides for a structure under which RBS is to purportedly retain a lien on the RBS REIT Collateral and will

receive the New RBS Note payable over time in the principal amount of $150,000 (which is the Debtors' assessment of the current value of the RBS REIT Collateral). The Plan also permits RBS to make the 1111(b) Election in which case the 1111(b) Note will have a face amount of RBS's total $90 million claim[11] but will provide for payments with a net present value not greater than $150,000.

43. Although the Plan provides that RBS will retain a lien on the RBS REIT Collateral in the event it makes the 1111(b) Election, the Plan further provides that New REIT shall distribute annual cash flow from the RBS REIT Collateral in excess of the annual payments to be made to RBS under the 1111(b) Note to the shareholders of New REIT. As noted, although the Debtors have not disclosed the proposed terms of the 1111(b) Note, the 1111(b) Note would in all likelihood provide for little to no current interest or amortization payments and just have a significant balloon payment sometime in the future. This means that under the Plan virtually all of the near-term annual cash flow from the RBS REIT Collateral would be upstreamed to the shareholders of New REIT. As such, the Debtors' proposed treatment of the annual cash flow will substantially if not completely divert the value of the RBS REIT Collateral from RBS to the New REIT equity holders and improperly dissipates if not eliminates the required collateral grant to RBS. By potentially permitting substantial cash flow to be diverted to the New REIT equity holders, the Plan is dissipating RBS's liens rights and does not comply with section 1129(b)(2)(A)(i)(I) which requires that the secured creditor retain its liens without "substantial disruption of bargained for rights which accompany interests in property and collateral."

*CoreStates Bank, N.A. v. United Chem. Techs.*, 202 B.R. 33, 50 (E.D. Pa. 1996) (*quoting In re*

---

[11] More precisely, the Plan provides that the 1111(b) Note will be in the face amount of the RBS Claim Amount which is to be specified in the Plan Supplement. RBS believes that that amount should be approximately $90 million (assuming it is determined that the Debtors retain an interest in the Class F Notes, Class G Notes and Class J Notes).

*Hoffman,* 52 B.R. 212, 216 (Bankr. D.N.D. 1985)); *In re Miami Ctr. Assoc., Ltd.*, 144 B.R. 937, 941 (Bankr. S.D. Fla. 1992); *Ford Prods. Corp. v. Bank of New York (In re Ford Prods. Corp.)*, 159 B.R. 693 (Bankr. S.D.N.Y. 1993). Therefore, the Plan is not fair and equitable and is not confirmable.

44. In *CoreStates Bank, N.A. v. United Chem. Techs.*, the debtors proposed a plan that did not provide the secured creditor with a continuing lien on machinery and equipment and certain insurance funds, all of which had been subject to the creditor's prepetition lien. The court chose to "strictly interpret § 1129(b)(2)(A)(i)(I)," and stated that "this Court will not allow substantial disruption of bargained for rights which accompany interests in property and collateral." 202 B.R. at 50 (citation omitted). The court thus concluded that the plan did not comply with the section 1129(b)(2)(A)(i)(I) requirement that the secured creditor "retain" its liens. In that regard, the court observed that a plan should not be confirmed under section 1129(b)(2)(A)(i)(I) if there is "an open and notorious removal of the [secured creditor's] liens", *id.* at 49, and that

> it has become increasingly apparent from recent appellant decisions that the disruption of interests in property caused by bankruptcy cases must be minimal or non-existent . . . . The concern expressed throughout these appellate decisions is not to diminish or restrict interests in property, but to protect the wide scope of property interests . . . . Generally, the source of a creditor's interest in collateral is the terms and conditions contained in a security agreement reached with the debtor. Alterations of those terms and conditions disrupts the creditor's rights and interests in collateral. In that connection, this Court will not allow substantial disruption of bargained for rights which accompany interests in property and collateral.

*Id.* at 50 (*quoting In re Hoffman,* 52 Bankr. 212, 216 (Bankr. D.N.D. 1985)). A similar conclusion was reached by the court in *In re Miami Ctr. Assoc.* There, the court determined that section 1129(b)(2)(A)(i)(I) was not satisfied because the

plan did not provide for the secured creditor to retain a lien in all of the collateral

(specifically hotel revenue) that it held prepetition.  144 B.R. at 941.

45.     Additionally, pursuant to section 1129(b)(2)(A)(i)(II) of the Bankruptcy

Code, a plan must provide "that each holder of a claim of such class receive on account of such

claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of

the effective date of the plan, of at least the value of such holder's interest in the estate's interest

in such property."  The Disclosure Statement ascribed a value of $150,000 to the RBS REIT

Collateral and, based on that valuation, the Debtors' Plan provides that RBS will receive deferred

cash payments totaling $150,000, or, in the event RBS makes the 1111(b) Election, deferred cash

payments having a present value of $150,000.  RBS strongly disagrees with that valuation and

believes that the RBS REIT Collateral is worth tens of millions of dollars.[12]  In any event, the

Bankruptcy Code does not permit the Debtors to unilaterally value the RBS REIT Collateral.

Rather, it is the prerogative of this Court to determine that value.  *In re Apple Tree Partners,*

*L.P.*, 131 B.R. at 402 ("[T]he Court is required by the Code to determine a value 'in light of the

purpose of the valuation [(*i.e.*, confirmation)]'" (quoting section 506(a)); *In re Stanley*, 185 B.R.

417, 423 (Bankr. D. Conn. 1995) (a 506(a) hearing may be held at any time during the pendency

of a chapter 11 case to determine the value of a claim to be treated under a proposed plan).  For

the same reason, the Plan improperly provides that the total payments to be made under the

1111(b) Note will equal the amount of the RBS Claim Amount as specified by the Debtors in the

Plan Supplement rather than in the amount of RBS's claim as determined by this Court.  The

Bankruptcy Code requires the Court, not a debtor, to determine the allowed amount of a

---

[12] As noted above, in connection with the March 31, 2011 Notice, RBS credited the Debtors $30 million on account of the Class F Notes, the Class G Notes and the Class J Notes.

creditor's claim and it is that determination by the Court that should govern the terms of the 1111(b) Note for purposes of the Plan.  11 U.S.C. § 502.

46.     In that regard, in order to satisfy section 1129(b)(2)(A)(i)(II), the Debtor's Plan must provide that the New RBS Note will provide for payments with a present value equal to the current value of the RBS REIT Collateral at the time of confirmation of the Plan, as determined by this Court (as opposed to a value unilaterally advanced by the Debtors). Similarly, in order to satisfy section 1129(b)(2)(A)(i)(II), the Debtors' Plan must provide that the 1111(b) Note will provide for payments having a present value equal to the current value of the RBS REIT Collateral at the time of confirmation of the Plan, as determined by this Court (as opposed to a value unilaterally advanced by the Debtors) and will provide for aggregate payments in an amount equal to RBS's total allowed claim as determined by the Court (as opposed to a claim amount unilaterally advanced by the Debtors).  Since the Plan does not provide for the Court to determine the value of the RBS REIT Collateral for purposes of both the New RBS Note and the 1111(b) Note or for the Court to determine the amount of RBS's allowed claim for purposes of the 1111(b) Note, the Plan is not fair and equitable and is unconfirmable on its face.

47.     Section 1129(b)(2)(A)(i)(II) requires that a holder of a claim receive certain minimum cash payments totaling the allowed amount of such claim having a value at least equal to the present value of such holder's interest in the collateral.  The Plan does not satisfy that requirement because it only contemplates payments to be made to the extent of cash flow realized from the RBS REIT Collateral.  Plan § IV.H.6 ("The RBS Debt will be non-recourse debt secured only by, and payable solely from proceeds of, the continuing lien of RBS on the RBS Debt Collateral, which is the RBS REIT Collateral.").  This means that if there is no

cash flow from the RBS REIT Collateral, no payments need be made to RBS. Consequently, the Plan violates section 1129(b)(2)(A)(i)(II) because it does not provide that RBS will actually <u>receive</u> payment of the RBS Debt.

48. As a further result of this proposed structure, RBS's ability to foreclose and otherwise exercise remedies against its collateral is effectively eliminated. Because payments are only required under the Plan to be made to RBS to the extent of actual cash flow from the RBS REIT Collateral, RBS is unable to exercise its remedies even if it does not receive any payments whatsoever. RBS's complete inability under the Plan to exercise foreclosure rights and other remedies even if it does not receive the payments expressly required by the Bankruptcy Code further establishes that the Plan is not fair and equitable. *In re D & F Constr., Inc.*, 865 F.2d 673, 676 (5th Cir. 1989); *In re Apple Tree Partners, L.P.*, 131 B.R. 380, 397-98 (Bankr. W.D. Tenn. 1991).

**C.  The Plan Clearly Is Not Feasible**

49. Bankruptcy Code Section 1129(a)(11) requires that the plan is not likely to be followed by liquidation or the need for further financial reorganization. *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988). The feasibility standard is whether the plan offers "a reasonable assurance of success." *Id.* Courts have considered the following factors when determining if a plan is feasible: (1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; (4) the ability of management; (5) the probability of the continuation of the same management; and (6) any other related matters which determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan. *In re Landmark at Plaza Park, Ltd.*, 7 B.R. 653, 659 (Bankr. D.N.J. 1980) (citing COLLIER ON BANKRUPTCY ¶ 1129.02 (15th ed. 1980)).

50.     If RBS makes the 1111(b) election, the Plan cannot offer any reasonable assurance of success.  The Debtors simply have no way of making the required payments of approximately $90 million due under the 1111(b) Note, even if those payments are deferred for a lengthy time period.  The Debtors have not demonstrated that they have the cash flow or other assets necessary to make such payments, even if required to be made several years from now. Making matters worse, the Debtors propose to divert the annual cash flow from the RBS REIT Collateral in excess of the required annual payments under the 1111(b) Note to the New REIT equity holders further undermining the possibility that the reorganized Debtors will be able to perform its obligations under the 1111(b) Note.

51.     Similarly, the Debtors have no reasonable ability to perform their obligations with respect to the New JPM Note.  The New JPM Note will be in the amount of $14.6 million, but the Debtors have not established that there is sufficient cash flow or value in the underlying assets for the Debtors to be able to reasonably perform their obligations under the New JPM Note.  To the contrary, the Debtors' contention that the RBS REIT Collateral is worth only $150,000 clearly undermines any argument that there is sufficient cash flow or value in the underlying assets for the  reorganized Debtors to be reasonably able to perform the obligations under the New JPM Note.

52.     Under the circumstances, the Plan is patently not feasible.  *See In re Apple Tree Partners, L.P.*, 131 B.R. at 395; *In re Lakeside Global II, Ltd.*, 116 B.R. at 508; *In re Edgewater Motel, Inc.*, 85 B.R. 989, 997 (Bankr. E.D. Tenn. 1988) (plan not feasible where debtor's ability to retire secured creditor's claim after ten years was at best speculative); *In re White*, 36 B.R. 199 (Bankr. D. Kan. 1983) (30 year plan not feasible where, among other things, debtor presented no reliable projections of expected earnings); *See also* COLLIER ON

BANKRUPTCY ¶ 1129.05(5) (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.) ("If the court determines that the debtor or the debtor's successor cannot reasonably be expected to earn a sufficient amount after confirmation to make the required deferred payments, the court cannot confirm the plan since the plan will fail to comply with the feasibility requirement contained in section 1129(a)(11) of the Code").

53.     In the Disclosure Statement, the Debtors explain that feasibility is satisfied because payments on the New RBS Note and the 1111(b) Note are only required to be made to the extent of cash flow generated from the RBS REIT Collateral and therefore there is no risk that the Plan will cause a further liquidation or reorganization.  Disclosure Statement at 37.  That is not sufficient to meet the feasibility standard.  The Debtors must establish a "reasonable assurance" that the obligations under the Plan, including in respect of the New RBS Note and the 1111(b) Note, can be performed.  The Debtors have not offered any evidence in support thereof nor have they even attempted to do so.

**D.     The Plan Was Not Proposed in Good Faith**

54.     The Debtors' Plan has not been proposed in good faith, as required by section 1129(a)(3).

55.     The Debtors have presented a Plan structure that is clearly not intended to maximize recoveries for the estates and their creditors but rather, as evidenced by the Disclosure Statement and the Motion, is alarmingly geared toward preserving and protecting the non-debtor Petra enterprise and Petra CDO for the benefit of Petra CDO's investors and shareholders.  The Disclosure Statement emphasizes the importance of preserving the REIT qualified structure of the Petra enterprise and/or Petra CDO for the benefit of the investors and noteholders in Petra CDO.  Disclosure Statement at 5.

56. Similarly, the Motion emphasizes the Debtors' concern for parties other than its creditors:

> An important component of Petra is that its integrated structure qualifies for tax and other financial benefits available to real estate investment trusts, which includes [Petra] REIT's direct and indirect ownership of certain equity and debt interests in [Petra CDO]. Ultimately, the CDO effectively provides financing for a substantial portion of Petra's real estate transactions. <u>The CDO, in turn, has several senior noteholders who are primarily substantial financial and similar institutions, which means that these cases have broader potential social and societal ramifications.</u>

Motion ¶ 10 (emphasis added). The Motion continues by stressing that the preservation of the REIT structure is essential for avoiding an adverse effect on the investors and noteholders of the non-debtor Petra CDO:

> To the extent a creditor of the Debtors (all of whom are structurally subordinated to the CDO's senior noteholders) was able to interfere with the REIT qualified structure of the Petra enterprise and/or the CDO, <u>there would be potentially devastating financial consequences for the investors and noteholders in the CDO</u> and the underlying value of the entire enterprise would be substantially diminished, to the ultimate detriment of all involved, including the Debtors and their estates.

Motion ¶ 11 (emphasis added).

57. The Debtors do pay lip service that the preservation of the REIT structure will benefit the Debtors and their estates (Motion ¶ 11; Disclosure Statement at 5), but fail to explain how the estates are actually meaningfully benefited from such preservation. Quite clearly, the creditors (other than JPM) do not realize any of that benefit under the Plan. The unsecured creditors are allocated a pool of de minimis assets that will yield approximately $1.5 million for the approximate $150 million to $200 million in unsecured claims (less than a 1% distribution), and are not entitled to <u>any</u> of the value resulting from the preservation of the REIT structure and Petra CDO. Instead, the entire upside value from the REIT collateral is distributed

to the Debtors' new equity holders and, as such, those new equity holders who are to be identified in the Plan Supplement and who presumably consist of the existing equity holders and/or "friends and family" of the Petra enterprise are the sole beneficiaries of that value.

58. The Debtors' lack of good faith is also highlighted by the fact that the Debtors are prepared to devote substantial estate resources to the detriment of its creditors in an effort to preserve assets that the Debtors have contended are only worth $150,000. To the extent that the Debtors honestly believe that the RBS REIT Collateral only has a value of $150,000, the Debtors should simply abandon those assets to RBS and thereby save the estates and their creditors the resources that will need to be expended to undertake a confirmation battle.[13] The Debtors refusal to do so makes clear that the Debtors are prepared to disregard their fiduciary duties and expend estate resources in order to fight to grab the value in the RBS REIT Collateral for the benefit of non-debtor parties that are not creditors of the Debtors' estate, with the costs of that fight borne by the Debtors' creditors.

59. In connection with the Plan and Disclosure Statement, the Debtors have asserted that the value as of Plan confirmation of the RBS REIT Collateral, consisting of the Class F Notes, the Class G Notes and the Class J Notes, is $150,000. Yet, the Debtors have stipulated with JPM to a value of $14.6 million for the JPM REIT Collateral, consisting of the Class K Notes and the CDO Preferred Shares. As detailed above, pursuant to the CDO Indenture, the JPM REIT Collateral is in all respects contractually subordinated in right of payment to the RBS REIT Collateral. Moreover, both the RBS REIT Collateral and the JPM REIT Collateral have the same obligor (Petra CDO) and are backstopped by the same underlying assets (assets of Petra CDO). It is thus hard to reasonably or fairly conceive in good faith how

---

[13] In connection with such abandonment, the Debtors should be required to cooperate so RBS can satisfy the transfer requirements that are applicable to the Class J Notes.

the JPM REIT Collateral could under these circumstances possibly be valued at $14.6 million while the RBS REIT Collateral is only valued at $150,000.

60. Notably, the Debtors developed and filed the Plan without any negotiation whatsoever with RBS. The Debtors did not attempt at all during or immediately prior to the Chapter 11 Cases to undertake any negotiations, in good faith or otherwise, with RBS in the development and formulation of the Plan.[14] This is fairly telling in view of RBS's status as the Debtors' largest secured and unsecured creditor, and evidences the Plan's lack of good faith and the Debtors' lack of good faith interest in their creditors and their failure to discharge their fiduciary duties to creditors.

61. Based on the foregoing, the Plan has not been filed in good faith and there are serious questions about whether the Debtors are properly discharging their fiduciary duties to their estates and their creditors.

**E.    The Plan Violates the Absolute Priority Rule**

62. It also appears that Plan will not satisfy the absolute priority rule. KBS and RBS have indicated their strong opposition to the Plan and control a supermajority of the general unsecured class (and if RBS makes the 1111(b) Election, then KBS would control a supermajority of the unsecured class in its own right), meaning that the general unsecured creditors class will be a rejecting class. Although the identity of the New REIT equity holders have not been identified in the Disclosure Statement, counsel for the Debtors has advised that the New REIT equity holders will include one or more of the existing equity holders or their affiliates. Therefore, the absolute priority rule is plainly violated by the Plan's proposed treatment of a de minimis distribution to unsecured creditors and old equity's retention of equity

---

[14] The Debtors and RBS had previously engaged in restructuring negotiations prior to the Petition Date, but those negotiations ended more than a year prior to the Petition Date.

interests in New REIT.  *See Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202 (1988) (plan violated the absolute priority rule where equity holders would retain an equity interest in reorganized farm and a dissenting class of unsecured creditors would not be paid in full); *Dish Network Corp. v. DBSD N. Am., Inc. (In re DBSD N. Am., Inc.)*, 2010 U.S. App. LEXIS 27007, at \*32 (2d Cir. Dec. 6, 2010) (plan violated the absolute priority rule where unsecured creditor would receive less than the value of its claim while existing shareholder would receive shares and warrants in the reorganized entity).

## **CONCLUSION**

WHEREFORE, RBS respectfully requests that the Court deny the Motion and grant such other and further relief as is just and proper.

Dated:  March 31, 2011
          New York, New York

                                  KAYE SCHOLER LLP
                                  Counsel for RBS

                                  _s/ Benjamin Mintz_
                                  Benjamin Mintz
                                  425 Park Avenue
                                  New York, New York  10022
                                  Telephone:  (212) 836-8000
                                  Facsimile:  (212) 836-8689